JUDGE DAVID GUADERRAMA

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS**

**CIVIL CASE NO. _____**

**BEATRIZ HUML, ON BEHALF OF THE UNITED STATES OF AMERICA,**

**PLAINTIFF/ RELATOR**

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

**V.**

**THE STATE OF TEXAS IN ITS CAPACITY AS A MEMBER OF THE JOINT STATE-FEDERAL MORTGAGE SETTLMENT TASK FORCE**

**DEFENDANT**

**QUI TAM COMPLAINT**

*"We cannot have a just society that applies the principle of accountability only to the powerless and the principle of forgiveness to the powerful."*
*— Christopher Hayes, Twilight of the Elites: America After Meritocracy*

**I.**

Comes now RELATOR BEATRIZ HUML who brings this "Qui Tam" action (hereinafter the "action") in the name of Texas homeowners and the United States of America, by and through her attorney Richard A. Roman and alleges as follows.

**II.**

**SUMMARY/ INTRODUCTION:**

This Qui Tam action is brought by Relator Beatriz Huml on her own behalf, on behalf of the United States of America and other individuals (homeowners) similarly situated against Defendant, a participant in the state attorneys general collectively comprising the plaintiffs in the so-called 49-state National Mortgage Settlement a/k/a "Joint State-Federal Mortgage Settlement". This consortium of states successfully sought homeowners' redress against 5 nationally chartered banks and mortgage servicers for,

ostensibly, "illegal or wrongful foreclosure practices" among other actions.

At the time of the genesis of this complaint, the lead attorney general for the "Joint State-Federal Mortgage Settlement" was then-Texas Attorney General Greg Abbott. Presently, the Honorable Ken Paxton is Texas' Attorney General.

Under the leadership of Assistant Attorney General James Daross, The Texas Attorney General's Office lead plaintiff negotiations. Daross spearheaded efforts that recovered substantial penalties and damages for homeowners pursuant to the nationally touted settlement.

Relator Huml posits that Texas (and the other defendant attorneys general respectively) as a state sovereign made, at-best, ambiguous and irregular statements and/or actions; Or, at worst, deceptive and fraudulent actions and declarations with respect to the receipt, disbursement and illegal diversion of settlement funds by legislative fiat. This was to the detriment of the intended Texas recipients.

Precedent, necessity and authority exists for this type of complaint. The complaint is timely and ripe. As proof reference is made to a pending Texas criminal court review of the state constitutional authority regarding recent executive actions by Texas Governor Rick Perry (Exhibit "1").

A pending criminal indictment against the governor alleges abuse of authority of an legislative office. Thus far the indictment has survived several aggressive defensive attacks that the indictment on coercion and abuse of office charges is not "clearly stated and legally justified". The indictment argues this type of governmental executive action is not "constitutionally allowed", specifically that the "procedures (a veto of legislative funds appropriation) used to obtain it" are illegal.

The constitutional questions are on appeal. From a prosecutorial vantage point sufficient legal and factual evidence supports the indictment. The opposing argument frames the question in that, Governor Perry needs more "specificity" to understand how

he is accused of "violating his oath of office to uphold the laws of the state" (Dallas Morning News, April 20, 2015).

III.

**JURISDICTION & VENUE:**

This action arises under the False Claims Act, 31 U.S.C.§ 3729 ): "False claims (a) LIABILITY FOR CERTAIN ACTS.— (1) IN GENERAL.—Subject to paragraph (2), any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true.

This Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question.). Jurisdiction is also pursuant to "diversity of the parties".

Venue is proper in this honorable court located within the Western District of Texas pursuant to 31 U.S.C. § 3732(a) because: (I) The lead, negotiating attorney general is the State of Texas; (ii) The State of Texas transacted negotiations and other business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) the named defendant committed acts proscribed by 28 U.S.C. § 3729—acts giving rise to this action—within this district, particularly in El Paso County, Texas..

Relator Huml served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing relevant material evidence she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2) before filing this complaint. Relator Huml has, thus, complied with all other conditions precedent to

bringing this action.

Relator Huml is not a direct or proximate source, original or otherwise, of any publically disclosed information. Huml does not have any direct, proximate or independent knowledge of, any or all publicly disclosed information upon which any allegations herein might be deemed based. To the extent possible or necessary, Relator has voluntarily provided such information to the Government before filing this action.

## IV.

Specific disclosures include: Exhibits 1, 2a & 2b, 3, 4, 5, 6, 7a - 7b - 7c - 7d - 7e, 8, 9, 10 and 11.

## V.

**RELATOR'S BACKGROUND:**

Relator Huml is herself a victim of wrongful foreclosure. She was owner of purchase-money, homestead real estate located within El Paso County, Texas identified municipally as (1) 4312 Hueco, El Paso, Texas 79930 and (2) 4318 Hueco, El Paso, Texas 79930 (Exhibit "2a").

Huml litigated her complaints extensively in state and federal forums. Relator unsuccessfully argued that she was subjected to illegal and wrongful foreclosure, wrongful evictions and actions by national banks, servicers and other banking-related entities e.g., MERS (the "Mortgage Electronic Registration Service"). Huml buttressed her claims with probative evidence (a power point presentation) to the courts that, among other things, **"robosigned" documents** were used in a unbridled, widespread fashion to foreclosure on her and countless other homeowners. It is no secret to anyone anywhere that homeowners such as Huml are among the constellation of homeowners in El Paso County and across the country to suffer this fate (Exhibit "3")

Relator did not secure any relief of any sort in any forum or any venue anywhere. Huml now seeks relief by way of the instant complaint (Exhibit "2b").

VI.

**PARTIES:**

Relator Beatriz Huml is a citizen of the State of Texas (El Paso County, Texas).

Defendant State of Texas is represented by elected attorney general, The Honorable Ken Paxton, with a principal office located at 300 W. 15th Street, Austin, Texas 78701.

VII.

**BACKGROUND:**

In 2008 the United States found itself immersed in a economically driven financial crisis, the so-called "mortgage meltdown". In response a "Joint State-Federal Mortgage Settlement Task Force" was created. In 2012 the task force, composed of 49 State Attorneys General announced it successfully negotiated a settlement to benefit aggrieved homeowners. The result: the nation's five largest banks agreed to a 2.5 billion dollar settlement on charges of "fraudulent foreclosure practices", etc. (Exhibit "4" & "5").

The State of Texas' portion of the $2.5 billion ("in direct state payments stemming from the historic settlement") was 134 million. Texas reportedly received the third largest of all state payments, behind only California and Florida. The reason provided was because of the "extent of the damage Texans homeowners suffered".

Texas homeowners were given the impression through releases from the Texas Attorney General's Office that relief was "on the way". The reality could not have been more illusory. Homeowner relief and foreclosure prevention programs was clearly the last thing on the minds of Texas officials as Texas instead diverted these funds into the Texas General Fund. Specifically, 10 million went to the Texas Judicial Fund and 124 million to the Texas General Fund (Exhibit "6").

Accordingly, the funds were subject to "appropriation" for <u>anything but homeowner relief</u> e.g., Texas Indigent Criminal Defense programs. To this day the nexus between incarcerated, indigent criminal defendants and mortgage and property tax-paying homeowners is anybody's guess because the connection has never been "defined".

As curious and shameful as this diversion by the Texas Legislature was, it was not an isolated event. Other states similarly shortchanged their homeowners or "tax-paying constituents". Texas' actions though, put it among the worst settlement violators.

Others include: (1) The State of Georgia devoted its $99 million for "corporate tax incentives"; (2) South Carolina used $10 million for corporate "tax incentives" with the rest of its $31 million going into its "general fund"; (3) Missouri used all of its $40 million settlement to fill the "gap" initially made after large cuts to higher education; and (4) New Jersey used "creative accounting" to put its money into, like Texas, the "general fund".

In fairness note: Alabama, Colorado Illinois and North Dakota did utilize funds for some housing-related programs (Exhibit "6") .

The result is now many states now face this paradox: Could that particular state end up getting sued over how it spends the spoils from its own lawsuits? A tug-of-war over the homeowner relief settlements is now, counter intuitively, the subject of fierce debate within those states. These funds were intended for affordable housing, consumer and foreclosure relief. In deed the settlement language itself contemplates as much.

California's situation underscores the nefarious consequences of Texas' diversion of funds. California Governor Jerry Brown diverted settlement money earmarked for foreclosure-relief programs towards the state budget. Then, in 2014 California incurred a budget surplus. Governor Brown was pressed by housing advocates to redirect the funds to foreclosure programs. When Governor Brown would not relent, he was sued. California now faces a real budget quagmire in the form of a severe, statewide drought.

The State of New York found itself in a similar situation. A well-known nonprofit organization called "Habitat for Humanity" and "LiveOn NY" sounded similar complaints and threatened legal action. More recently, New York Governor Cuomo and Attorney General Eric Schneiderman waged a very public battle over New York's portion of a $613 million settlement with JP Morgan Chase Bank. That settlement articulated that 85 percent of these funds were earmarked for foreclosure prevention, to ameliorate the effects of the foreclosure crisis, and for financial fraud prosecution (deceptive trade practices). The results have yet to be seen.

## IIX.

Arizona Governor Jan Brewer and the state legislature appropriated $50 Million from its portion of the settlement to build new prisons. Critics argue that the funds were subjected to a legislative "shell game" to disguise this action. They state that new, unnecessary prisons will be built in the face of competent data showing Arizona's prison population on the decline. How many families will suffer at the hands of the misguided Arizona leadership is clearly an afterthought in the Grand Canyon State..

Other settlements with like questions involve Ocwen Financial Corporation ($100 million), Citigroup ($92 million) and Bank of America ($300 million). All describe how the money is supposed to be utilized.

Ocwen posits it is "to be used by the State of New York for housing, foreclosure relief, and community redevelopment programs supporting New York's housing recovery."

The Bank of America settlement reads: "The payment to the State of New York shall be used, to the maximum extent possible, for purposes of redeveloping and revitalizing housing and home ownership and rebuilding communities in the State, and for programs intended to avoid preventable foreclosures, to ameliorate the effects of the foreclosure crisis, to provide funding for housing counselors and legal assistance, housing remediation and anti-blight projects, to enhance housing code compliance efforts aimed at addressing blight and disinvestment, and to enhance efforts to remediate the effects of financial fraud or unfair or deceptive acts or practices."

The agreement with Citigroup uses almost identical language.

## TEXAS' UNLAWFUL DIVERSION OF SETTLEMENT FUNDS:

In Texas, because of the complexity of the mortgage market and the agreement (which will be performed over a three year period) borrowers will not immediately know if

they are eligible for relief. Generally speaking, for loan modifications and refinance options, borrowers may be contacted directly by one of the five participating mortgage servicers.

A settlement administrator was "designated by the attorneys general" to send claim forms to eligible persons or foreclosure victims. Homeowners were advised that if their loan was serviced by one of the 5 settling banks, to contact the servicer and inquire about their eligibility.

In that regard, lead Assistant Texas Attorney General James Daross out of the El Paso, Texas office was on the Executive Committee in over a dozen multi-state cases. The cases ran the gamut of mortgage complaints including deceptive trade practices, predatory lending and mortgage servicing. Matters were successfully concluded against Ameriquest, Countrywide, Wells Fargo, Ocwen Financial and others, which together brought in over $185 million in attorney's fees, restitution to consumers, civil penalties and other payments to the State of Texas. Some "$400 million in non-cash benefits to Texas consumers" was touted.

Daross explains how, when and why Texas' funds were diverted (Exhibit "7a" and "7b").

Daross and this same El Paso office received the US Attorney General's Award for Distinguished Service (the first time that award has been given to non-employees of the US Department of Justice) for having represented the State of Texas in the multi-state, DOJ and HUD negotiating  team for the $26 billion National Mortgage Servicing Settlement against Ally Bank, Bank of America, Citibank, JP Morgan Chase, and Wells Fargo. The settlement amount was publicized as "the largest joint state-federal settlement in history".

Yet, Texas continues to have a high number of completed foreclosures. Countless, faceless Texans continue to be at risk at an alarming rate to lose their homes to foreclosure. This alarming rate combined with high mortgage delinquency rates and

chronically low credit scores signals that Texas' (and the national) foreclosure crisis is far from over.


**EL PASO COURTS SUBJECTED TO FORUM SHOPPING:**

Note that the El Paso Texas judiciary seems to have the enviable "distinction" of being "ground zero" for million dollar, state court mortgage settlements. 3 multimillion dollar lawsuits and settlements **were filed and settled** in a incredible, miniscule amount of time (see "7c, 7d and 7e"). The Texas Attorney General's El Paso Office was the lead negotiator for plaintiffs in other matters (Exhibit "8").


**LARGE BANK'S DISDAIN AND CONTEMPT FOR EL PASO JUDICIARY:**

If the above was not enough cause for concern regarding transparency in this litigation,   consider the following.

Outside counsel for AHMI, Robert ("Rob") Mowrey of the Locke Lord law firm and AHMI General Counsel Eric J. Spett were present at a March 24, 2014 hearing in El Paso's 448th district court sitting alongside with Assistant Texas Attorney General James Daross. Opposite them was opposing counsel Roman. During said hearing Mr. Mowrey had the audacity to mock Judge Sergio Enriquez's finding of judicial notice that both defense counsel for AHMI (the target of a large lawsuit by the Texas Attorney General) and Mr. Daross were seated at the same table - even though they were opponents in the very same litigation (see "Exhibit 8" and 448th district court transcript March 24, 2015).

Mr. Lowery's lack of professionalism towards Judge Enriquez, a dignified, qualified and duly-elected Hispanic Judge, is a reminder of the Arabian proverb**, *"Arrogance diminishes wisdom".***


Finally, efforts by Texas legislators to do the right thing have gone unnoticed. State Sen. Eddie Lucio, D-Brownsville, and Rep. Sergio Munoz, D-Palmview tried last session to direct a portion of Texas' settlement by filing legislative riders to finance an affordable

housing trust fund, provide homeless services, assist veterans repay loans, foreclosure assistance and affordable housing (Exhibit "9").

Predictably those riders suffered a quick, quite death in a short-sided budget negotiation. It's open to debate whether the current Texas legislative session will seize the opportunity to do any different i.e., mandate settlement dollars be placed into programs to help people injured by the foreclosure crisis rather than subject the funds to the appropriation process (Exhibit "10").

However, on this issue "The jury is out".

So far Texas' hardworking families have not received the assistance they need. There is no debate that the mortgage crisis has been and continues to be a drain on the Texas economy.

The upshot: These settlement funds offer stop-gap cash that **does not come from taxpayers.** Rather, the funds are **for the taxpayer**.

Without the homeowners, there would be no settlement. None of these states would have received a penny. The State of Texas unjustly enriched itself by allowing this "disingenuous enterprise" victimize the very citizens the Texas Attorney General has a duty to protect.

The settlement from the suits filed in El Paso were as a result of the unlawful activity that saw Texas homeowners unmercifully pillaged. The settlement was to supposed to make "the borrowers whole". Through this scheme Texas enjoyed a highly-profitable, money-making business for itself, albeit when Texas wasn't the party who suffered the injury.

To date, the Texas Legislature has not acted on the opportunity to help Texas homeowners.

## IX

**THE NATURE OF DEFENDANT'S SCHEME:**   (Exhibit "11").

**M**arking of the inception of the timeline;

A list of potential witnesses;

Recitation of how homeowners may have been harmed, the legal authority for the claims that defendants actions are illegal and false, and the applicable regulations;.

Falsity of the defendants actions and how the Relator discovered this;

Actions Relator has taken to expose the illegal diversion.

## XI.

*"The probability that we may fail in the struggle ought not to deter us from the support of a cause we believe to be just." President Abraham Lincoln*

COUNT I:   Defendant's violations of the False Claims Act

Each of the foregoing allegations is realleged and incorporated hereby.

As described in this Qui Tam Complaint, the defendant, by and through its officers, agents, and employees: (i) knowingly diverted, or caused to be diverted, to or within the respective state government foreclosure settlement funds to the detriment of the intended recipients (the affected party) Texas homeowners under false or fraudulent pretenses and without prior approval; (ii) knowingly made, used, or caused to be made or used, a false statements, records or utterances in order to divert settlement funds in the manner herein described; and (iii) knowingly made, used, or caused to be made or used, a false records or statements in an effort to conceal, avoid, or decrease the public's knowledge that said settlement funds were diverted in the manner described.

The Defendant authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

The United States Government, homeowners and the public's fiscal status have been damaged as a result of Defendant's violations of the False Claims Act.

**PRAYER:**

**WHEREFORE,** Relator Beatriz Huml, on behalf of herself, homeowners across Texas and the United States Government itself, prays as follows:

(i.)  That this Court enter a judgment against Defendant in an amount equal to three times the amount of damages homeowners and the United States has sustained as a result of Defendant's violations of the False Claims Act;

(ii.)  That America receive all relief to which either or both may be entitled at law or in equity;

(iii.) That this Court enter a judgment against Defendant for a civil penalty of $10,000 for each of Defendant's violations of the False Claims Act;

(iv.) That Relator Bea Huml recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(v.) That Relator Huml be awarded reasonable attorneys' fees in bringing this action;

(vi.) That in the event the United States Government proceeds with this action, Relator Huml be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

(vii.) That in the event the United States Government does not proceed with this action, Relator Huml be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

(iix.) That Relator Huml be awarded pre-judgment and post-judgment interest;

(ix.) That a trial by jury be held on all issues so triable such that that Relator, homeowners and the United States of America be made whole.

## X.

**JURY DEMAND AND PRAYER:**

Plaintiffs request a trial by jury and pray for further relief as plead hereinbefore.

Respectfully Submitted,

/s/ *Richard A. Roman*
**RICHARD A. ROMAN, ESQ.**
SBN 00789595
1018 Brown Street
El Paso, Texas 79902
915 351-2679 (Telephone)
915-351-6754 (Facsimile)
rromanattorney @yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on May ___, 2015 a true and correct copy of the foregoing instrument has been forwarded to the attention of Office of the Attorney General of the United States, The United States Department of Justice, The United States Attorney for the Western District of Texas (askdoj@usdoj.com) and via the CM/ ECF electronic filing system, and the Texas Attorney General's Office at ken.paxton@texasattorneygeneral.org and regular mail.

/s/ Richard A. Roman, Esq.

**STATE OF TEXAS**        )

                                  )      **VERIFICATION**

**COUNTY OF EL PASO**      )

Before me, a Notary Public, in and for El Paso County, Texas, on this day personally Appeared Beatriz Huml , who being by me first duly sworn, says that he/she has read the above and foregoing and that it is in every particular true and correct to his/her own personal Knowledge and belief.

_Beatriz Huml_
Print Name

_Bet Huml_
Signature

SUBSCRIBED AND SWORN TO BEFOR ME on May 1 2015

_[signature]_
Notary Public's Signature

Staci Anderson
[Notary's typed or printed name]

My commission expires: March 12, 2016

Staci Nicole Anderson
Notary Public, State of Texas
My Commission Expires:
March 12, 2016

No. D1DC14 100139

Filed in The District Court
of Travis County, Texas

AUG 15 2014
5:30 A.M.
Rodriguez-Mendoza, Clerk

The State of Texas v. James Richard "Rick" Perry

## INDICTMENT

**Count I - Abuse of Official Capacity 39.02 DPS 23990064**
**Count II - Coercion of Public Servant 36.03 DPS 13990027**

In the 390th Judicial District Court of Travis County, Texas

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:**

**THE GRAND JURY** for the County of Travis, State of Texas, duly selected, empanelled, sworn, charged, and organized as such at the January 2014 Term, A.D., of the 390th Judicial District Court for said County, upon its oath presents in and to said Court at said term, that in Travis County, Texas, and anterior to the presentment of this indictment, James Richard "Rick" Perry, committed the following offenses:

### Count I

On or about June 14, 2013, in the County of Travis, Texas, James Richard "Rick" Perry, with intent to harm another, to-wit: Rosemary Lehmberg and the Public Integrity Unit of the Travis County District Attorney's Office, intentionally or knowingly misused government property by dealing with such property contrary to an agreement under which defendant held such property or contrary to the oath of office he took as a public servant, such government property being monies having a value of in excess of $200,000 which were approved and authorized by the Legislature of the State of Texas to fund the continued operation of the Public Integrity Unit of the Travis County District Attorney's

Exhibit

1.

Office, and which had come into defendant's custody or possession by virtue of the defendant's office as a public servant, namely, Governor of the State of Texas.

## Count II

Beginning on or about June 10, 2013, and continuing through June 14, 2013, in the County of Travis, Texas, by means of coercion, to-wit: threatening to veto legislation that had been approved and authorized by the Legislature of the State of Texas to provide funding for the continued operation of the Public Integrity Unit of the Travis County District Attorney's Office unless Travis County District Attorney Rosemary Lehmberg resigned from her official position as elected District Attorney, James Richard "Rick" Perry, intentionally or knowingly influenced or attempted to influence Rosemary Lehmberg, a public servant, namely, the elected District Attorney for Travis County, Texas, in the specific performance of her official duty, to-wit: the duty to continue to carry out her responsibilities as the elected District Attorney for the County of Travis, Texas through the completion of her elected term of office, and the defendant and Rosemary Lehmberg were not members of the same governing body of a governmental entity, such offense having been committed by defendant, a public servant, while acting in an official capacity as a public servant.


AGAINST THE PEACE AND DIGNITY OF THE STATE OF TEXAS.


*Della M. Tyus*
Foreperson of the Grand Jury

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

4312 HUECO AVENUE
EL PASO, TX 79903
20110169803952

### SUBSTITUTE TRUSTEE'S DEED

GRANTOR(S):
    BEATRIZ HUML

                       DEED OF TRUST DATE: July 28, 2008
                       DATE OF SALE OF PROPERTY: September 6, 2011

ORIGINAL MORTGAGEE:
    MORTGAGE ELECTRONIC REGISTRATION SYSTEMS
    INC. ("MERS"), AS NOMINEE

                       TIME OF SALE: _____ 1:01 _____ AM/(PM)
                       PLACE OF SALE OF PROPERTY:
                       LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO
                       COUNTY COURTHOUSE OR AS DESIGNATED BY THE
                       COUNTY COMMISSIONERS

CURRENT MORTGAGEE:
    WELLS FARGO BANK, N.A.
                       GRANTEE/BUYER:
MORTGAGE SERVICER:             FEDERAL HOME LOAN MORTGAGE CORPORATION
    WELLS FARGO BANK, N.A.       GRANTEE/BUYER'S MAILING ADDRESS:
                       5000 PLANO PARKWAY
                       CARROLLTON, TX 75010

RECORDED IN:
    CLERK'S FILE NO. 20080061709      AMOUNT OF SALE: $ _103, 901. 22_
PROPERTY COUNTY/LEGAL DESCRIPTION: EL PASO
LOTS 25 AND 26, BLOCK 72, GOVERNMENT HILL ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY CLERK OF EL PASO COUNTY, TEXAS.
Grantor conveyed the property to Trustee in trust to secure payment of the Note. Mortgagee, through the Mortgage Servicer, declared that Grantor defaulted in performing the obligations of the Deed of Trust. Current Mortgagee of the Note, through the Mortgage Servicer, accordingly has appointed Substitute Trustee and requested Substitute Trustee to enforce the trust.

Notices stating the time, place and terms of sale of the property were mailed, posted and filed, as required by law. Substitute Trustee sold the property to Buyer, who was the highest bidder at the public auction, for amount of sale in the manner prescribed by law. The subject sale was conducted no earlier than 11:00AM as set forth in the Notice of Substitute Trustee's Sale and was concluded within three (3)hours of such time. All matters, duties and obligations of Mortgagee were lawfully performed.

Substitute Trustee, subject to any matters of record, and for amount of sale paid by buyer as consideration, grants, sells and conveys to Buyer, Buyer's heirs, executors, administrators, successors or assigns forever, the property together with all rights and appurtenances belonging to Grantor. Substitute Trustee hereby sells the above referenced property AS IS without any expressed or implied warranties, except as to warranties of title, and hereby conveys the property to the purchaser at the purchaser's own risk, pursuant to the terms of Texas Property Code §§ 51.002 and 51.009.

WITNESS MY HAND, this September 06, 2011.

                             _Beverly Melexicu_
                          BEVERLY MITRISIN OR ~~C.T. NATIONS~~
                          Substitute Trustee

STATE OF TEXAS
COUNTY OF EL PASO

Before me, the undersigned Notary Public, on this day personally appeared BEVERLY MITRISIN OR ~~C.T. NATIONS~~ as Substitute Trustee, known to me or proved to me through a valid State driver's license or other official identification described as _TX DL_ , to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this September 06, 2011.

My Commission Expires:
_01-22-2013_

                             _Gisela Stephens_
                          Notary Public for the State of TEXAS
                          Gisela Stephens
                          Printed Name of Notary Public



GISELA STEPHENS
NOTARY PUBLIC
In and for the State of Texas
My commission expires
JANUARY 22, 2013

RETURN TO:
    BARRETT DAFFIN FRAPPIER
    TURNER & ENGEL, L.L.P.
    15000 Surveyor Boulevard, Suite 100
    Addison, Texas 75001

    Substitute Trustee's Deed (Conventional)
    SubTrusteeDeedCounty.rpt - (06/04/2009) / Ver-19


STD20110169803952

Exhibit

2.a.

4312 HUECO AVENUE
EL PASO, TX  79903

BDFTE No: 20110169803952

BEFORE ME, the undersigned authority on this day personally appeared Joseph Weber, known to me, who upon oath administered by me deposed and stated:

1.  I am a representative of the law firm BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP in connection with the administration of foreclosure of that certain Deed of Trust or Security Instrument ("Deed of Trust") dated July 28, 2008, recorded in CLERK'S FILE NO. 20080061709, Real Property Records, EL PASO County, TEXAS, executed by BEATRIZ HUML ("Grantor").

2.  I am making this affidavit based upon certain records maintained within the firm's files in the regular course of its business, which may include images of notices, certified mail forms, the signed Substitute Trustee's Deed, title searches, and other documents and records obtained and maintained in the usual course of business. Together with my general knowledge of mortgage servicer practices for referring foreclosure matters to the firm, the statements and information shown in these records form the basis for the following statements made in this affidavit, which to the best of my knowledge and belief are true.

3.  WELLS FARGO BANK, N.A. is the Mortgage Servicer for the Lender or its Nominee concerning the debt evidenced by the Deed of Trust.

4.  The Mortgagee, through the Mortgage Servicer declared that the Grantor defaulted in performing the obligations of the Deed of Trust and lawfully performed service of a proper notice of default and other obligations and duties of the Mortgage Servicer.

5.  All notices of acceleration were served on each debtor obligated on the debt according to records obtained from the Mortgage Servicer by certified mail at the last known address of each such debtor in accordance with law. Based upon these records, each mortgagor was alive at the time of the foreclosure sale or if deceased, title was restored to the debt owner through a court judgment, or an underwriter's approval letter obtained.

6.  At the instructions and on behalf of the Mortgage Servicer, Notices stating the time, place and terms of sale of the property were mailed, posted and filed in accordance with law. Notices were served on each debtor obligated on the debt according to records obtained from the Mortgage Servicer by certified mail at the last known address of each such debtor at least twenty one (21) days before the date of the sale.

7.  Through my work at the firm, I know that the firm follows a regular process in foreclosure matters to ascertain a Grantor's military service status for purposes of the federal Service Member's Civil Relief Act and state law. I am familiar with this regular process, which involves submitting Grantors' names and identifying information obtained from the Mortgage Servicer or commercially available records searches to the federal Defense Manpower Data Center ("DMDC") through that agency's official internet search site (the "DMDC Site). Based upon my review of search returns obtained and maintained in the firm's files, no Grantor is reported as on active duty military service or as having concluded active duty military service within the preceding nine months.

APPIANT: Joseph Weber

STATE OF      TEXAS      }
COUNTY OF   DALLAS    }

Given under my hand and seal of office this _____ day of   SEP 0 7 2011   _____.

Notary Seal:

Notary Public for the State of Texas

Jody Victoria Sutliffe
Notary Public
State of Texas
My Comm. Exp. 02-10-2015

AFFIDAVIT - 448
RETURN TO:
BARRETT DAFFIN FRAPPIER
TURNER & ENGEL, LLP
15000 Surveyor Boulevard, Suite 100
Addison, Texas 75001

Affidavit-BatchPrint.rpx - (12/30/2010) / Ver.17

STA20110169803952

Page 453 of 1580

**SCANNED**



Doc# 20110055709
#Pages 2 #NPages 1
9/21/2011 1:05:05 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $15.00

I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded by document number in the Official Public Records of Real Property in El Paso County.

EL PASO COUNTY, TEXAS



Jody Victoria But\_\_\_
Notary Public
State of Texas
My Comm. Exp. 02-05-2013

Doc# 20110078561

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

4318 HUECO AVENUE
EL PASO, TX  79903
20110018800128

### SUBSTITUTE TRUSTEE'S DEED

GRANTOR(S):
    BEATRIZ HUML

ORIGINAL MORTGAGEE:
    MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE

CURRENT MORTGAGEE:
    CITIMORTGAGE, INC.

MORTGAGE SERVICER:
    CITIMORTGAGE, INC.

RECORDED IN:
    CLERK'S FILE NO. 20070098417

DEED OF TRUST DATE:  October 5, 2007
DATE OF SALE OF PROPERTY: November 1, 2011

TIME OF SALE: _11:23_ AM/PM
PLACE OF SALE OF PROPERTY:
    LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONERS

GRANTEE/BUYER:
    FEDERAL HOME LOAN MORTGAGE CORPORATION

GRANTEE/BUYER'S MAILING ADDRESS:
    5000 PLANO PARKWAY
    CARROLLTON , TX 75010

AMOUNT OF SALE: $ _114,374.00_

PROPERTY COUNTY/LEGAL DESCRIPTION: EL PASO
LOTS 22, 23, AND 24, BLOCK 72, GOVERNMENT HILL ADDITION, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 11, PAGE 58, PLAT RECORDS OF EL PASO COUNTY, TEXAS, MORE COMMONLY KNOWN AS 4318 HUECO, EL PASO, TEXAS.

Grantor conveyed the property to Trustee in trust to secure payment of the Note. Mortgagee, through the Mortgage Servicer, declared that Grantor defaulted in performing the obligations of the Deed of Trust. Current Mortgagee of the Note, through the Mortgage Servicer, accordingly has appointed Substitute Trustee and requested Substitute Trustee to enforce the trust.

Notices stating the time, place and terms of sale of the property were mailed, posted and filed, as required by law. Substitute Trustee sold the property to Buyer, who was the highest bidder at the public auction, for amount of sale in the manner prescribed by law. The subject sale was conducted no earlier than 11:00AM as set forth in the Notice of Substitute Trustee's Sale and was concluded within three (3)hours of such time. All matters, duties and obligations of Mortgagee were lawfully performed

Substitute Trustee, subject to any matters of record, and for amount of sale paid by buyer as consideration, grants, sells and conveys to Buyer, Buyer's heirs, executors, administrators, successors or assigns forever, the property together with all rights and appurtenances belonging to Grantor. Substitute Trustee hereby sells the above referenced property AS IS without any expressed or implied warranties, except as to warranties of title, and hereby conveys the property to the purchaser at the purchaser's own risk, pursuant to the terms of Texas Property Code §§ 51.002 and 51.009.

WITNESS MY HAND, this November 01, 2011.

    BEVERLY MITRISIN OR C.T. NATIONS
    Substitute Trustee

STATE OF TEXAS
COUNTY OF EL PASO

Before me, the undersigned Notary Public, on this day personally appeared  BEVERLY MITRISIN OR C.T. NATIONS as Substitute Trustee, known to me or proved to me through a valid State driver's license or other official identification described as ____TXDL_____, to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this  November 01, 2011.

My Commission Expires:
01-22-2013

    Notary Public for the State of, TEXAS
    Gisela Stephens
    Printed Name of Notary Public

GISELA STEPHENS
NOTARY PUBLIC
In and for the State of Texas
My commission expires
JANUARY 22, 2013

RETURN TO:
    BARRETT DAFFIN FRAPPIER
    TURNER & ENGEL, L.L.P.
    15000 Surveyor Boulevard, Suite 100
    Addison, Texas 75001

    Substitute Trustee's Deed (EQUITY)
    SubTrusteeDeedCounty.rpt - (06/04/2009) / Ver-19

STD20110018800128

## STATEMENT OF FACTS

4318 HUECO AVENUE
EL PASO, TX  79903

BDFTE No: 20110018800128

BEFORE ME, the undersigned authority on this day personally appeared Derek Freitag, known to me, who upon oath administered by me deposed and stated:

1.  I am a representative of the law firm BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP in connection with the administration of foreclosure of that certain Deed of Trust or Security Instrument ("Deed of Trust") dated October 05, 2007, recorded in CLERK'S FILE NO. 20070098417, Real Property Records, EL PASO County, TEXAS, executed by BEATRIZ HUML ("Grantor").

2.  I am making this affidavit based upon certain records maintained within the firm's files in the regular course of its business, which may include images of notices, certified mail forms, the signed Substitute Trustee's Deed, title searches, and other documents and records obtained and maintained in the usual course of business. Together with my general knowledge of mortgage servicer practices for referring foreclosure matters to the firm, the statements and information shown in these records form the basis for the following statements made in this affidavit which to the best of my knowledge and belief are true

3.  CITIMORTGAGE, INC. is the Mortgage Servicer for the Lender or its Nominee concerning the debt evidenced by the Deed of Trust.

4.  The Mortgagee, through the Mortgage Servicer declared that the Grantor defaulted in performing the obligations of the Deed of Trust and lawfully performed service of a proper notice of default and other obligations and duties of the Mortgage Servicer

5.  All notices of acceleration were served on each debtor obligated on the debt according to records obtained from the Mortgage Servicer by certified mail at the last known address of each such debtor in accordance with law. Based upon these records, each mortgagor was alive at the time of the foreclosure sale or if deceased, title was restored to the debt owner through a court judgment, or an underwriter's approval letter obtained

6.  At the instructions and on behalf of the Mortgage Servicer, Notices stating the time, place and terms of sale of the property were mailed, posted and filed in accordance with law. Notices were served on each debtor obligated on the debt according to records obtained from the Mortgage Servicer by certified mail at the last known address of each such debtor at least twenty one (21) days before the date of the sale.

7.  Through my work at the firm, I know that the firm follows a regular process in foreclosure matters to ascertain a Grantor's military service status for purposes of the federal Service Member's Civil Relief Act and state law. I am familiar with this regular process, which involves submitting Grantors' names and identifying information obtained from the Mortgage Servicer or commercially available records searches to the federal Defense Manpower Data Center ("DMDC") through that agency's official internet search site (the "DMDC Site"). Based upon my review of search returns obtained and maintained in the firm's files, no Grantor is reported as on active duty military service or as having concluded active duty military service within the preceding nine months.

AFFIANT: Derek Freitag

STATE OF   TEXAS   }
COUNTY OF   DALLAS   }

Given under my hand and seal of office this _____ day of _____ NOV 0 3 2011 , _____.

Notary Seal:



Notary Public for the State of Texas

Jody Victoria Sutliffe
Notary Public
State of Texas
My Comm. Exp. 02-10-2013

AFFIDAVIT - 496
RETURN TO:
BARRETT DAFFIN FRAPPIER
TURNER & ENGEL, LLP
15000 Surveyor Boulevard, Suite 100
Addison, Texas  75001
Affidavit-BatchPrint.rpt - (12/30/2010) / Ver-17

STA20110018800128

Page 501 of 1632

Doc# 20110078561
#Pages 2 #NPages 1
11/16/2011 2:25:13 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $28.00

I hereby certify that this instrument was filed on the date and time stamped
hereon by me and was duly recorded by document number in the Official
Public Records of Real Property in El Paso County.

EL PASO COUNTY, TEXAS



Comptroller of the Currency
Administrator of National Banks

January 20, 2012

Beatriz Huml
4318 Hueco Ave
El Paso TX 79903

Re:     Case# 01943675
        CITIBANK, NATIONAL ASSOCIATION

Dear Ms. Huml:

This letter acknowledges receipt of your correspondence concerning the above-referenced
financial institution. The Office of the Comptroller of the Currency (OCC) is the federal
regulator responsible for this financial institution. Based upon your correspondence we have
opened a case in the OCC's Customer Assistance Group (CAG). Please make note of the case
number listed above and provide the case number on any future correspondence or contact with
our office.

We have carefully reviewed the information you provided and contacted the financial institution
requesting a response to your issues. In most instances, the financial institution will respond
directly to you and copy us in writing. Once you receive the financial institution's response, it is
very important that you carefully review their summary and actions taken, if any.

If the financial institution has satisfactorily addressed your issues and/or concerns no further
action on your part is required. However, if the financial institution failed to address any of your
issues and/or concerns or you disagree with their response, please contact the CAG in writing
within 30 days of receipt of the financial institution's letter. Please include in your reply the
specific issues that the financial institution failed to address or, if applicable, the reasons you
disagree with the financial institution's assessment. Also, please include any additional
documentation that supports your position.

The OCC examines national banks and federal savings associations (thrifts) to ensure their safe
and sound financial condition and ensures compliance with applicable banking laws, rules and
regulations. The CAG was established to assist customers who have questions or complaints
involving national banks and federal savings associations (thrifts). For additional information on
the OCC and CAG please visit www.helpwithmybank.gov.

Exhibit

2b.

The CAG offers guidance, and assists consumers in resolving complaints about national banks and federal savings associations (thrifts) and their operating subsidiaries. The OCC is an administrative agency and does not have jurisdiction to resolve contractual and factual issues. We do not have judicial authority and cannot award damages in excess of an institution's error.

While complaint processing times may vary, on average you should receive a written response from CAG within 60 days after we have a complete file. If you would like to check the status of your case online, please visit www.helpwithmybank.gov and click on the Check Case Status link. Should you have questions, please contact this office at the number listed below.

Sincerely,

*Customer Assistance Group*

# Independent Foreclosure Review





**Important Notice:**

Your loan may be eligible for an Independent Foreclosure Review that may result in compensation or other remedy.
Please respond by April 30, 2012.

Loan Number:     2004733728

Reference Number:   1200043576

Property Address:

4318 Hueco Avenue
El Paso  TX  79903-3021

Beatriz Huml
4318 Hueco Ave
El Paso, TX 79903-3021

*If you have more than one mortgage account that meets the initial criteria for an independent review, you will receive a separate notice for each. You will need to submit a Request For Review Form for each account.*

## You are receiving this notice because the above property is or was active in the foreclosure process between January 1, 2009 and December 31, 2010.

Si usted habla español, tenemos representantes que pueden asistirle en su idioma.

The Board of Governors of the Federal Reserve System and the Office of the Comptroller of the Currency (federal bank regulators) have required an **Independent Foreclosure Review** to identify customers who may have been financially injured as a result of errors, misrepresentations, or other deficiencies made during the foreclosure process. Citimortgage's records indicate that your loan may meet the initial criteria:

- Your mortgage loan was active in the foreclosure process between January 1, 2009 and December 31, 2010.
- The property was your primary residence.

If you believe that you may have been financially injured, you may submit a Request for Review Form for an **Independent Foreclosure Review** by a consultant outside of Citimortgage.

The **Independent Foreclosure Review** will not have an impact on your credit report or any other options you may pursue related to your foreclosure. If you filed a complaint about the foreclosure process prior to this independent review, you are still eligible to submit a Request for Review Form.

## The Review Process
**Step 1: Review the enclosed Request for Review Form.**
The form describes examples of situations that may have led to financial injury during the foreclosure process.

**Step 2: After reviewing the form, if you believe you may have been financially injured, complete and submit a Request for Review Form describing your situation.**
Return the completed form using the enclosed prepaid envelope by April 30, 2012.
You will be sent an acknowledgement letter within one week after your request is received.

**Step 3: Your request will be evaluated to confirm eligibility for the Independent Foreclosure Review.**
If your request meets the eligibility requirements, it will be reviewed by an independent consultant.

| | |
|---|---|
| **Subject:** | Your complaint [Case number: 120321-000552] |
| **From:** | Consumer Financial Protection Bureau (donotreply@consumerfinance.gov) |
| **To:** | rromanattorney@yahoo.com; |
| **Date:** | Wednesday, March 21, 2012 4:05 PM |

Thank you for contacting the Consumer Financial Protection Bureau.

We have received your complaint (Case number: 120321-000552) and will send it to your company as soon as possible.

You can track your complaint at: https://help.consumerfinance.gov/app/account/complaints/list/

In the meantime, if you're having trouble paying your mortgage and want to be connected to a free, HUD-approved housing counselor, call (855) 411-CFPB. Special assistance may be available to military members or veterans.

Thank you,
Consumer Response Team

Consumer Financial Protection Bureau
consumerfinance.gov
(855) 411-CFPB (2372)


Thank you for contacting the Consumer Financial Protection Bureau.

We have received your complaint (Case number: 120321-000552) that you filed on behalf of beatrize huml and will send it to your company as soon as possible.

You can track your complaint at: https://help.consumerfinance.gov/app/account/complaints/list/

In the meantime, if you're having trouble paying your mortgage and want to be connected to a free, HUD-approved housing counselor, call (855) 411-CFPB. Special assistance may be available to military members or veterans.

Thank you,
Consumer Response Team

Consumer Financial Protection Bureau
consumerfinance.gov
(855) 411-CFPB (2372)

**IN THE DISTRICT/ COUNTY COURT OF EL PASO COUNTY, TEXAS**
171st **DISTRICT COURT/ COUNTY COURT AT LAW**

| | |
|---|---|
| BEATRIZ HUML | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| -V- | ) |
| | ) |
| FEDERAL HOME LOAN MORTGAGE CO. | ) |
| | ) |
| DEFENDANT. | ) |

CAUSE NO. 2011-DCV-16814

## NOTICE OF FILING

Pursuant to Texas Rules of Civil Procedure 4, 5, 21, 21a, 21b, 23-27 45 (d); Texas Government Code, sec.311.014;  TRAP 4.1, 5, 9, the attached documents are filed for consideration in this matter.

This matter pertains to an eviction subsequent to a foreclosure. The attached Exhibits 1-9 are evidence of "robo-signed" mortgage-related documents displaying at least 4 different signatures for "Beverly Mitrisin". Other documents appear to be executed utilizing a signature "stamp".

The Substitute Trustee's Deed in the foreclosure action against the defendant was executed by Beverly Mitrisin (Exhibit 8).

Specifically:

1. Substitute Trustee's Deed through MERS with original signature, return to Barrett Daffin law firm;
2. Substitute Trustee's Deed through MERS with original signature; return to Barrett Daffin law firm;
3. Substitute Trustee's Sale with different original signature, return to McCarthy, Holthus & Ackerman law firm;
4. Notice of Trustee's Sale with signature stamp, return to Codilis & Stawiarski law firm;
5. Notice of Substitute Trustee's Sale with different signature stamp, return to Barrett, Daffin law firm;
6. Notice of Foreclosure Sale with different signature stamp, return to AV
7. Notice of Substitute Trustee's Sale with signature stamp, return to Ba[rrett] law firm. Same signature stamp as 5, above;
8. Substitute Trustee's Deed with original signature, return to Barrett firm;
9. Assignment of Deed of Trust through MERS signed by "Chun Harris" Assistant Secretary of MERS in place of, and on behalf of, Trustee Allen Polunsky for

Exhibit

3.

Primelending, Plainscapital Company.

Respectfully submitted,
Law Office of Richard A. Roman

By:

Richard A. Roman
Attorney for Beatriz Huml
505 East Rio Grande
El Paso, Texas 79902
915. 351.2679
Fax  351-6754
Email: rromanattorney @yahoo.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above "Notice of Filing" was mailed (and sent via electronic means) to the Barrett Daffin law firm on this 28 day of December, 2011.

Richard A. Roman, Esq.

Doc# 20110165709

*A*

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

4312 HUECO AVENUE
EL PASO, TX 79903
20110169803952

### SUBSTITUTE TRUSTEE'S DEED

GRANTOR(S):
   BEATRIZ HUML

ORIGINAL MORTGAGEE:
   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE

CURRENT MORTGAGEE:
   WELLS FARGO BANK, N.A.

MORTGAGE SERVICER:
   WELLS FARGO BANK, N.A.

RECORDED IN:
   CLERK'S FILE NO. 20080061709

DEED OF TRUST DATE: July 28, 2008
DATE OF SALE OF PROPERTY: September 6, 2011

TIME OF SALE: _1:01_ AM/**PM**
PLACE OF SALE OF PROPERTY:
   LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONERS

GRANTEE/BUYER:
   FEDERAL HOME LOAN MORTGAGE CORPORATION

GRANTEE/BUYER'S MAILING ADDRESS:
   5000 PLANO PARKWAY
   CARROLLTON, TX 75010

AMOUNT OF SALE: $ _103,901.22_ .

PROPERTY COUNTY/LEGAL DESCRIPTION: EL PASO
LOTS 25 AND 26, BLOCK 72, GOVERNMENT HILL ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY CLERK OF EL PASO COUNTY, TEXAS. Grantor conveyed the property to Trustee in trust to secure payment of the Note. Mortgagee, through the Mortgage Servicer, declared that Grantor defaulted in performing the obligations of the Deed of Trust. Current Mortgagee of the Note, through the Mortgage Servicer, accordingly has appointed Substitute Trustee and requested Substitute Trustee to enforce the trust.

Notices stating the time, place and terms of sale of the property were mailed, posted and filed, as required by law. Substitute Trustee sold the property to Buyer, who was the highest bidder at the public auction, for amount of sale in the manner prescribed by law. The subject sale was conducted no earlier than 11:00AM as set forth in the Notice of Substitute Trustee's Sale and was concluded within three (3)hours of such time. All matters, duties and obligations of Mortgagee were lawfully performed

Substitute Trustee, subject to any matters of record, and for amount of sale paid by buyer as consideration, grants, sells and conveys to Buyer, Buyer's heirs, executors, administrators, successors or assigns forever, the property together with all rights and appurtenances belonging to Grantor. Substitute Trustee hereby sells the above referenced property AS IS without any expressed or implied warranties, except as to warranties of title, and hereby conveys the property to the purchaser at the purchaser's own risk, pursuant to the terms of Texas Property Code §§ 51.002 and 51.009.

WITNESS MY HAND, this September 06, 2011

BEVERLY MITRISIN OR C.T. NATIONS
Substitute Trustee

STATE OF TEXAS
COUNTY OF EL PASO

Before me, the undersigned Notary Public, on this day personally appeared BEVERLY MITRISIN OR C.T. NATIONS as Substitute Trustee, known to me or proved to me through a valid State driver's license or other official identification described as _TX DL_ , to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this September 06, 2011.

My Commission Expires
_01-22-2013_

Notary Public for the State of TEXAS
Gisela Stephens
Printed Name of Notary Public

GISELA STEPHENS
NOTARY PUBLIC
In and for the State of Texas
My commission expires
JANUARY 22, 2013

RETURN TO:
BARRETT DAFFIN FRAPPIER
TURNER & ENGEL, L.L.P.
15000 Surveyor Boulevard, Suite 100
Addison, Texas 75001

Substitute Trustee's Deed (Conventional)
SubTrusteeDeedCounty.rpt - (06/04/2009) / Ver-19


STD20110169803952

" *1* "

Doc# 20110078561

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

4318 HUECO AVENUE
EL PASO, TX 79905
20110018800128

### SUBSTITUTE TRUSTEE'S DEED

GRANTOR(S):
BEATRIZ RUML

ORIGINAL MORTGAGEE:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE

CURRENT MORTGAGEE:
CITIMORTGAGE, INC.

MORTGAGE SERVICER:
CITIMORTGAGE, INC.

RECORDED IN:
CLERK'S FILE NO. 20070098417

DEED OF TRUST DATE: October 5, 2007
DATE OF SALE OF PROPERTY: November 1, 2011

TIME OF SALE: 11:23 (AM)PM
PLACE OF SALE OF PROPERTY:
LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONERS

GRANTEE/BUYER:
FEDERAL HOME LOAN MORTGAGE CORPORATION

GRANTEE/BUYER'S MAILING ADDRESS:
5000 PLANO PARKWAY
CARROLLTON, TX 75010

AMOUNT OF SALE: $ 114,374.00

PROPERTY COUNTY/LEGAL DESCRIPTION: EL PASO
LOTS 22, 23, AND 24, BLOCK 72, GOVERNMENT HILL ADDITION, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 11, PAGE 58, PLAT RECORDS OF EL PASO COUNTY, TEXAS, MORE COMMONLY KNOWN AS 4318 HUECO, EL PASO, TEXAS.

Grantor conveyed the property to Trustee in trust to secure payment of the Note. Mortgagee, through the Mortgage Servicer, declared that Grantor defaulted in performing the obligations of the Deed of Trust. Current Mortgagee of the Note, through the Mortgage Servicer, accordingly has appointed Substitute Trustee and requested Substitute Trustee to enforce the trust.

Notices stating the time, place and terms of sale of the property were mailed, posted and filed, as required by law. Substitute Trustee sold the property to Buyer, who was the highest bidder at the public auction, for amount of sale in the manner prescribed by law. The subject sale was conducted no earlier than 11:00AM as set forth in the Notice of Substitute Trustee's Sale and was concluded within three (3)hours of such time. All matters, duties and obligations of Mortgagee were lawfully performed.

Substitute Trustee, subject to any matters of record, and for amount of sale paid by buyer as consideration, grants, sells and conveys to Buyer, Buyer's heirs, executors, administrators, successors or assigns forever, the property together with all rights and appurtenances belonging to Grantor. Substitute Trustee hereby sells the above referenced property AS IS without any expressed or implied warranties, except as to warranties of title, and hereby conveys the property to the purchaser at the purchaser's own risk, pursuant to the terms of Texas Property Code §§ 51.002 and 51.009.

WITNESS MY HAND, this November 01, 2011

_Beverly Mitrisin_
BEVERLY MITRISIN OR C.T. NATIONS
Substitute Trustee

STATE OF TEXAS
COUNTY OF EL PASO

Before me, the undersigned Notary Public, on this day personally appeared BEVERLY MITRISIN OR C.T. NATIONS as Substitute Trustee, known to me or proved to me through a valid State driver's license or other official identification described as _TDL_, to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this November 01, 2011

My Commission Expires:
01-22-2013

_Gisela Stephens_
Notary Public for the State of TEXAS
Gisela Stephens
Printed Name of Notary Public

GISELA STEPHENS
NOTARY PUBLIC
in and for the State of Texas
My commission expires
JANUARY 22, 2013

RETURN TO:
BARRETT DAFFIN FRAPPIER
TURNER & ENGEL, L.L.P.
15000 Surveyor Boulevard, Suite 100
Addison, Texas 75001

Substitute Trustee's Deed (EQUITY)
SubTrusteeDeedCounty.rpt - (06/04/2009) / Ver-19

STD2011018800128



| | |
|---|---|
| **Current Borrower:** | AMY C. PIRK AND HUSBAND, JONATHAN A. PIRK |
| **MHA File Number:** | TX-10-09301-CM |
| **VA/FHA/PMI Number:** | |
| **Loan Type:** | Conventional Residential |
| **Property Address:** | 752 TEPIC DRIVE, EL PASO, TX 79912 |

Doc# 00000000097
#Pages 1   #NFPages 1
12/12/2011 2:09:43 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk

*Sample*

# NOTICE OF SUBSTITUTE TRUSTEE SALE

*of*

*Signature*

**Deed of Trust Date:**
11/12/2004

**Grantor(s)/Mortgagor(s):**
AMY C. PIRK AND HUSBAND, JONATHAN A. PIRK

**Original Beneficiary/Mortgagee:**
LONG BEACH MORTGAGE COMPANY, A CORPORATION

**Current Beneficiary/Mortgagee:**
Deutsche Bank Nat'l Trust Co, as Trustee for Long Beach Mortgage Loan Trust 2005-1

**Recorded in:**
  **Volume:**
  **Page:**
  **Instrument No:** 20040106248

**Property County:**
EL PASO

**Mortgage Servicer:**
JPMorgan Chase Bank, National Association is representing the Current Beneficiary/Mortgagee under a servicing agreement with the Current Beneficiary/Mortgagee.

**Mortgage Servicer's Address:**
7255 Baymeadows Way, Jacksonville, FL 32256

**Legal Description:** LOT 18, BLOCK 108, CHAPARRAL PARK UNIT 23, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS ACCORDING TO THE PLAT THEREOF ON FILE IN VOLUME 54, PAGE 2, REAL PROPERTY RECORDS, EL PASO COUNTY, TEXAS.

**Date of Sale:**  1/3/2012            **Earliest Time Sale Will Begin:**        10:00 am

**Place of Sale of Property:** THE LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR IN THE AREA DESIGNATED BY THE COMMISSIONER'S COURT, PURSUANT TO SECTION 51.002 OF THE TEXAS PROPERTY CODE.

The Substitute Trustee will sell the property by public auction to the highest bidder for cash at the place and date specified.   The sale will begin at the earliest time stated above or within three (3) hours after that time.

Beverly Mitrisin and Charles Thomas Nations
or Cole D. Patton
or Melissa A. McKinney
or Karl Terwilliger
McCarthy, Holthus & Ackerman, LLP
ATTN: SALES
1255 West 15th Street, Suite 1060
Plano, TX 75075

"3"

Doc# 00000000166
#Pages 1    #NFPages 1
12/12/2011 2:58:07 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
$8.00

C&S No. 44-11-3663 / Conventional
JPMorgan Chase Bank, National Association

# NOTICE OF TRUSTEE'S SALE

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately. Sender is: Codilis & Stawiarski, PC, 650 North Sam Houston Parkway East, Suite 450, Houston, Texas 77060**

**Date of Security Instrument:**    November 14, 2007

**Grantor(s):**    Rene Aguilar, a single person

**Original Trustee:**    Calvin C. Mann, Jr.

**Original Mortgagee:**    Washington Mutual Bank, FA

**Recording Information:** Volume , Page , or Clerk's File No.20070109952 in the Official Public Records of EL PASO County, Texas

**Current Mortgagee:**    JPMorgan Chase Bank, National Association

**Mortgage Servicer:**    JPMorgan Chase Bank, National Association, National Association whose address is C/O 7255 Baymeadows Way Jacksonville, FL 32256 Pursuant to a Servicing Agreement between the Mortgage Servicer and Mortgagee, the Mortgage Servicer is authorized to represent the Mortgagee. Pursuant to the Servicing Agreement and Section 51.0025 of the Texas Property Code, the Mortgage Servicer is authorized to collect the debt and to administer any resulting foreclosure of the referenced property.

**Date of Sale:**   1/3/2012        **Earliest Time Sale Will Begin:**    10:00:00 AM

**The Substitute Trustee will sell the property by public auction to the highest bidder for cash at the place and date specified. The sale will begin at the earliest time stated above, or within three (3) hours after that time.**

**If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the funds paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee or the Mortgagee's attorney.**

Legal Description:
LOT 11, BLOCK NN, EASTRIDGE SUBDIVISION UNIT 13, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 47, PAGE 19, PLAT RECORDS OF EL PASO COUNTY, TEXAS

**Place of Sale of Property:**
The foreclosure sale will be conducted in the area designated by the EL PASO County Commissioners Court pursuant to Section 51.002 of the Texas Property Code as the place where the foreclosure sales are to take place, or if no place is designated by the Commissioners Court, the sale will be conducted at the place where the Notice of Trustee's Sale was posted.

_Beverly Mitrisin_

Beverly Mitrisin or Melissa McLain or Charles Thomas Nation
c/o Servicelink
6029 Belt Line Rd. Ste. 200
Dallas, TX 75254

**For Information:**
Codilis & Stawiarski, P.C.
650 N. Sam Houston Parkway East, Suite 450
Houston, TX 77060 / (281) 925-5200

"4"



5101 BASTILLE AVE
EL PASO, TX 79924

COPY of Signature

Doc# 00000000025
#Pages 1   #NFPages 1
12/1/2011 1:25:00 PM 053756
Filed & Recorded in 20090031415083
Official Records of
EL PASO County
Delia Briones
County Clerk

**NOTICE OF SUBSTITUTE TRUSTEE'S SALE**

Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.

Deed of Trust:
Date:   December 20, 2007

Grantor(s):
MARIA GONZALEZ
SIMON GONZALEZ

Original Mortgagee:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE

Current Mortgagee:
BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP, FKA
COUNTRYWIDE HOME LOANS SERVICING LP
c/o BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP
PTX-C-32 7105 CORPORATE
PLANO, TX 75024

Mortgage Servicer:
BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP

Recorded in: CLERK'S FILE NO. 20070118570

Property County: EL PASO

Legal Description:
LOT 22, BLOCK 41, MILAGRO HILLS, ADDITION UNIT FIVE, AN ADDITION TO THE CITY OF EL PASO, EL PASO
COUNTY, TEXAS, ACCORDING TO THE MAP THEREOF ON FILE IN BOOK 12, PAGE 39, PLAT RECORDS OF EL
PASO COUNTY, TEXAS.

Date of Sale: Tuesday, January 3, 2012

Earliest Time Sale will Begin: 11:00AM

Place of Sale of Property:
LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE
COUNTY COMMISSIONERS.

The Substitute Trustee will sell the property by public auction to the highest bidder for cash at the place and date specified. The sale will begin at the earliest time stated above or within three (3) hours after that time.

BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP is acting as the Mortgage Servicer for BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP, FKA COUNTRYWIDE HOME LOANS SERVICING LP, who is the Mortgagee of the Note and Deed of Trust associated with the above referenced loan.  BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP, as Mortgage Servicer, is representing the Mortgagee, whose address is:
BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP, FKA COUNTRYWIDE
HOME LOANS SERVICING LP
c/o BANK OF AMERICA, N.A., AS SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP
PTX-C-32 7105 CORPORATE
PLANO, TX 75024

The Mortgage Servicer is authorized to represent the Mortgagee by virtue of a servicing agreement with the Mortgagee.  Pursuant to the Servicing Agreement and Texas Property Code §51.0025, the Mortgage Servicer is authorized to collect the debt and to administer any resulting foreclosure of the property securing the above referenced loan.

Dated this December 01, 2011.

_Beverly Mitkisin_

BEVERLY MITKISIN OR C.T. NATIONS
Substitute Trustee
c/o BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP
15000 Surveyor Boulevard, Suite 100
Addison, Texas 75001

5

Doc# 00000000181
#Pages 1   #NFPages 1
        12/12/2011 3:13:41 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $8.00

# NOTICE OF FORECLOSURE SALE

1. *Property to Be Sold.* The property to be sold is described as follows:

LOT 3, BLOCK 12, PASEOS DEL SOL "UNIT TWO" AMENDING SUBDIVISION, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO MAP OR PLAT THEREOF RECORDED IN VOLUME 80, PAGE(S) 6, OF THE PLAT RECORDS OF EL PASO COUNTY, TEXAS.

2. *Instrument to be Foreclosed.* The instrument to be foreclosed is the Deed of Trust dated 05/15/2007 and recorded in Document 20070053396 real property records of El Paso County, Texas.

3. *Date, Time, and Place of Sale.* The sale is scheduled to be held at the following date, time, and place:

Date:       01/03/2012

Time:       The sale will begin no earlier than 11:00 AM or no later than three hours thereafter.

Place:      El Paso County Courthouse, Texas, at the following location: LOBBY OF FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONER'S OFFICE or as designated by the County Commissioners Court.

4. *Terms of Sale.* The sale will be conducted as a public auction to the highest bidder for cash. Pursuant to the deed of trust, the mortgagee has the right to direct the Trustee to sell the property in one or more parcels and/or to sell all or only part of the property.

Pursuant to section 51.009 of the Texas Property Code, the property will be sold in AS IS, WHERE IS condition, without any express or implied warranties, except as to the warranties of title, if any, provided for under the deed of trust. Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the property.

Prospective bidders are reminded that by law the sale will necessarily be made subject to all prior matters of record affecting the property, if any, to the extent that they remain in force and effect and have not been subordinated to the deed of trust. The sale shall not cover any part of the property that has been released of public record from the lien of the deed of trust. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

5. *Obligations Secured.* The Deed of Trust executed by JULIO T. SOSA AND GUADALUPE E. SOSA, provides that it secures the payment of the indebtednesses in the original principal amount of $188,800.00, and obligations therein described including but not limited to (a) the promissory note; and (b) all renewals and extensions of the note. HSBC BANK USA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF FIRST NLC TRUST 2007-1 MORTGAGE-BACKED CERTIFICATES, SERIES 2007-1 is the current mortgagee of the note and deed of trust.

6. *Default and Request to Act.* Default has occurred under the deed of trust and HSBC BANK USA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF FIRST NLC TRUST 2007-1 MORTGAGE-BACKED CERTIFICATES, SERIES 2007-1 obtained a Home Equity Foreclosure Order from the County Court At Law No. 5 County Court of El Paso County on 12/01/2011 under Cause No. 2011-DCV-02257. The mortgagee has requested a Substitute Trustee conduct this sale pursuant to the Court's Order and notice is given that before the sale the mortgagee may appoint another person substitute trustee to conduct the sale.

BEVERLY MITRISIN OR CHARLES THOMAS NATIONS
c/o AVT Title
Pacific Center I, Suite 660
14180 North Dallas Parkway
Dallas, TX 75254

10-001655-670
1508 PASEO UNIDO STREET
EL PASO, TX 79928

Sample of Signature

"6"

14308 PATRIOT POINT DRIVE
EL PASO, TX 79938

COPY

Doc# 00000000217
#Pages 1   #NFPages 3496500
12/12/2011 3:26:21PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones

**NOTICE OF SUBSTITUTE TRUSTEE SALE**

Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.

Deed of Trust
Date:  February 14, 2009

Grantor(s):
LUIS JAVIER LOPEZ
MIRIAM LOPEZ

Original Mortgagee:
ROCKY MOUNTAIN MORTGAGE COMPANY

Current Mortgagee:
ROCKY MOUNTAIN MORTGAGE CO.
c/o ROCKY MOUNTAIN MORTGAGE CO.
2244 TRAWOOD, SUITE 100
EL PASO, TX 79935

Mortgage Servicer:
ROCKY MOUNTAIN MORTGAGE CO.

Recorded in: CLERK'S FILE NO. 20090013032

Property County: EL PASO

Legal Description:
LOT 38, BLOCK 173, TIERRA DEL ESTE UNIT FORTY NINE, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT, RECORDED IN CLERK'S FILE NO. 20070084456, REAL PROPERTY RECORDS OF EL PASO COUNTY, TEXAS.

Date of Sale: Tuesday, January 3, 2012

Earliest Time Sale will Begin: 11:00AM

Place of Sale of Property:
LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONERS.

The Substitute Trustee will sell the property by public auction to the highest bidder for cash at the place and date specified. The sale will begin at the earliest time stated above or within three (3) hours after that time.

ROCKY MOUNTAIN MORTGAGE CO. is acting as the Mortgage Servicer for ROCKY MOUNTAIN MORTGAGE CO., who is the Mortgagee of the Note and Deed of Trust associated with the above referenced loan. ROCKY MOUNTAIN MORTGAGE CO., as Mortgage Servicer, is representing the Mortgagee, whose address is:
ROCKY MOUNTAIN MORTGAGE CO.
c/o ROCKY MOUNTAIN MORTGAGE CO.
2244 TRAWOOD, SUITE 100
EL PASO, TX 79935

The Mortgage Servicer is authorized to represent the Mortgagee by virtue of a servicing agreement with the Mortgagee. Pursuant to the Servicing Agreement and Texas Property Code §51.0025, the Mortgage Servicer is authorized to collect the debt and to administer any resulting foreclosure of the property securing the above referenced loan.

Dated this December 12, 2011.

BEVERLY MITRISIN OR C.T. NATIONS
Substitute Trustee
c/o BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP
15000 Surveyor Boulevard, Suite 100
Addison, Texas 75001

NOS20110023300077

NSTS3SIG.rpt - (11/22/2011) - Ver-19

Doc# 20110078561

W

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

4318 HUECO AVENUE
EL PASO, TX 79903
20110018800128

## SUBSTITUTE TRUSTEE'S DEED

GRANTOR(S):
    BEATRIZ HUML

DEED OF TRUST DATE: October 5, 2007
DATE OF SALE OF PROPERTY: November 1, 2011

ORIGINAL MORTGAGEE:
    MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE

TIME OF SALE: _____ 11:23 _____ AM/PM
PLACE OF SALE OF PROPERTY:
    LOBBY OF THE FIRST FLOOR AT THE NEW EL PASO COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONERS

CURRENT MORTGAGEE:
    CITIMORTGAGE, INC.

GRANTEE/BUYER:
    FEDERAL HOME LOAN MORTGAGE CORPORATION

MORTGAGE SERVICER:
    CITIMORTGAGE, INC.

GRANTEE/BUYER'S MAILING ADDRESS:
    5000 PLANO PARKWAY
    CARROLLTON, TX 75010

RECORDED IN:
    CLERK'S FILE NO. 20070098417

AMOUNT OF SALE: $ 114,374.00

PROPERTY COUNTY/LEGAL DESCRIPTION: EL PASO
LOTS 22, 23, AND 24, BLOCK 72, GOVERNMENT HILL ADDITION, AN ADDITION TO THE CITY OF EL PASO, EL PASO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 11, PAGE 58, PLAT RECORDS OF EL PASO COUNTY, TEXAS, MORE COMMONLY KNOWN AS 4318 HUECO, EL PASO, TEXAS.

Grantor conveyed the property to Trustee in trust to secure payment of the Note. Mortgagee, through the Mortgage Servicer, declared that Grantor defaulted in performing the obligations of the Deed of Trust. Current Mortgagee of the Note, through the Mortgage Servicer, accordingly has appointed Substitute Trustee and requested Substitute Trustee to enforce the trust.

Notices stating the time, place and terms of sale of the property were mailed, posted and filed, as required by law. Substitute Trustee sold the property to Buyer, who was the highest bidder at the public auction, for amount of sale in the manner prescribed by law. The subject sale was conducted no earlier than 11:00AM as set forth in the Notice of Substitute Trustee's Sale and was concluded within three (3)hours of such time. All matters, duties and obligations of Mortgagee were lawfully performed

Substitute Trustee, subject to any matters of record, and for amount of sale paid by buyer as consideration, grants, sells and conveys to Buyer, Buyer's heirs, executors, administrators, successors or assigns forever, the property together with all rights and appurtenances belonging to Grantor. Substitute Trustee hereby sells the above referenced property AS IS without any expressed or implied warranties, except as to warranties of title, and hereby conveys the property to the purchaser at the purchaser's own risk, pursuant to the terms of Texas Property Code §§ 51.002 and 51.009.

WITNESS MY HAND, this November, 01, 2011.

    BEVERLY MITRISIN OR C.T. NATIONS
    Substitute Trustee

STATE OF TEXAS
COUNTY OF EL PASO

Before me, the undersigned Notary Public, on this day personally appeared BEVERLY MITRISIN OR C.T. NATIONS as Substitute Trustee, known to me or proved to me through a valid State driver's license or other official identification described as _____ TXDL _____, to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ November, 01, 2011.

My Commission Expires:
01-22-2013

Notary Public for the State of TEXAS
Gisela Stephens
Printed Name of Notary Public

GISELA STEPHENS
NOTARY PUBLIC
In and for the State of Texas
My commission expires
JANUARY 22, 2013

RETURN TO:
    BARRETT DAFFIN FRAPPIER
    TURNER & ENGEL, L.L.P.
    15000 Surveyor Boulevard, Suite 100
    Addison, Texas 75001

Substitute Trustee's Deed (EQUITY)
SubTrusteeDeedCounty.rpt - (06/04/2009) / Ver-19

STD20110018800128

8

Doc# 20110049765

## ASSIGNMENT OF DEED OF TRUST
### MIN: 100053608020149864

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc., ("MERS"), as Nominee for Primelending, a Plainscapital Company, its successors and assigns, hereby grants, assigns, and transfers to:

Wells Fargo Bank, NA, 1 Home Campus, Des Moines, IA 50328

all beneficial interest under that certain Deed of Trust dated: July 28, 2008

executed by:    Beatriz Humi, a single woman

Beneficiary:    Mortgage Electronic Registration Systems, Inc., as Nominee for Primelending, a Plainscapital Company / Trustee: Allan B. Polunsky

and recorded as Instrument No. 20080061709 on July 30, 2008 in Book: N/A, Page: N/A of Official Records in the County Recorder's office of El Paso County, TX, describing land therein as:

| | |
|---|---|
| Legal Description: | See Attached |
| Loan Amount: | $90,000.00 |
| Property Address: | 4312 Hueco Avenue, El Paso, Texas 79903-3021 |
| Parcel ID #: | G56999907207900 |

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed Of Trust.

Signed this _____7/13/2011_____.

Mortgage Electronic Registration Systems, Inc.

_Chan Harris_

_Chan Harris_, Assistant Secretary

State of MINNESOTA        )
County of DAKOTA         )

On this ____7/13/2011____ before me personally appeared: Chan Harris Assistant Secretary, Mortgage Electronic Registration Systems, Inc., known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Document drafted and prepared by:
Greg Werner
Wells Fargo Home Mortgage
PO Box 1629, x9999-018
Minneapolis, MN 55467
MERS Phone: 888-679-6377

Notary: _____

SHELLY K STRAUSS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 1/31/16

Page 1 of 2

NOTARY SEAL/STAMP
NOT THOROUGH

" 9 "

HOME    TAX INFO    SERVICEMEMBERS

  


*Joint State-Federal*
NATIONAL MORTGAGE
SERVICING SETTLEMENTS

## Joint State-Federal National Mortgage Servicing Settlements

This website provides information on the joint state and federal Settlements involving residential mortgage foreclosures and loan servicing. For information about the settlement for which you may be eligible, begin by locating your Mortgage Servicer – the entity to which you sent your monthly Mortgage Payments up until your foreclosure – from the list below, or clicking on the name of the settlement. When you click on your Servicer, you will be directed to information about that specific settlement. If you do not know your Mortgage Servicer's name, you may click on one of the settlement icons to get more information.


Ocwen
National
Servicing
Settlement


NATIONAL
MORTGAGE
SETTLEMENT

Nati
SunT
Settle

American Home Mortgage Servicing (AHMSI)

Homeward Residential Holdings

Litton

Ocwen

Ally (formerly known as GMAC)

Bank of America

Citi

JPMorgan Chase

Wells Fargo

SunTrust

HOME | ABOUT | FAQ | NEWS | HELP FOR BORROWERS | STATES

*This Web site was developed and is hosted and maintained by the Attorneys General on the Executive Committee that negotiated the settlement. For questions regarding the settlement—signed by 49 states—please contact your state Attorney General or visit the Help for Homeowners page.*

Exhibit
4.

Case 3.15-cv-00126-DCG Document 1 Filed 05/01/15 Page 39 of 163

Home     Tax Info     SERVICEMEMBERS



# State Attorneys General who signed the Joint State-Federal Mortgage Settlement by State

Links for "additional help" direct to the <u>Office of Mortgage Settlement Oversight</u>.  On March 12, 2012, the participants in the 49-state National Mortgage Settlement appointed attorney <u>Joseph A. Smith, Jr.</u> as the Monitor who will oversee the agreement.  Smith's appointment is for a three-and-a-half year term.

**Alabama Attorney General Luther Strange (R)**

501 Washington Ave. P.O. Box 300152 Montgomery, AL 36130-0152

(334) 242-7300

http://www.ago.state.al.us/

For <u>additional help in Alabama</u>

**Alaska Attorney General Craig W. Richards**

P.O. Box 110300 Juneau, AK 99811-0300

(907) 465-2133

http://www.law.state.ak.us/

For <u>additional help in Alaska</u>

**Arizona Attorney General Mark Brnovich (R)**

1275 W. Washington St., Phoenix, AZ 85007

(602) 542-4266

http://www.azag.gov/

For <u>additional help in Arizona</u>

**Arkansas Attorney General Leslie Rutledge (R)**

200 Tower Bldg., 323 Center St., Little Rock, AR 72201-2610

(800) 482-8982

http://www.ag.arkansas.gov/

For <u>additional help in Arkansas</u>

**California Attorney General Kamala Harris (D)**

Exhibit

5.

1300 I St., Ste. 1740, Sacramento, CA 95814

(916) 445-9555

http://ag.ca.gov/

For additional help in California


**Colorado Attorney General Cynthia Coffman (R)**

1525 Sherman St. Denver, Colorado 80203

303-866-4500

http://www.ago.state.co.us/index.cfm

For additional help in Colorado


**Connecticut Attorney General George Jepsen (D)**

55 Elm St., Hartford, CT 06141-0120

(860) 808-5318

http://www.ct.gov/ag/

For additional help in Connecticut


**Delaware Attorney General Matthew Denn (D)**

Carvel State Office Bldg., 820 N. French St., Wilmington, DE 19801

(302) 577-8338

http://attorneygeneral.delaware.gov/

For additional help in Delaware


**District of Columbia Attorney General Karl A. Racine (D)**

John A. Wilson Building, 1350 PA Ave, NW Suite 409, Washington, DC 20009

(202) 727-3400

http://occ.dc.gov

For additional help in District of Columbia


**Florida Attorney General Pam Bondi (R)**

The Capitol, PL 01, Tallahassee, FL 32399-1050

(850) 414-3300

http://myfloridalegal.com/

For additional help in Florida


**Georgia Attorney General Sam Olens (R)**

40 Capitol Square, SW, Atlanta, GA 30334-1300

(404) 656-3300

http://law.ga.gov/02/ago/home/0,2705,87670814,00.html

For additional help in Georgia


**Hawaii Attorney General (Acting) Russell Suzuki (D)**

425 Queen St., Honolulu, HI 96813

(808) 586-1500

http://www.hawaii.gov/ag/

For additional help in Hawaii

**Idaho Attorney General Lawrence Wasden (R)**

Statehouse, Boise, ID 83720-1000

(208) 334-2400

http://www2.state.id.us/ag/

For additional help in Idaho

**Illinois Attorney General Lisa Madigan (D)**

James R. Thompson Ctr., 100 W. Randolph St., Chicago, IL 60601

(312) 814-3000

http://illinoisattorneygeneral.gov/

For additional help in Illinois

**Indiana Attorney General Greg Zoeller (R)**

Indiana Government Center South - 5th Floor, 302 West Washington Street, Indianapolis, IN 46204

(317) 232-6201

http://www.in.gov/attorneygeneral/

For additional help in Indiana

**Iowa Attorney General Tom Miller (D)**

Hoover State Office Bldg., 1305 E. Walnut, Des Moines, IA 50319

(515) 281-5164

http://www.iowaattorneygeneral.gov

For additional help in Iowa

**Kansas Attorney General Derek Schmidt (R)**

120 S.W. 10th Ave., 2nd Fl., Topeka, KS 66612-1597

(785) 296-2215

http://www.ksag.org/home/

For additional help in Kansas

**Kentucky Attorney General Jack Conway (D)**

700 Capitol Avenue, Capitol Building, Suite 118, Frankfort, KY 40601

(502) 696-5300

http://ag.ky.gov/

For additional help in Kentucky

**Louisiana Attorney General James D. "Buddy" Caldwell (R)**

P.O. Box 94095, Baton Rouge, LA 70804-4095

225-326-6000

http://www.ag.state.la.us/

For <u>additional help in Louisiana</u>

**Maine Attorney General Janet T. Mills (D)**

State House Station 6, Augusta, ME 04333

(207) 626-8800

http://www.maine.gov/ag/

For <u>additional help in Maine</u>

**Maryland Attorney General Brian Frosh (D)**

200 St. Paul Place, Baltimore, MD 21202-2202

(410) 576-6300

http://www.oag.state.md.us

For <u>additional help in Maryland</u>

**Massachusetts Attorney General Maura Healey (D)**

1 Ashburton Place, Boston, MA 02108-1698

(617) 727-2200

http://www.mass.gov/ago/

For <u>additional help in Massachusetts</u>

**Michigan Attorney General Bill Schuette (R)**

P.O.Box 30212, 525 W. Ottawa St., Lansing, MI 48909-0212

(517) 373-1110

http://www.michigan.gov/ag

For <u>additional help in Michigan</u>

**Minnesota Attorney General Lori Swanson (D)**

1400 Bremer Tower, 445 Minnesota Street, St. Paul, MN 55101-2131

(651) 296-3353

http://www.ag.state.mn.us

For <u>additional help in Minnesota</u>

**Mississippi Attorney General Jim Hood (D)**

Department of Justice, P.O. Box 220, Jackson, MS 39205

(601) 359-3680

http://www.ago.state.ms.us/

For <u>additional help in Mississippi</u>

**Missouri Attorney General Chris Koster (D)**

Supreme Ct. Bldg., 207 W. High St., Jefferson City, MO 65101

(573) 751-3321

http://ago.mo.gov/

For <u>additional help in Missouri</u>


**Montana Attorney General Tim Fox (R)**

Justice Bldg., 215 N. Sanders, Helena, MT 59620-1401

(406) 444-2026

http://www.doj.mt.gov

For <u>additional help in Montana</u>


**Nebraska Attorney General Doug Peterson (R)**

State Capitol, P.O.Box 98920, Lincoln, NE 68509-8920

(402) 471-2682

http://www.ago.state.ne.us/

For <u>additional help in Nebraska</u>


**Nevada Attorney General Adam Paul Lazalt (R)**

Old Supreme Ct. Bldg., 100 N. Carson St., Carson City, NV 89701

(775) 684-1100

http://ag.state.nv.us/

For <u>additional help in Nevada</u>


**New Hampshire Attorney General Joseph A. Foster (D)**

State House Annex, 33 Capitol St., Concord, NH 03301-6397

(603) 271-3658

http://doj.nh.gov/

For <u>additional help in New Hampshire</u>


**New Jersey Attorney General John Jay Hoffman (Acting)**

Richard J. Hughes Justice Complex, 25 Market Street P.O. Box 080 Trenton, NJ 08625

(609) 292-8740

http://www.state.nj.us/lps/

For <u>additional help in New Jersey</u>


**New Mexico Attorney General Hector Balderas (D)**

P.O. Drawer 1508, Sante Fe, NM 87504-1508

(505) 827-6000

http://www.nmag.gov/

For <u>additional help in New Mexico</u>


**New York Attorney General Eric Schneiderman (D)**

Dept. of Law - The Capitol, 2nd fl., Albany, NY 12224

(518) 474-7330

http://www.ag.ny.gov/

For <u>additional help in New York</u>

**North Carolina Attorney General Roy Cooper (D)**

Dept. of Justice, P.O.Box 629, Raleigh, NC 27602-0629

(877) 5-NO-SCAM (877-566-7226)

(919) 716-6000

http://www.ncdoj.gov/

For additional help in North Carolina


**North Dakota Attorney General Wayne Stenehjem (R)**

State Capitol, 600 E. Boulevard Ave., Bismarck, ND 58505-0040

(701) 328-2210

http://www.ag.state.nd.us

For additional help in North Dakota


**Ohio Attorney General Mike DeWine (R)**

State Office Tower, 30 E. Broad St., Columbus, OH 43266-0410

(614) 466-4320

http://www.ohioattorneygeneral.gov/

For additional help in Ohio


**Oregon Attorney General Ellen F. Rosenblum (D)**

Justice Bldg., 1162 Court St., NE, Salem, OR 97301

(503) 378-4732

http://www.doj.state.or.us/

For additional help in Oregon


**Pennsylvania Attorney General Kathleen Kane (D)**

15th Floor Strawberry Square, Harrisburg, PA 17120

(800) 441-2555 (outside PA)

(717) 787-9707 (within PA)

http://www.attorneygeneral.gov

For additional help in Pennsylvania


**Rhode Island Attorney General Peter Kilmartin (D)**

150 S. Main St., Providence, RI 02903

(401) 274-4400

http://www.riag.state.ri.us

For additional help in Rhode Island


**South Carolina Attorney General Alan Wilson (R)**

Rembert C. Dennis Office Bldg., P.O.Box 11549, Columbia, SC 29211-1549

(803) 734-3970

http://www.scattorneygeneral.org

For additional help in South Carolina

4/17/2015     State Attorneys General who signed the Joint State-Federal Mortgage Settlement, by State | National Mortgage Settlement

Case 3:13-cv-01126-DCB Document 1 Filed 05/01/13 Page 46 of 163

**South Dakota Attorney General Marty J. Jackley (R)**

1302 East Highway 14, Suite 1, Pierre, SD 57501-8501

(605) 773-3215

http://atg.sd.gov/

For <u>additional help in South Dakota</u>


**Tennessee Attorney General Herbert H. Slatery, III (R)**

425 5th Avenue North, Nashville, TN 37243

615-741-3491

http://www.tn.gov/attorneygeneral

For <u>additional help in Tennessee</u>


**Texas Attorney General Ken Paxton (R)**

Capitol Station, P.O.Box 12548, Austin, TX 78711-2548

(512) 463-2100

http://www.oag.state.tx.us

For <u>additional help in Texas</u>


**Utah Attorney General Sean Reyes (R)**

State Capitol, Rm. 236, Salt Lake City, UT 84114-0810

(801) 538-9600

http://attorneygeneral.utah.gov/

For <u>additional help in Utah</u>


**Vermont Attorney General William H. Sorrell (D)**

109 State St., Montpelier, VT 05609-1001

(802) 828-3173

http://www.atg.state.vt.us/

For <u>additional help in Vermont</u>


**Virginia Attorney General Mark Herring (D)**

900 East Main Street Richmond, VA 23219

(804) 786-2071

http://www.oag.state.va.us/

For <u>additional help in Virginia</u>


**Washington Attorney General Bob Ferguson (D)**

1125 Washington St. SE, PO Box 40100, Olympia, WA 98504-0100

(360) 753-6200

http://www.atg.wa.gov/

For <u>additional help in Washington</u>

**West Virginia Attorney General Patrick Morrisey (R)**

PO Box 1789, Charleston, WV 25326

(800) 368-8808

http://www.wvago.gov/

For additional help in West Virginia

**Wisconsin Attorney General Brad Schimel (R)**

State Capitol, Ste. 114 E., P.O.Box 7857, Madison, WI 53707-7857

(608) 266-1221

http://www.doj.state.wi.us

For additional help in Wisconsin


**Wyoming Attorney Peter K. Michael (R)**

State Capitol Bldg., Cheyenne, WY 82002

(307) 777-7841

http://attorneygeneral.state.wy.us

For additional help in Wyoming

---

HOME  |  ABOUT  |  FAQ  |  NEWS  |  HELP FOR BORROWERS  |  STATES


*This Web site was developed and is hosted and maintained by the Attorneys General on the Executive Committee that negotiated the settlement. For questions regarding the settlement—signed by 49 states—please contact your state Attorney General or visit the Help for Homeowners page.*

# James A. Darc

### ARBITRATOR  MEDIATOR  ATTOF

HOME      PRACTICE AREAS      QUALIFICATIONS      FAQ

# RESUMÉ

**Profession**

Attorney, Former Judge, Arbitrator, Mediator

**Work History**

Regional Managing Attorney, Office of the  Attorney Ger

Judge, 384th Judicial District Court, State of Texas, 199

Associate Municipal Court Judge, City of El Paso, 1994

Attorney at Law, Business Litigation, 1983 - 1995 and 19

Corporate Counsel, El Paso Natural Gas Company, 197

**Experience**

As a Managing Attorney in the Consumer Protection Div

- represented the State of Texas, the Texas Departr
  the Office of Consumer Credit Commissioner in ma
  including mortgage litigation, foreclosure fraud, del
- investigated cases involving the Truth in Lending A
  Equity Protection Act, Fair Debt Collection Practice
  Act, Real Estate Settlement Procedures Act, mortg
  force-placed insurance, mortgage origination and s
  residential mortgage backed securities;
- was on the Executive Committee in over a dozen n
  deceptive trade practices, predatory lending and m
  cases against Ameriquest, Countrywide, Wells Far

MyAccount | Login | Create Account | Home | Contact | Help

ABOUT US     LEGISLATORS & STAFF     RESEARCH     MEETINGS & TRAINING     NCSL IN D.C.     BOOKSTORE     BLOG

## NATIONAL MORTGAGE SETTLEMENT SUMMARY

The five largest mortgage servicers recently agreed to a $25 billion settlement over some questionable mortgage loan servicing and foreclosure practices, including the so-called "robo-signing" activities that came to light in late 2010. Robo-signing refers to the practice of signing mortgage documents without verifying their accuracy as well as other procedural errors. The five mortgage servicers—Ally Financial, Bank of America, Citigroup, JPMorgan Chase and Wells Fargo—collectively service nearly 60 percent of the U.S. mortgage market. While mortgage loan servicers collect and process mortgage payments and handle defaults and foreclosures, the servicers often do not own the underlying loans.

The national mortgage settlement—which involved more than a year of negotiations with the states' attorneys general, the U.S. Department of Justice and other federal agencies—includes direct payments to the federal government, the participating 49 states and individual borrowers. Oklahoma was the only state not to join the settlement, choosing to settle separately with the five servicers for $18.6 million.

The federal government will receive $912 million for five whistleblower lawsuits and losses incurred for the FHA Capital Reserve Account, the Veterans Housing Benefit Program Fund and the Rural Housing Service. The 49 participating states will split $2.5 billion based on criteria such as the number of foreclosures and other factors, with California, Florida, Texas, New York and Illinois receiving the largest amounts respectively. The settlement agreement allows each state to designate up to 10 percent of the amount paid to each state as a civil penalty, fine or similar payment.

The National Association of Attorneys General will receive $15 million to create and administer the "Financial Services and Consumer Protection Enforcement, Education and Training Fund." The Conference of State Bank Supervisors will receive $65 million—$15 million will establish the "State Financial Regulation Fund" and $1 million will go to each state financial regulator who signed the consent judgment. The state members of the executive committee who negotiated the settlement and the Ameriquest Financial Services Fund will split $10 million to cover costs and attorneys' fees. Qualifying individuals whose homes were sold or taken in foreclosure between Jan. 1, 2008, and Dec. 31, 2011, who submit claims, will receive cash payments from the $1.5 billion set aside for that purpose.

Nearly $3 billion is committed to refinance "underwater" mortgages, for borrowers who are current on their payments, but whose mortgage is more than their home's current market value. The remaining settlement money, approximately $17 billion, is dedicated to consumers for mortgage modifications, short sales, deficiency waivers, anti-blight prevention activities and principal forbearance for unemployed borrowers, along with specific short sale provisions for military borrowers. Each servicer will receive credit for completing these consumer relief activities; however since only some count dollar-for-dollar, the banks will end up providing consumer relief in excess of the nearly $17 billion specified in the consent judgment.

Approved by U.S. District Judge Rosemary Collyer on April 4, the settlement is now effective. The five servicers have seven days—until April 11—to deposit their portions of the settlement into an escrow account. The consent judgment remains in effect for three and a half years, and the servicers are required to earn 75 percent of the consumer relief credits within the first two years or pay substantial cash penalties. Direct payments to mortgage borrowers will begin once a settlement administrator is retained, within 90 days of the settlement's effective date.

In addition to the payments, the servicers have agreed to follow new standards for handling mortgage loans and foreclosures. During the term of the settlement agreement, the servicers will oversee and manage third-party providers, such as foreclosure firms, law firms and independent contractors. The servicers must establish an easily accessible and reliable single point of contact for each first lien mortgage borrower and develop an online site where borrowers can check the status of their loan modifications.

"Dual tracking" practices are restricted under the agreement. Servicers are also prohibited from adopting employee compensation arrangements that encourage foreclosure over loss mitigation alternatives. The settlement also requires more transparency in the mortgage servicing process, such as making the general requirements for short sales more available. In addition, the settlement enhances protections for military personnel.

### NCSL Staff Contact

Heather Morton, 303-364-7700, Denver

**Page Last Updated: September 4, 2013**

### Additional Information

National Mortgage Summary Documents

2013 Foreclosures Legislation

2012 Foreclosures Legislation

2011 Foreclosures Legislation

### Office of Mortgage Settlement Oversight Reports

Fact Sheet: Final Progress Report Aug 2013

Fact Sheet: Updated National Consumer Relief Data May 2013

Ongoing Implementation: A Report from the Monitor of the National Mortgage Settlement Feb. 2013

Continued Progress: A Report from the Monitor of the National Mortgage Settlement Nov. 2012

First Take: Progress Report from the Monitor of the National Mortgage Settlement Aug. 2012

### NAVIGATE

Home

About State Legislatures
Agriculture and Rural Development
Civil and Criminal Justice
Education
Elections and Campaigns
Energy
Environment and Natural Resources
Ethics
**Financial Services and Commerce**
• Commerce
• Financial Crimes
• Insurance
• Medical Liability and Malpractice
• Mortgages and Loans

Fiscal Policy
Health
Human Services
Immigration
International
Labor and Employment
Military and Veterans Affairs
Redistricting
State-Tribal Institute
Telecommunications and Information Technology
Transportation

**Share this:**

Exhibit

6.

Joseph A. Smith, Jr., former North Carolina banking commissioner, will supervise the implementation of the settlement, along with the monitoring committee comprised of representatives from the state attorneys general, state financial regulators, the U.S. Department of Justice and the U.S. Department of Housing and Urban Development. He is responsible for determining whether the five financial institutions are in compliance with the servicing standards and have satisfied the relief requirements in accordance with the consent judgment.

Although the settlement resolves some violations, the federal government and state attorneys general did not release all the potential claims against these five servicers. The federal government and states can still pursue criminal prosecutions for criminal offenses and violations of the fair lending laws based on discriminatory conduct. Securitization claims based on the offer, sale or purchase of mortgage securities are not released by the settlement. The states also did not release any potential claims against Mortgage Electronic Registration Systems, Inc., MERSCORP, Inc. or any tax claims relating to real estate transfer taxes. Mortgage borrowers can still file claims on an individual or class action basis.

To review the settlement documents for each servicer, go to www.NationalMortgageSettlement.com. The chart below summarizes how states allocated their share of the settlement funds.

## State Payment Settlement Amounts

AL | AK | AZ | AR | CA | CO | CT | DE | FL | GA | HI | ID | IL | IN | IA | KS | KY | MD | MA | MI | MS | MT | NE | NV | NH | NJ | NY | NC | ND | OH | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WI

**NOTE: If you have questions regarding an individual mortgage, please contact an attorney in your state or the Office of Mortgage Oversight. NCSL is unable to provide assistance or advice in individual cases.**



| State | Dollar Allocation | Use of Funds in the State |
|---|---|---|
| Alabama | $25,305,692 | $1,119,730 to the Alabama Foreclosure Assistance Project administered by Legal Services Alabama to provide free civil legal representation to up to 6,000 low-income families facing foreclosure or other mortgage-related issues;<br>$1,095,356 to Gateway to provide financial counseling, pre- and post-purchase housing counseling, foreclosure prevention, reverse mortgage counseling, and consumer outreach;<br>$500,000 to the Woodlawn Foundation, Inc., for its homeowner rehabilitation program to provide rehabilitation services to existing homeowners who are potentially facing foreclosure;<br>$500,000 to the Alabama Statewide Foreclosure Prevention Mediation Program administered by the Alabama Center for Dispute Resolution to train mediators in foreclosure mediation and provide 300-500 foreclosure mediations;<br>$440,000 to the Stepping In to Homeownership Project administered by the Women's Fund of Greater Birmingham to provide housing and workforce development services;<br>$210,870 to the Foreclosure Relief Project administered by the University of Alabama School of Law to provide free legal services through six to 10 law students each semester;<br>$2,530,569 to state General Fund as civil penalties, and<br>The remaining funds are directed to the Office of the Attorney General. |
| Alaska | $3,286,839 | The funds are directed to the state General Fund to be earmarked for housing development projects. |
| Arizona | $97,784,204 | $50 million to state general fund to used for areas covered by the National Mortgage Settlement, including agencies such as the state Real Estate Department, Department of Insurance and attorney general – Department of Law, and for other areas impacted by the alleged unlawful conduct of the defendants in the National Mortgage Settlement;<br>$41 million for direct assistance to help keep people in their homes and consumer restitution;<br>$5 million for enforcement and monitoring ($1.6 million per year for three years);<br>$5 million for housing counseling ($1.6 million per year for three years);<br>$4 million for legal services ($1.3 million for three years), and<br>$2 million for outreach, marketing and education ($666,000 per year for three years). |
| Arkansas | $12,830,241 | $9 million for the Arkansas Development Finance Authority;<br>$2 million for the Arkansas Access to Justice Commission;<br>$500,000 for the University of Arkansas School of Law legal aid clinic;<br>$500,000 for the University of Arkansas at Little Rock School of Law legal aid clinic, and<br>The remaining funds are directed to the state treasury for costs and fees associated with the settlement agreement. |
| California | $410,576,996 | $1 million to the National Housing Law Project;<br>$225,000 to the Asian Pacific Islander Legal Outreach;<br>$1,750,000 to the Bet Tzedek Legal Services; |

| | | |
|---|---|---|
| | | $550,000 to the California Rural Legal Assistance;<br>$700,000 to the Central California Legal Services;<br>$450,000 to the Community Housing Development Corporation;<br>$500,000 to the Community Housing Works San Diego;<br>$75,000 to El Concilio;<br>$200,000 to Fair Housing of Marin;<br>$225,000 to Habitat for Humanity Stanislaus County;<br>$250,000 to Housing and Economic Rights Advocates;<br>$35,000 to the Inland Empire Latino Lawyers Association;<br>$850,000 to the Inland Fair Housing and Mediation Board;<br>$450,000 to the Legal Aid Foundation of Santa Barbara;<br>$725,000 to Legal Services of Northern California;<br>$550,000 to the Mission Economic Development Agency;<br>$100,000 to the National Telemarketing Victim Call Center;<br>$500,000 to Neighborhood Housing Services of Los Angeles County;<br>$345,000 to NeighborWorks Orange County;<br>$50,000 to the Tri-Valley Housing Opportunity Center<br>$575,000 to the Unity Council;<br>$295,000 to the Watsonville Law Center and<br>10% of the total payment as civil penalties and deposited in the Unfair Competition Law Fund. |
| Colorado | $50,170,188 | $24 million for supplemental loan-modification programs;<br>$18.196 million for affordable housing programs;<br>$5.625 million for housing counseling through the state;<br>$1.5 million for Colorado Legal Services;<br>$750,000 for temporary staffing at the attorney general's office;<br>$600,000 for the Colorado Foreclosure Hotline, and<br>$500,000 for marketing and outreach efforts. |
| Connecticut | $26,102,142 | $21 million to fund the Emergency Mortgage Assistance Program administered by the Connecticut Housing Finance Authority;<br>$400,000 for the Foreclosure Mediation Program and Voluntary Attorney Foreclosure Advice pilot program;<br>$500,000 for the Mortgage Crisis Job Training Program in the state Department of Labor;<br>$2.6 million to the state General Fund as civil penalties, and<br>The remaining funds will be used to fund attorneys and housing counselors in the Department of Banking, the Connecticut Fair Housing Center, the Office of the Attorney General and the Department of Economic and Community Development and to fund public service announcements promoting the Foreclosure Prevention Hotline and other related initiatives. |
| Delaware | $7,913,923 | $4 million to the Delaware Emergency Mortgage Assistance Program;<br>$3.5 million to fund housing counselors and outreach and education programs for homeowners;<br>$2.75 million to the Office of the Attorney General for continuing financial fraud investigation and enforcement initiatives;<br>$888,923 to the Community Legal Aid Society, Delaware Volunteer Legal Services and the Legal Services Corporation to support legal representation for borrowers facing foreclosure, and<br>$500,000 to Delaware's Mortgage Mediation Program. |
| District of Columbia | $4,433,081 | |
| Florida | $334,073,974 | $35 million for down payment assistance;<br>$10 million for housing counseling;<br>$5 million for the state court system to help with foreclosure-related issues;<br>$5 million to the Office of the Attorney General to fund legal aid programs;<br>$9,117,895 to the Florida Prepaid Tuition Scholarship Program;<br>$5,262,579 to the state courts system to provide technology solutions that expedite foreclosure cases through the judicial process;<br>$16 million to the state courts system to provide supplemental resources to reduce the backlog of pending foreclosure cases;<br>$9.7 million to the clerks of the court to enhance service levels to assist and support the courts in expediting processing backlogged foreclosure cases;<br>$10 million to the Office of the Attorney General to provide legal aid to low- and moderate-income homeowners facing foreclosure;<br>$10 million to the Department of Children and Families for capital improvements to certified domestic violence centers;<br>$20 million to Habitat for Humanity of Florida;<br>$50 million to reduce rents on new or existing rental units through the State Apartment Incentive Program;<br>$10 million to fund the construction or rehabilitation of units through the State Apartment Incentive Loan Program;<br>$40 million to fund the State Housing Initiative Program;<br>$10 million to the Department of Economic Opportunity to fund a competitive grant |

| | | |
|---|---|---|
| | | program to provide housing for homeless persons;<br>$10 million to the Department of Economic Opportunity to fund a competitive grant program to provide housing for persons with developmental disabilities;<br>$5 million to the Office of the Attorney General to reimburse the office for costs and fees;<br>The remaining funds are directed to the state General Fund as civil penalties. |
| Georgia | $99,365,105 | The entire amount will be used for economic development, the money will be split equally between regional economic business assistance grants and other rural economic development efforts. |
| Hawaii | $7,911,883 | $3 million to Legal Aid and its grant partners Consumer Credit Counseling Services of Hawaii, Hale Mahaolu, The Hawaii HomeOwnership Center and Hawaiian Community Assets<br>$2 million to the department of Commerce and Consumer Affairs<br>$1,176,293 to the state judicial system<br>$149,225 to the Kuikahi and West Hawaii Mediation Centers<br>$57,122 to the Mediation Center of the Pacific |
| Idaho | $13,305,209 | $500,000 to the Consumer Protection Fund;<br>$120,000 for the Idaho State Bar Volunteers Legal Program;<br>$120,000 for the Idaho Legal Aid Services;<br>$110,000 for distribution to other governmental entities or organizations as determined by the attorney general;<br>$100,000 for the Community Action Partnership, and<br>The remaining funds are directed to the state treasury. |
| Illinois | $105,806,405 | $20 million to legal aid organizations;<br>$5 million to pilot mortgage foreclosure mediation programs;<br>$2 million to the Affordable Housing Corporation of Lake County;<br>$1.5 million to Chicago Neighborhood Initiatives;<br>$3 million to the Community Foundation of the Fox River Valley;<br>$2.2 million the Community Investment Corporation;<br>$1,237,000 to the Community Service Council of Northern Will County;<br>$6 million to the Cook County Land Bank Authority;<br>$2 million to the Decatur Housing Authority;<br>$1.5 million to the Evanston Community Revitalization Partnership;<br>$750,000 to Genesis Housing Development Corporation;<br>$2 million to Habitat for Humanity Champaign County;<br>$1 million to Habitat for Humanity Chicago South Suburbs;<br>$1,360,000 to Habitat for Humanity of McHenry County;<br>$3 million to the Hispanic Housing Development Corporation;<br>$150,000 to Access Living of Metropolitan Chicago;<br>$100,000 to Chicago Area Fair Housing Alliance;<br>$448,448 to Chicago Metropolitan Agency for Planning;<br>$50,000 to Corporation for Supportive Housing;<br>$500,000 to DePaul University Institute for Housing Studies;<br>$750,000 to Housing Action Illinois/NeighborWorks America;<br>$500,000 to Housing Action Illinois/Neighborhood Housing Services of Chicago;<br>$250,000 to Illinois Association of Community Action Agencies;<br>$2.5 million to Illinois Housing Development Authority;<br>$94,875 to Mission Strategy Consulting;<br>$41,000 to the National Consumer Law Center;<br>$150,000 to Teska Associates, and<br>$500,000 to the Woodstock Institute. |
| Indiana | $43,803,419 | $28.8 million for the Low Income Home Energy Assistance Program (LIHEAP);<br>The remaining funds are directed to the Consumer Protection Division and its Homeowner Protection Unit (HPU) and other efforts to prevent foreclosure. |
| Iowa | $14,651,922 | $1 million to the Iowa Infrastructure Fund;<br>Mortgage Servicing Settlement Fund created under the control of the state Department of Justice;<br>Banking Division Mortgage Servicing Settlement Fund created under the control of the Division of Banking of the Department of Commerce;<br>Any unencumbered or unobligated moneys remaining in the Mortgage Servicing Settlement Fund or Banking Division Mortgage Servicing Settlement Fund on June 30, 2015, shall be transferred to the general fund of the state. |
| Kansas | $13,778,401 | 25% of the settlement to the Office of the Attorney General to 1) support the attorney general's investigation and prosecution of suppliers in the housing and financial sectors who violate the law; 2) to resolve consumer complaints regarding efforts to prevent foreclosures and remedy mortgage servicing abuses; and 3) defraying the investigative, administrative and consumer education costs associated with the settlement.<br>The remaining funds are directed to the state General Fund as civil penalties. |
| Kentucky | $19,198,220 | $1.5 million to the City of Louisville for the city's Vacant Abandoned Property Initiative, the Targeted Demolition Program that addresses the problem of blight by removing deteriorated structures that have been abandoned and the Affordable |

|  |  | Housing Trust Fund, which provides grants to organizations dedicated to creating or preserving affordable housing for low and moderate-income families;<br>$7.5 million to the Kentucky Housing Corporation (KHC);<br>$250,000 to each of the four regional Legal Aid centers in Kentucky to be used to assist homeowners who are going through the foreclosure process or seeking to avoid foreclosure;<br>$4 million to update the Kentucky All Schedule Prescription Electronic Reporting Program;<br>$5 million to the Office of the Attorney General to assist consumers and investigate mortgage and securities issues. This includes potential litigation regarding MERS involvement in wrongful foreclosures, and<br>$150,000 to the Cabinet for Health and Family Services for lead abatement through the Division of Public Health. |
|---|---|---|
| Louisiana | $21,741,560 |  |
| Maine | $6,907,023 |  |
| Maryland | $59,697,470 | $8,600,000 for housing counselors;<br>$6,227,863 for legal assistance organizations;<br>$10,000,000 for Baltimore City local government housing program;<br>$10,000,000 for Prince George's County local government housing program;<br>$2,761,860 for new temporary enforcement positions in the Office of the Attorney General<br>$2,138,000 for financial fraud prevention positions at Department of Labor, Licensing and Regulation;<br>$14,000,000 for a neighborhood stabilization fund, and<br>$5,969,747 to the state General Fund as civil penalties. |
| Massachusetts | $44,450,668 | $16 million to be used to mitigate future impacts of the foreclosure crisis through the HomeCorps Loan Modification Initiative, HomeCorps Borrower Representation Initiative and the HomeCorps Borrower Recovery Initiative;<br>$10 million for Crisis Response Innovation grants and Municipal and Community Restoration grants;<br>$4.4 million to the state General Fund as civil penalties;<br>$1 million to the state General Fund for legal expenses;<br>$1.5 million for compliance and implementation of the consent judgment;<br>$1 million to the Supplement Local Consumer Aid Fund, and<br>The remaining funds are reserved for further implementation, HomeCorps programming and grants. |
| Michigan | $97,209,465 | $7.5 million for foreclosure rescue scam victim restitution;<br>$5 million for assistance for veterans who have been unable to qualify for existing mortgage and foreclosure assistance programs;<br>$6 million for the Michigan Attorney General Home Protection Unit to investigate and prosecute foreclosure-related crimes;<br>$25 million for blight elimination throughout the state;<br>$20 million for foreclosure counseling for homeowners through the Michigan State Housing and Development Authority (MSHDA) and Michigan State University Extension Offices;<br>$3.7 million for housing and community development programs to develop and coordinate public and private resources to meet the affordable housing needs of low income households and revitalizing downtown areas and neighborhoods in Michigan;<br>$5 million to the MSHDA to provide grants to help homeowners refinance existing mortgage loans;<br>$15 million to provide assistance to homebuyers when purchasing a home, and<br>$10 million to the Education Achievement Authority to help improve performance of Michigan's lowest performing schools. |
| Minnesota | $41,536,169 |  |
| Mississippi | $13,580,374 | $5.8 million for the Mississippi Foreclosure Prevention Consortium and<br>$7.7 million to the state's General Fund. |
| Missouri | $39,583,212 |  |
| Montana | $4,858,276 | $3 million to create Keep My Montana Home;<br>$863,000 to the Montana Legal Services Association to provide free advice and representation to some homeowners experiencing legal problems in the foreclosure process;<br>$450,000 to the state General Fund as civil penalties, and<br>The remaining funds to the Office of the Attorney General for ongoing enforcement activities to prevent and prosecute financial fraud or deceptive practices, monitoring of the settlement, public outreach and training. |
| Nebraska | $8,422,528 | The entire amount will be deposited into the state's rainy day fund. The funds are eligible to be transferred from the rainy day fund for future expenditure. |
| Nevada | $57,368,430 | $11.7 million to be used to create a dedicated call center staffed by housing counselors. The attorney general will seek legislative review and funding approval to continue the program when the legislature convenes in 2013. |

| New Hampshire | $9,575,447 | $3.5 million to New Hampshire Legal Assistance, Legal Advice Referral Center, and the New Hampshire Bar Association;<br>$2.5 million to the New Hampshire Housing Finance Authority and<br>$1,006,616 to the Department of Justice for the creation of a Financial Fraud Unit. |
|---|---|---|
| New Jersey | $72,110,727 | The funds from the Mortgage Servicing Settlement Fund are to be transferred to the General Fund as state revenue to be appropriated, subject to the approval of the director of the Division of Budget and Accounting, for the following purposes: attorneys fees, investigation and other expenses related to the investigation and resolution of the mortgage servicing settlement, affordable housing, local planning services, developmental disabilities residential services, state rental assistance program, jomelessness prevention, shelter assistance, community-based senior programs, mental health residential programs, social services for the homeless, and Temporary Assistance for Needy Families, but only to the extent that the use of these funds comports with the settlement for the use of these funds. |
| New Mexico | $11,174,579 | |
| New York | $107,642,490 | $9 million to support the state's Foreclosure Prevention Services Program;<br>$6 million to support housing and community renewal activities statewide through not-for-profit community-based housing organizations;<br>$60 million to the Attorney General's Homeowner Protection Program to support housing counselors and legal services providers working with homeowners statewide and<br>The remaining funds allocation to be determined. |
| North Carolina | $60,852,159 | $4,780,000 to the Department of Justice, Consumer Protection Division, for financial fraud detection and prevention efforts;<br>$6,690,000 to the Administrative Office of the Courts to be administered by the North Carolina Conference of District Attorneys. Funds shall be used for grants and training for prosecutorial offices to expand prosecution of lending and financial crimes;<br>$30,520,000 to the Housing Finance Agency for housing counselors and other assistance to help distressed homeowners;<br>$5,740,000 to the Civil Penalty and Forfeiture Fund and<br>$2,870,000 to the Department of Justice, State Bureau of Investigation, to expand its accounting and financial investigative ability and its expertise to investigate financial and lending crimes. |
| North Dakota | $1,947,666 | The entire amount will be spent to support housing projects in the state. |
| Ohio | $92,783,033 | $75 million to the creation of a grant program for abandoned/vacant property demolition;<br>$20 million to a grant program to provide assistance to families and individuals who are at risk of foreclosure or have already lost their home, and<br>$2 million to to expand the Economic Crimes Division of the Ohio Attorney General's Office. |
| Oregon | $29,253,190 | |
| Pennsylvania | $66,527,978 | 90% is allocated to the Pennsylvania Housing Finance Agency for the purpose of funding the Homeowner's Emergency Mortgage Assistance Program;<br>5% is allocated to the Office of the Attorney General for the purpose of funding housing consumer protection programs, and<br>5% is allocated to the Access to Justice Account for civil legal assistance related to housing issues. |
| Rhode Island | $8,500,755 | The entire amount will be used to fund the Rhode Island Foreclosure Protection Program to prevent or reduce the number of initiated foreclosures in Rhode Island and assist homeowners struggling with mortgage payments. The program will be developed by the Office of the Attorney General in consultation with Rhode Island Housing. |
| South Carolina | $31,344,349 | $10 million to the Department of Commerce Closing Fund for economic development and<br>The remaining funds are directed to the state General Fund. |
| South Dakota | $2,886,824 | $1 million to the South Dakota Home Builders Association for the purpose of revolving low interest loan fund to fund spec homes for low income applicants;<br>$500,000 to GROW South Dakota to create loan products that will assist veterans and other low to moderate income South Dakota residents with home purchase and modification financing;<br>$372,364 to the South Dakota Housing Development Authority to fund homebuyer education programs;<br>$270,778 to the Ellsworth Development Authority to develop residential lots and rental units for low income residents in the housing Development Freedom Estates, outside of Ellsworth Air Force Base;<br>$200,000 to Homes Are Possible Inc., for housing down payment and closing cost assistance;<br>$144,341 to East River Legal Services to fund legal costs for low income applicants;<br>$144,341 to Dakota Plains Legal Services to fund legal costs for low income applicants; |

|  |  |  |
|---|---|---|
|  |  | $120,000 to Luther Social Services of South Dakota for credit counseling services;<br>$50,000 to Beadle and Spink Enterprise Community to assist with collateral expenses for four governor homes in Beadle and Spink Counties;<br>$40,000 to the Teton Coalition for the purpose of homebuyer education;<br>$30,000 to Consumer Credit Counseling of the Black Hills for housing and foreclosure counseling, and<br>$15,000 to James Valley Housing Inc., for the purpose of housing, education, counseling and closing cost loan assistance. |
| Tennessee | $41,207,810 | $4,120,781 to the state general fund as civil penalties;<br>$34.5 million to the Tennessee Housing Development Agency for its Keep My Tennessee Home financial assistance program and for foreclosure counseling;<br>$250,000 to the Department of Commerce and Insurance, Division of Consumer Affairs, for the Consumer Education Fund;<br>$700,000 to four legal aid entities (Memphis Area Legal Services, West Tennessee Legal Services, Legal Aid of East Tennessee and Legal Aid Society of Middle Tennessee and the Cumberlands);<br>$1,862,029 to the attorney general's litigation settlement reserve;<br>$1 million to the Department of Financial Institutions for examiner training, information technology support and equipment, Tennessee Financial Literacy Commission and consumer education efforts. |
| Texas | $134,628,489 | $10 million to the Judicial Fund as civil penalties and<br>The remaining funds to be directed to the state General Fund. |
| Utah | $21,951,641 | $1.75 million for homeless shelters and services,<br>$2 million for mortgage fraud investigations in the office of the attorney general and<br>The remaining funds are directed to the state treasury. |
| Vermont | $2,552,240 | $1,100,000 to fund affordable housing initiatives, including grants for foreclosure and homeownership counseling, financing mobile homes, increasing the state's affordable housing tax credit, capacity building among state and nonprofit agencies to assist mobile home owners, and exemption from several taxes to replace homes destroyed by recent flooding and natural disasters, and<br>The remaining funds are directed to the state General Fund. |
| Virginia | $66,525,233 | $7 million for the Virginia Housing Trust Fund and<br>The remaining funds are directed to the state General Fund. |
| Washington | $54,242,749 | $2 million to Aberdeen Neighborhood Housing Services, Inc.;<br>$393,563 to Catholic Charities Housing Services;<br>$600,000 to El Centro de la Raza;<br>$2,145,800 to HomeSight to provide downpayment assistance to encourage purchase of foreclosed homes;<br>$1 million to Homestead Community Land Trust to purchase and rehabilitate vacant and distressed homes;<br>$13,053,044 to Legal Foundation of Washington;<br>$2 million to Lifelong AIDS Alliance to address housing needs for individuals with chronic conditions or special needs;<br>$2,137,700 to Resolution Washington to continue foreclosure mediation program;<br>$3,074,354 to Spokane Neighborhood Action Partners;<br>$3,860,000 to the City of Tacoma/Tacoma Community Redevelopment Authority to purchase and rehabilitate vacant and distressed homes;<br>$950,000 to Washington Homeownership Resource Center;<br>$3 million to Washington State Housing Finance Commission for its Home Advantage Rebound program;<br>$3,120,000 to Washington State Housing Finance Commission for its statewide housing counseling program;<br>$6,153,689 to Washington State Housing Finance Commission for its Washington Homeowner Stability Fund, and<br>$311,850 to White Center Community Development Association. |
| West Virginia | $5,748,915 |  |
| Wisconsin | $30,191,806 | $625,000 to retain experienced Assistant District Attorneys;<br>$625,000 to retain experienced Assistant Attorneys General;<br>$500,000 to support a WHEDA program for demolitions;<br>$750,000 to a WHEDA program for equity investment in Milwaukee's industrial corridor;<br>$750,000 to a WHEDA program for loan guarantees to Milwaukee small businesses;<br>$780,000 in tribal law enforcement grants and victim/witness program grants;<br>$496,050 in 2012-2013 support for foreclosure mediation in Milwaukee county and expansion of mediation statewide;<br>$400,000 for future support for foreclosure mediation;<br>$100,000 for law enforcement and prosecutor training on white collar crime;<br>$139,000 for positions within the DOJ's Division of Legal Services' Consumer Protection Unit to assist consumers and investigate and prosecute mortgage-related fraud and white collar crime;<br>$185,000 for the DOJ's Division of Criminal Investigation (DCI) to focus on white |

collar crime and
$550,000 remains to be allocated.

Wyoming    $2,614,515

NCSL Member Toolbox

Members Resources
- Get Involved With NCSL
- Jobs Clearinghouse
- Legislative Careers
- NCSL Staff Directories
- Staff Directories
- StateConnect Directory

Policy & Research Resources
- Bill Information Service
- Legislative Websites
- NCSL Bookstore
- State Legislatures Magazine

Meeting Resources
- Calendar
- Online Registration

Press Room
- Media Contact
- NCSL in the News
- Press Releases

Denver

7700 East First Place
Denver, CO 80230
Tel: 303-364-7700 | Fax: 303-364-78(

Washington

444 North Capitol Street, N.W., Suite
Washington, D.C. 20001
Tel: 202-624-5400 | Fax: 202-737-10(

Copyright 2015 by National Conference of State Legislatures

Website Feedback

Go 24569



# ATTORNEY GENERAL OF TEXAS
## GREG ABBOTT

## CONSUMER PROTECTION DIVISION
## FACSIMILE COVER SHEET

**From:** James A. Daross/lfq

**Phone:** (915) 834-5806

**Fax:** (915) 542-1546

**Date:** March 19, 2014

**To:** Richard Roman

**Company/Agency:**

**Phone:** (915) 651-2679

**Fax:** (915) 351-6754

**Pages (including cover page):** 100

**Comments:** Attached are copies of the Plaintiff's Motion to Dismiss for Lack of Jurisdiction and Plaintiff's Response to Motion for Appointment of A Master in Chancery and Motion to Reurge an Appointment of A Master In Chancery or to Covene [*sic*] a Court of Inquiry that we will be filing today.

### CONFIDENTIALITY NOTICE

This communication is confidential pursuant to Texas Government Code §§ 552.101, 552.103, 552.107 & 552.111, and Texas Penal Code § 39.06, and should not be disclosed without the express authorization of the Attorney General. It may also be subject to the attorney client and/or work product privileges. This communication is intended solely for the exclusive use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that the sender does not waive any privileges accorded to this communication and that any use, disclosure, dissemination, distribution, forwarding, copying or the taking of any action because of this communication without the express authorization of the sender is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or electronic mail to arrange for the return of the communication

401 E. FRANKLIN AVE., SUITE 530, EL PASO, TEXAS 79901 TEL. 915-834-5800 FAX. 542-1546    **Exhibit**
WEB: WWW.TEXASATTORNEYGENERAL.GOV
*An Equal Employment Opportunity Employer · Printed on Recycled Paper*    **7.a.**

## IN THE 448TH JUDICIAL DISTRICT COURT OF
## EL PASO COUNTY, TEXAS

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Cause No. 2010-3307 |
| | § | |
| AMERICAN HOME MORTGAGE | § | |
| SERVICING, INC. | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION TO DISMISS FOR
## LACK OF JURISDICTION

Plaintiff, the State of Texas ("Plaintiff") files this its Motion to Dismiss Robert and
Marie Hossfeld's "Texas Rules of Civil Procedure Rule 171 Motion for Appointment of a Master
In Chancery" and Robert Hossfeld's "Motion to Reurge an Appointment of a Master in Chancery
or to Covene [sic] a Court of Inquiry" for lack of jurisdiction, and would show the Court as
follows:

### PROCEDURAL HISTORY

1.     On August 30, 2010, the State of Texas sued Defendant, Homeward Residential
Holdings, Inc. f/k/a American Home Mortgage Servicing, Inc. ("Defendant" or "Homeward"),
alleging that Defendant violated, among other laws, §17.47 of the Texas Deceptive Trade
Practices-Consumer Protection Act, TEX. BUS. & COM. CODE ANN. §17.41, et seq. (West 2011)
(the "DTPA").

2.     On November 26, 2013, Robert and Marie Hossfeld filed a pleading in this cause entitled "Texas Rules of Civil Procedure Rule 171 Motion for Appointment of a Master In Chancery" (the "First Motion").

3.     On December 6, 2013, this Court signed its Order Granting Motion to Strike Intervenors Robert and Marie Hossfeld, in which it ordered Robert and Marie Hossfeld severed from this suit and ordered the District Clerk to open a new action with a separate cause number. As of December 6, 2013, Robert and Marie Hossfeld ceased being parties to this suit and as a result, have no standing in this action.

4.     On December 19, 2013, Robert Hossfeld filed in this cause a "Motion to Reurge an Appointment of a Master in Chancery or to Covene [sic] a Court of Inquiry" (the "Second Motion").

5.     On January 23, 2014, the Clerk assigned Cause No. 2014-DCV-0180, styled Robert and Marie Hossfeld v. American Home Mortgage Servicing, Inc., (the "Hossfeld Case") to the severed cause of action.

6.     On February 14, 2014, Defendant Homeward Residential, f/k/a American Home Mortgage Servicing, Inc., removed the Hossfeld Case to federal court.

7.     On February 24, 2014, Robert and Marie Hossfeld dismissed the federal court case.

### ARGUMENT & AUTHORITIES

#### A. This Court Lacks Jurisdiction Over
#### Robert and Marie Hossfeld and Their Motions.

8.     To render a binding judgment, the trial court must have (1) jurisdiction over the parties or property; (2) jurisdiction over the subject matter of the suit; (3) jurisdiction to enter the

particular judgment and (4) capacity to act as a court. *State Bar v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). Judgment may not be granted in favor of a party not named in the suit as a plaintiff or a defendant. *Fuqua v. Taylor*, 683 S.W.2d 735, 738 (Tex. App.-Dallas 1984, writ ref'd n.r.e.)

9.      Once this court signed its Order Granting Motion to Strike Intervenors Robert and Marie Hossfeld, Mr. and Mrs. Hossfeld were no longer parties to this suit. Because they are no longer parties, the court does not have jurisdiction over them. Neither does it have jurisdiction over any pleading filed by them.

10.     A severance divides a lawsuit into independent suits, each of which may be resolved separately. *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381 (Tex. 1985). Because the Hossfeld's case against AHMSI was severed from the instant cause, they have no live lawsuit against the State of Texas.

### B. Robert and Marie Hossfeld Lack Standing to Challenge the Actions of the State of Texas or the Office of the Attorney General

11.     Even assuming Mr. Roman could find clients willing to file a lawsuit against the State containing the allegations in his Motions, and therefore bring a live case before this Court, they would, like the Hossfelds, lack standing to challenge the actions of the State of Texas or the Office of the Attorney General.

12.     In his Second Motion, Robert Hossfeld states that:

> "Now, serious factual concerns have materialized that substantiate doubts about the efficacy of General Abbott's mortgage task force on behalf of 'harmed homeowners.' Indeed, an argument exists that the appointment of a master in chancery is essential to insure that the public interests and justice are served."

13.     These "factual concerns," which are not specified or even vaguely described in any of Hossfeld's pleadings, appear to relate to the manner in which the State of Texas or the Office of

the Attorney General have allocated funds recovered in several actions against mortgage companies. As such, these "concerns" seem to be about how the State or its agency, the Office of the Attorney General, conducts state business.

14.     Generally, a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts. *Andrade v. NAACP of Austin*, 345 S.W.3d 1, (Tex. 2011); *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001). Thus, "[s]tanding doctrines reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law." Charles Alan Wright, Et Al., *Federal Practice & Procedure* § 3531.10 (3d ed. 2008). This pragmatic approach "ensures that 'there is a real need to exercise the power of judicial review' in a particular case, and it helps guarantee that courts fashion remedies 'no broader than required by the precise facts to which the court's ruling would be applied.'" *Lance v. Coffman*, 549 U.S. 437, 441, 127 S. Ct. 1194, 167 L. Ed. 2d 29 (2007) (citations omitted). Based partly on the notion of judicial self governance, this rule recognizes that other branches of government may more appropriately decide "abstract questions of wide public significance," *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).

### C. This Court Lacks Jurisdiction to Hear a Claim for Judgment Against the State or its Agency under the Doctrine of Sovereign Immunity

15.     Even assuming that there were a live lawsuit against the State, which there is not, this Court lacks jurisdiction to hear a claim against the State or the Office of the Attorney General by reason of the doctrine of sovereign immunity.

16.     Mr. Hossfeld has asked this court to enter an order on an issue which has no bearing on the facts of the underlying suit. In essence, he is asking this Court to hale the Office of the

Attorney General into this Court as a new party in a new case, and render judgment against it and/or the State of Texas for vague, unspecified, unfounded allegations of wrongdoing.

17.     Sovereign immunity protects the State of Texas and various divisions of the state government, including agencies, boards, hospitals, and universities. The Office of the Attorney General is an agency of the State of Texas. Governmental immunity, on the other hand, protects political subdivisions of the State, including counties, cities, and school districts. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). Both sovereign and governmental immunity embrace two separate and distinct principles: (1) immunity from suit; and (2) immunity from liability. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 93 (Tex. 2012) ; *General Services Comm'n v. Little-Tex Insulation Co., Inc.,* 39 S.W.3d 591, 594 (Tex. 2001). Immunity from suit bars an action against the governmental entity unless immunity from suit has been waived by the legislature [see *City of Dallas v. Albert*, 354 S.W.3d 368, 373 (Tex. 2011) ("we have consistently held that waivers of [immunity from suit] are the prerogative of the Legislature"); cf. *City of Mexia v. Tooke*, 197 S.W.3d 325, 344 (Tex. 2006)]. Immunity from suit is a jurisdictional bar and is properly raised by a plea to the trial court's jurisdiction [see *Tex. Dept. of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)] The Texas Supreme Court stated that "governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." *Osborne v. Keith*, 142 Tex. 262, 177 S.W.2d 198, 200 (Tex. 1944)

18.     The Legislature has not given its consent to this action, so the Court lacks jurisdiction to hear and rule on the Hossfelds' Motions.

### D. Mootness

19.    The Hossfelds' request for appointment of a Master in Chancery is moot as there are no discretionary funds to distribute. With the exception of a $50,000 payment to the State of Texas which is specifically designated for attorney's fees in this case, there are no other funds to be distributed herein. And in the three cases mentioned in the Hossfelds' Motion in which the Office of the Attorney General recovered money for the State, all of the monies have already been distributed in accordance with the legislative mandates:

- In the Lender Processing case, $5,755,050.00 was deposited in the General Fund pursuant to Tex. Gov't Code§ 404.097, and $483,333.00 was deposited in the General Fund for attorney's fees pursuant to Tex. Gov't Code § 402.006(c)

- In the Wells Fargo case, $2,012,772.00 was distributed pro rata to consumers who had lost their homes to foreclosure.

- In the Countrywide case, $7.46 million was paid as compensation to Texans who lost their homes to foreclosure, $2.80 million was paid to Texans in a "cash for keys" program, and $200,000.00 was deposited in the General Fund for attorney's fees pursuant to Tex. Gov't Code § 402.006(c)

20.    There are no funds herein (with the exception of the attorney's fees discussed above) for a Master in Chancery to distribute. There is literally nothing for a Master in Chancery to do.

### E. This Court Lacks Jurisdiction to Appoint
### A Master in Chancery under the Doctrine of Separation of Powers

21.    The doctrine of separation of powers is derived directly from the Texas Constitution, and states that each of the three branches of the State's government has defined powers and

authority, and a power granted to one branch may not be usurped by another.[1] Generally, it is said that the duty of the legislature is to enact laws; the duty of the executive is to enforce them; and the duty of the judiciary is to construe, interpret, and uphold them. See *Government Services Insurance Underwriters v. Jones*, 368 S.W.2d 560 (Tex. 1963).

22.     The Texas Legislature is constitutionally authorized to determine how money recovered in litigation is to be used.[2] It has done so,[3] and the money recovered in the actions at issue has been distributed according to the legislatively-mandated scheme. Absent an allegation that the statutory scheme is unconstitutional, which plaintiff does not make, the separation of powers doctrine precludes this court, through the appointment of a Master in Chancery, from second-guessing that legislative determination.

## CONCLUSION

19.     The Court has no jurisdiction to consider the Hossfelds' Motions for Appointment of a Master in Chancery or a Court of Inquiry, and the Hossfelds lack standing to bring such claims.

## PRAYER

20.     For these reasons, Plaintiff asks the Court to dismiss the Hossfelds' "Texas Rules of Civil Procedure Rule 171 Motion for Appointment of a Master In Chancery" and Mr. Hossfeld's "Motion to Reurge an Appointment of a Master in Chancery or to Covene [sic] a Court of Inquiry."

---

[1] TEX. CONST. art. II, § 1 The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

[2] Only the Legislature may designate the purposes and uses to which public moneys may be devoted. Tex. Att'y Gen. Letter Advisory No. 2 (1973); See TEX. CONST. Art. III, § 49a; Art. III, § 49(j); Art. VIII, § 22; See HB 1, 83rd Texas Legislature, pp I-3 to I-12.

[3] Tex. Gov't Code Ann. §402.007; §404.094; and §404.097(c); See SB 178, 76th Texas Legislature, Art. 3, §3.01(a)(2) and (b).

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**JOHN SCOTT**
Deputy Attorney General for Civil Litigation

**TOMMY PRUD'HOMME**
Chief, Consumer Protection Division


/s/ James A. Daross

**JAMES A. DAROSS**
Assistant Attorney General
State Bar No. 05391500
james.daross@texasattorneygeneral.gov
**RICHARD L. BISCHOFF**
Assistant Attorney General
State Bar No. 02343200
richard.bischoff@texasattorneygeneral.gov
Consumer Protection Division
401 E. Franklin Ave., Suite 530
El Paso, Texas 79901
915-834-5800
Fax 915-542-1546
**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded on the 19th day of March, 2014 to Defendant's attorney of record, Robert T. Mowery, Locke Lord Bissell & Liddell LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201-6776, and to Richard Roman, 505 E. Rio Grande, El Paso, Texas 79902, via fax number 915-351-6754, in accordance with the Texas Rules of Civil Procedure.


/s/ James A. Daross

James A. Daross

IN THE 448TH JUDICIAL DISTRICT COURT OF
EL PASO COUNTY, TEXAS

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| V. | § | Cause No. 2010-3307 |
| | § | |
| AMERICAN HOME MORTGAGE | § | |
| SERVICING, INC. | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S RESPONSE TO MOTION FOR APPOINTMENT OF A MASTER IN CHANCERY AND MOTION TO REURGE AN APPOINTMENT OF A MASTER IN CHANCERY OR TO COVENE [sic] A COURT OF INQUIRY

Subject to its Motion to Dismiss for Lack of Jurisdiction, Plaintiff, the State of Texas ("Plaintiff") files this its response to Robert and Marie Hossfeld's "Texas Rules of Civil Procedure Rule 171 Motion for Appointment of a Master In Chancery" and Robert Hossfeld's "Motion to Reurge an Appointment of a Master in Chancery or to Covene [sic] a Court of Inquiry," and would show the Court as follows:

### EXECUTIVE SUMMARY

1.      Robert Hossfeld, who is not a party in this case and has no standing, has filed with this Court a request to appoint a Master to investigate the manner in which settlement funds have been received and distributed by the State or the Office of the Attorney General, and to open a criminal inquiry without specifying what criminal law he contends the State or the Office of the Attorney General has violated.

2.      In purported support of his Motions, Mr. Hossfeld, with not a single sworn statement or other proof, has made reference to a non-existent investigation and cases in which the State of

Texas has no involvement. Mr. Hossfeld apparently wants this Curt to conduct a criminal inquiry in spite of the fact that the Office of the Attorney General conducted its business as required by Texas law. The Motions have no basis in law or in fact and should be dismissed.

## PROCEDURAL HISTORY

3.      On August 30, 2010, the State of Texas sued Defendant, Homeward Residential Holdings, Inc. f/k/a American Home Mortgage Servicing, Inc. ("Defendant" or "Homeward"), alleging that Defendant violated, among other laws, §17.47 of the Texas Deceptive Trade Practices-Consumer Protection Act, TEX. BUS. & COM. CODE ANN. §17.41, *et seq.* (West 2011) (the "DTPA").

4.      On November 26, 2013, Robert and Marie Hossfeld filed a pleading in this cause entitled "Texas Rules of Civil Procedure Rule 171 Motion for Appointment of a Master In Chancery" (the "First Motion").

5.      On December 6, 2013, this Court signed its Order Granting Motion to Strike Intervenors Robert and Marie Hossfeld, in which it ordered Robert and Marie Hossfeld severed from this suit and ordered the District Clerk to open a new action with a separate cause number. As of December 6, 2013, Robert and Marie Hossfeld ceased being parties to this suit and as a result, have no standing in this action.

6.      On December 19, 2013, Robert Hossfeld filed in this cause a "Motion to Reurge an Appointment of a Master in Chancery or to Covene [*sic*] a Court of Inquiry" (the "Second Motion").

7.      On January 23, 2014, the District Clerk assigned Cause No. 2014-DCV-0180, styled Robert and Marie Hossfeld v. American Home Mortgage Servicing, Inc., (the "Hossfeld Case")

to the severed cause of action.

8.      On February 14, 2014, Defendant Homeward Residential, f/k/a American Home Mortgage Servicing, Inc., removed the Hossfeld Case to federal court.

9.      On February 24, 2014, Robert and Marie Hossfeld dismissed the federal court case, and therefore have no live action against Defendant.

### ARGUMENT & AUTHORITIES

**A.      Hossfeld's Allegations of Misapplication of Funds are Without Merit by Operation of Texas Law**

10.     Both of Mr. Hossfeld's Motions make vague allegations about the use of funds which were recovered by the State in actions by the Office of the Attorney General against mortgage companies, going back five years to the Agreed Judgment entered into between the State and Countrywide Financial Corporation. Mr. Hossfeld claims that "[s]pecifically, settlement funds secured by the State of Texas are not being administered legally, validly, appropriately, or in the best interests of the citizens of the State of Texas." Implicit in this claim is the assumption that the State of Texas or the Office of the Attorney General has discretion over how funds from settlements are allocated and administered, and abused that discretion to the detriment of Texas consumers. However, the Hossfelds offer no factual basis for these allegations, and do not present any evidence to substantiate them or to meet Tex. R. Civ. P. Rule 171's requirement of "good cause." In fact, there could be no evidence of such allegations, because the Office of the Attorney General has almost no discretion over how funds are allocated in cases brought under the DTPA. Rather, the disposition of funds recovered by the Office of the Attorney General is controlled by the Texas Legislature and the following Texas statutes:

TEX. GOV'T CODE ANN. § 404.097(c) (West 2005). DEPOSIT OF FUNDS RECOVERED BY LITIGATION OR SETTLEMENT.

(c)   "**All funds recovered by a state governmental entity in litigation or in settlement of a matter that could have resulted in litigation,** including funds designated as damages, amounts adjudged or awarded, attorney's fees, costs, interest, settlement proceeds, or expenses, **are public funds of the state or the state governmental entity and shall be deposited in the state treasury to the credit of the appropriate fund or account.**"  Emphasis added.

TEX. GOV'T CODE ANN. § 404.094 (West 2005). FUNDS TO BE DEPOSITED IN TREASURY.

(a) Fees, fines, penalties, taxes, charges, gifts, grants, donations, and other funds collected or received by a state agency under law shall be deposited in the treasury, credited to a special fund or funds, and subject to appropriation only for the purposes for which they are otherwise authorized to be expended or disbursed....

(b)   "Money that is required by this subchapter or by another law to be deposited in the treasury shall be deposited to the credit of the general revenue fund unless the money is expressly required to be deposited to another fund, trust fund, or special account not in the general revenue fund. This subsection does not affect the authority of the comptroller to establish and use accounts necessary to manage and account for state revenues and expenditures."

TEX. GOV'T CODE ANN. § 402.007 (West 2005).  PAYMENT TO TREASURY; ALLOCATION OF CERTAIN PENALTIES.

(a) The attorney general shall immediately pay into the state treasury money received for a debt or penalty.

(b) Subject to Subsection (c), **the comptroller shall credit to the judicial fund for programs approved by the supreme court that provide basic civil legal services to the indigent the net amount of a civil penalty that is recovered in an action by the attorney general** in any matter actionable under Subchapter E, Chapter 17, Business & Commerce Code, after deducting amounts allocated to or retained by the attorney general as authorized by law, unless:

(1) another law requires that the penalty be credited to a different fund or account; or

(2) the judgment awarding the penalty requires that the penalty be paid to another named recipient.

(c) **The total amount credited to the judicial fund for programs**

**approved by the supreme court that provide basic civil legal services to the indigent under Subsection (b) may not exceed $10 million per state fiscal biennium.** Emphasis added.

11.    In summary, these statutes require that if the Office of the Attorney General obtains money as the result of a case brought under the DTPA, that money must be:

    a.    First, deposited in the State's General Fund;

    b.    Second, if the money is specifically designated in the judgment to go to some identified fund, e.g, restitution for harmed consumers, funding for consumer counseling and education, etc., the money is paid over from the General Fund to the identified fund;

    c.    Third, if the money is <u>not</u> specifically designated to go to some identified fund, then the money remains in the General Fund, to be allocated as the Legislature sees fit;

    d.    However, if the money is designated as a <u>civil penalty</u> under the DTPA, it shall be credited to the "judicial fund" about which Mr. Hossfeld complains. That fund is to be used for "programs approved by the supreme court that provide basic civil legal services to the indigent." The fund can accept a maximum of $10 million in civil penalties every two years.

12.    These statutes have been followed by the Office of the Attorney General in all cases brought under the DTPA in which money was recovered from defendants. By operation of law, there has been no "good cause" shown by the Hossfelds, as all monies were distributed a directed by the Legislature.

**B.      Hossfeld's Examples Do Not Support His allegations**

13.     Of the eight examples listed by Mr. Hossfeld in his First Motion which purportedly
**"conclusively, affirmatively and definitively demonstrate that the best interests of citizens
of Texas are not being overseen,"** only three were actually cases prosecuted by the Office of
the Attorney General: (1) State of Texas v. Lender Processing Services, Inc., *et al*,  Cause No.
2013-DCV-0413; (2) In the Matter of State of Texas and Wells Fargo Bank, N.A., Cause No.
2010-3872, and  (3) State of Texas v. Countrywide Financial Corporation, *et al*, Cause No. 2009-
717. Copies of the final order in each of these three cases are attached hereto as Exhibits A, B
and C.

14.     The other five cases cited as rationale for appointing a Master have nothing whatsoever
to do with this office:

> a.   *"American Home Mortgage Servicing, Inc., CEO Wilbur Ross faces Texas
> federal lawsuit alleging illegal foreclosure practices;"*  This is a putative class
> action suit brought in Federal court in Dallas in October, 2013 by an individual
> *consumer*. The State of Texas is not a party. The only connection to the Office of
> the Attorney General is that the individual plaintiff apparently made allegations
> against AHMSI that were similar to the allegations made by the State in this suit.
> *See*  http://www.bloomberg.com/news/2010-10-28/wilbur-ross-s-american-home-
> sued-by-homeowner-texas-for-mortgage-practice.html

> c.  *"Consumer Financial Protection Bureau (CFPB) investigation of Texas-LPS
> settlement;"* Mr. Hossfeld would have this Court believe that the federal
> Consumer Financial Protection Bureau, the agency charged with regulating
> practically every type of financial institution in the United States, has made a

determination that the settlement between the State of Texas and Lender Processing Service was somehow improper and should be investigated. However, the Hossfelds present no evidence to substantiate such a claim, and the State believes there is no such investigation. What the exhibits to the Hossfelds Motion show s that Mr. Roman filed a complaint with the CFPB in his own name, listing the elements of the LPS case he wanted the CFPB to look into. There is no indication that the CFPB took any action on his complaint.

e. "*U.S. Department of Justice announcement of Wells Fargo Executive target of foreclosure/ mortgage fraud suit*;" This is a civil suit brought in 2012 by the Department of Justice seeking to recover funds paid by the Federal Housing Administration to Wells Fargo on loan guarantees for what DOJ claims were fraudulent loans. There is no connection to the Office of the Attorney General. *See* http://www.bloomberg.com/news/2013-11-22/wells-fargo-s-lofrano-should-be-added-to-fraud-suit-u-s-says.html

g. "*Report of 'disparate impact' to prove harmful lending practices towards innocent homeowners,*" This is fair lending initiative by the CFPB under the Equal Credit Opportunity Act, in which CFPB will use a "disparate impact" test in assessing fairness in mortgage lending, credit card debt, student loans, auto loans and other forms of consumer credit. There is no connection to the Office of the Attorney General. *See*

http://files.consumerfinance.gov/f/201404_cfpb_bulletin_lending_discrimination.pdf

h. *"CFPB published guidelines to protect homeowners."* The CFPB issued an over 700 page long document under the Dodd-Frank Act to promulgate mortgage servicing regulations. These regulations are partially based upon the National Mortgage Settlement against the five largest banks in the country, in which the State of Texas and Office of the Attorney General was a part of the negotiating team. However, the mortgage servicing rules have no bearing on funds which may be recovered by any state in a case against a mortgage servicer. *See* http://www.consumerfinance.gov/newsroom/new-mortgage-rules-protect-american-dream/; and

http://files.consumerfinance.gov/f/201312_cfpb_mortgagerules.pdf

15. In his Motion to Reurge an Appointment of a Master in Chancery or to Covene [sic] a Court of Inquiry., Mr. Hossfeld states:

"El Paso is now ground zero in the 50 State Attorney General Task Force's battle against mortgage irregularities committed by large banks against millions of homeowners. ...Texas Attorney General Greg Abbott spearheads the task force and has launched at least 3 mortgage-related lawsuits here in El Paso County, Texas.

16. While it is true that the Office of the Attorney General has been involved in fighting predatory lending and mortgage servicing abuses for several years, there is in fact no "Task Force" of 50 State Attorneys General, and General Abbott does not spearhead such a task force. Mr. Hossfeld may be mistakenly referring to the Texas Residential Mortgage Fraud Task Force, which includes Texas and federal regulatory and law enforcement agencies that track and prosecute mortgage fraud. This Task Force was established by the Legislature in 2007 in House Bill 716, but it has nothing to do with recovery of funds for consumers from mortgage

companies -- it is aimed at preventing fraud against mortgage companies by individuals. Or, it could be that Mr. Hossfeld believes the Office of the Attorney General was the head of the investigation that led to the National Mortgage Settlement. Texas did have a seat on the executive committee in that case, but in fact the State leader of the effort was the Office of the Attorney General of Iowa, Tom Miller, and the co-chair of the executive committee was Iowa Assistant Attorney General Patrick Madigan.

17.   Mr. Hossfeld's Second Motion also states:

> "Lender Processing Services, Inc." (LPS) was the target of a fraud/ deceptive trade lawsuit by the State of Texas. The venue chosen for this "robosigning" complaint was an El Paso district court, and was disposed in an "Agreed Final Judgment and Injunction" (Exhibit "A"). A settlement payment in excess of $5,000,000.00 dollars was deposited in the 'Texas Judiciary Fund'"

18.   While it is true that the State filed its suit against Lender Processing Services, Inc. in El Paso County, no funds from the settlement of that case were deposited in the "Texas Judiciary Fund." Mr. Hossfeld is again confused -- in the LPS case, $5,755,050.00, which was not designated for any specific fund, was paid to the State of Texas for deposit in the General Fund pursuant to Tex. Gov't Code Ann. § 404.094. *See*

www.oag.state.tx.us/oagnews/release.php?id=4283

19.   The true source for a payment which was in fact made to the "Judiciary Fund" was in the National Mortgage Settlement, in which the Office of the Attorney General was part of the executive committee of a 49 state multistate case against Bank of America, JP Morgan Chase, Citibank, Wells Fargo and Ally Bank. See www.nationalmortgagesettlement.com. This investigation, done jointly with two Federal agencies, the US Department of Justice and HUD, resulted in a $26 billion settlement, the largest state-federal settlement in history. In the Consent

Judgment in that case, out of a cash payment of $1.5 billion to be divided among the 49 States, the State of Texas received $134,628,489.00, of which the statutory maximum of $10 million in civil penalties was allocated to the Judicial Fund. The remainder, $124,628,489.00, was paid to the State of Texas for deposit into the General Revenue Fund pursuant to Texas Government Code §404.094(b) and §404.097(c).

20.    Mr. Hossfeld would have the Court believe that sending money to the Judicial Fund does not serve the interests of Texas citizens. The Texas Access to Justice Commission has a different opinion on it: at the May 1, 2013 Champions of Justice Gala, it presented several awards to "distinguished legal aid advocates" for their contributions in improving access to justice, including the following:

> **Texas Attorney General Greg Abbott** received the Star of Justice Award that recognizes dedication to improving access to justice for low-income Texans. Abbott was recognized for his exemplary support of access to justice in Texas and partnership in serving the legal needs of Texans. Abbott has worked hard to safeguard the solvency of the Crime Victims' Compensation Fund, which among other things, provides funding for civil legal services to victims of crime. Also, the attorney general was instrumental in ensuring that $10 million from the national mortgage settlement was directed to civil legal aid.

> *State Bar of Texas Press Release, May 1, 2013*

21.    The Texas Legislature also disagrees with Mr. Hossfeld, having in the last session increased the statutory limit on funds that are to be allocated to the Judicial Fund from $10 million to $50 million. See H.B No. 1445, 83rd Legislature, effective May 28, 2013.[1]

22.    In both the First and Second Motions, Mr. Hossfeld complains that there was no media attention given to the three settlements. In actual fact, in all three cases the Office of the Attorney

---

1 (d) The total amount credited to the judicial fund for programs approved by the supreme court that provide basic civil legal services to the indigent under Subsection (b) may not exceed $50 [$10] million per state fiscal biennium.

General issued press releases and sent them to hundreds of media outlets; if they were not given attention by El Paso media, that is no fault of the State. See the following press releases:

    a.   Countrywide: www.oag.state.tx.us/oagnews/release.php?print=1&id=2680

    b.   Wells Fargo: www.oag.state.tx.us/consumer/release_view.php?id=3502

    c.   LPS: www.oag.state.tx.us/oagnews/release.php?print=1&id=4283

23.    Mr. Hossfeld also accuses the State and AHMSI of being "collaborators" in this case, even commenting on the fact that the Court took judicial notice that counsel for the State and AHMSI were seated at the same table during the December 2, 2013 hearing. Mr. Hossfeld mistakes civility for collaboration, as there were only two tables in the courtroom where counsel could sit. And the fact that the two parties agreed on a few occasions to abate this action in order to await the outcome of much larger multistate cases does not mean that the parties are not otherwise adversarial.

24.    As to Mr. Hossfeld's request that this Court hold an evidentiary hearing to determine whether a court of inquiry should be convened, he has not produced to this Court any evidence or facts, let alone "substantial facts," establishing probable cause that a specific offense has been committed against the laws of this state. Therefore, this Court has no basis for the affidavit required by TEX. CRIM. PROC. CODE ANN. § 52.01(b)(1) (West 2006).[2]

## CONCLUSION

25.    The Hossfeld's Motions for appointment of a Master in Chancery or for a Court of Inquiry have no basis in law or in fact. Further, by virtue of the Order severing their cause from

---

[2] (b) (1) Before requesting the presiding judge to appoint a district judge to commence a Court of Inquiry, a judge must enter into the minutes of his court a sworn affidavit stating the substantial facts establishing probable cause that a specific offense has been committed against the laws of this state.

this one, the Hossfelds lack standing to present the Motions to this Court.

## PRAYER

26.     For these reasons, Plaintiff asks the Court to dismiss the Hossfelds' "Texas Rules of Civil Procedure Rule 171 Motion for Appointment of a Master In Chancery" and Mr. Hossfeld's "Motion to Reurge an Appointment of a Master in Chancery or to Covene [sic] a Court of Inquiry."

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**JOHN SCOTT**
Deputy Attorney General for Civil Litigation

**TOMMY PRUD'HOMME**
Chief, Consumer Protection Division

  /s/ James A. Daross
**JAMES A. DAROSS**
Assistant Attorney General
State Bar No. 05391500
james.daross@texasattorneygeneral.gov
**RICHARD L. BISCHOFF**
Assistant Attorney General
State Bar No. 02343200
richard.bischoff@texasattorneygeneral.gov
Consumer Protection Division
401 E. Franklin Ave., Suite 530
El Paso, Texas 79901
915-834-5800
Fax 915-542-1546
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded on the 19th day of March, 2014 to Defendant's attorney of record, Robert T. Mowery, Locke Lord Bissell & Liddell LLP, 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201-6776, and to Richard Roman, 505 E. Rio Grande, El Paso, Texas 79902, via fax number 915-351-6754, in accordance with the Texas Rules of Civil Procedure.

/s/ James A. Daross
James A. Daross



IN THE DISTRICT COURT OF EL PASO COUNTY TEXAS

_____ 384th _____ JUDICIAL DISTRICT

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **vs.** | § | CAUSE NO.: 2013-DCV - **0413** |
| | § | |
| **LENDER PROCESSING SERVICES, INC.,** | § | |
| a Delaware Corporation; **LPS DEFAULT** | § | |
| **SOLUTIONS, INC.,** a Delaware Corporation, and | § | |
| **DOCX, LLC,** a Georgia Limited Liability | § | |
| Company, | § | |
| | § | |
| Defendants. | § | |

## AGREED FINAL JUDGMENT AND INJUNCTION

Plaintiff, State of Texas ("State"), acting by and through the Attorney General of Texas, GREG ABBOTT, and Defendants Lender Processing Services, Inc., LPS Default Solutions, Inc., and DocX, LLC (hereinafter collectively referred to as "LPS" or "Defendants"), by and through the undersigned counsel, have requested entry of an Agreed Final Judgment and Injunction. Therefore, upon consideration of the papers filed and consent of the parties hereto, it is hereby ORDERED and ADJUDGED as follows:

## I. JURISDICTION

1.1      The parties agree that this Court has subject matter jurisdiction over this matter and jurisdiction over the parties and agree to the continuing jurisdiction of this Court over this matter and the parties. The Attorney General filed an Original Petition (the "Petition") against LPS pursuant to the Texas Deceptive Trade Practices – Consumer Protection Act, TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.* (2011) (hereafter DTPA).

Exhibit

7.C.

1

## II.    GENERAL PROVISIONS

### 2.1    Agreement

The State and LPS are represented by counsel and have agreed on a basis for settlement of the matters alleged in the Petition. The parties agree to entry of this Agreed Final Judgment and Injunction ("Judgment") without the need for trial, discovery in this action, or adjudication of any issue of law or fact. Defendants enter into this Judgment freely and without coercion, and without admitting any violation of the law. Defendants acknowledge that they are able to abide by the provisions of this Judgment. Defendants further acknowledge that a violation of this Judgment may result in additional relief pursuant to the DTPA.

### 2.2    Definitions

a.    "**Attesting Documents**" shall mean affidavits and similar sworn statements making various assertions relating to a mortgage loan, such as the ownership of the mortgage note and mortgage or deed of trust, the amount of principal and interest due, and the fees and expenses chargeable to the borrower.

b.    "**Covered Conduct**" shall mean LPS' practices related to mortgage default servicing, including document creation, preparation, execution, recordation, and notarization practices as they relate to Mortgage Loan Documents as well as LPS' relationships with attorneys representing the Servicers and other third parties through the Effective Date of this Judgment.

c.    "**Effective Date**" shall mean the date on which a copy of this Judgment, duly executed by Defendants and by the State, is approved by and becomes a Judgment of the Court.

d.     **"Federal Banking Agencies"** shall mean the Board of Governors of the Federal Reserve System, The Federal Deposit Insurance Corporation, The Office of the Comptroller of the Currency, and the Office of Thrift Supervision.

e.     **"Investigating Attorneys General"** shall mean the Attorneys General of the States of Arizona, California, Connecticut, Florida, Illinois, Iowa, Oregon, New Jersey, North Carolina, Pennsylvania, South Carolina, Texas, and Washington.

f.     **"LPS"** shall mean Defendants Lender Processing Services, Inc.; LPS Default Solutions, Inc.; and DocX, LLC, including all of their parents, subsidiaries, and divisions.

g.     **"Mortgage Loan Documents"** shall mean (i) Attesting Documents; (ii) assignments of mortgages or deeds of trust or notes; (iii) mortgage or deed of trust lien releases and satisfactions; (iv) notices of trustee sale; (v.) notices of breach or default; and (vi) other mortgage-related documents that are required for statutory, non-judicial foreclosure or foreclosure-related documents filed with a state court or in connection with a federal bankruptcy proceeding.

h.     **"Parties"** shall mean LPS and the State of Texas.

i.     **"Servicer"** shall mean any residential mortgage loan servicing entity to which LPS provides technology and/or other services relating to mortgages in default.

j.     **"Signatory Attorney General"** shall mean the Attorney General of Texas, or his/her authorized designee, who has agreed to this Judgment.

2.3    **Stipulated Facts**

The Investigating Attorneys General conducted investigations regarding certain business practices relating to the Covered Conduct. The Investigating Attorneys General found and the Defendants stipulate to the following facts of the investigation:

a.    During a period from at least January 1, 2008, to December 31, 2010, certain Servicers authorized specific persons employed by certain subsidiaries of Lender Processing Services, Inc., to sign Mortgage Loan Documents or assist with the execution of Mortgage Loan Documents on their behalf.

b.    Some Mortgage Loan Documents generated and/or executed by certain subsidiaries of Lender Processing Services, Inc., on behalf of Servicers contain defects including, but not limited to, unauthorized signatures, improper notarizations, or attestations of facts not personally known to or verified by the affiant. Some of these Mortgage Loan Documents may contain unauthorized signatures or may contain inaccurate information relating to the identity, location, or legal authority of the signatory, assignee, or beneficiary or to the effective date of the assignment.

c.    Certain subsidiaries of Lender Processing Services, Inc., recorded or caused to be recorded Mortgage Loan Documents with these defects in local land records offices or executed or facilitated execution on behalf of the Servicers knowing some of these Mortgage Loan Documents would be filed in state courts or used to comply with statutory, non-judicial foreclosure processes.

d.    At some time prior to November 1, 2009, employees and agents of DocX, LLC ("DocX") a wholly owned, indirect subsidiary of Lender Processing Services, Inc., were directed by management of DocX to initiate and implement a program under which some DocX

4

employees signed Mortgage Loan Documents in the name of other DocX employees, who were or had been at one time authorized to sign on behalf of Servicers. DocX referred to these unauthorized signers as "Surrogate Signers."

e.       At the time the Surrogate Signers signed certain Mortgage Loan Documents, they were not authorized by the applicable Servicer to sign their own names or the names of those persons who had purportedly been authorized by the Servicer to sign the Mortgage Loan Documents in question.

f.       The Surrogate Signers executed certain Mortgage Loan Documents in the name of other DocX employees without indicating that the documents had been signed by a Surrogate Signer.

g.       Notaries public employed by DocX or as agents of DocX completed the notarial statements on the Mortgage Loan Documents that were executed by Surrogate Signers and stated that those documents had been properly acknowledged, signed, and affirmed in their presence by the person whose name appeared on the document when in fact the Surrogate Signer had signed the name of another person or signed outside the presence of the notary, or both.

h.       DocX presented and recorded certain Mortgage Loan Documents with local land records offices knowing they had been executed by Surrogate Signers.

i.       On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies. Lender Processing Services, Inc., has also identified certain other defects and deficiencies in the Mortgage Loan Documents executed by some of its other subsidiaries. Such past practices, when discovered by Lender Processing Services, Inc., management, were discontinued.

j.      On April 13, 2011, LPS entered into a Consent Order with Federal Banking Agencies, which order contains similar allegations of deficiencies in Mortgage Loan Document execution practices at certain subsidiaries of LPS and management oversight of these practices. Pursuant to the Consent Order, LPS has agreed to take further remedial action, including, but not limited to, proposing a plan to enhance internal auditing and risk management, adopting a comprehensive compliance program for activities relating to default management services, and retaining an independent consultant to conduct an independent review of LPS' document execution services occurring between January 1, 2008, and December 31, 2010, to determine the existence and extent of the deficiencies and to assess LPS' ability to identify affected Mortgage Loan Documents, to remediate the deficiencies, as appropriate, and to assess whether any financial injury to Servicers or borrowers resulted from the document execution services described herein. To the extent the independent consultant identifies any such financial harm, LPS has agreed to prepare a remediation plan under the Consent Order that will, as appropriate, address reimbursement to those borrowers for any such financial injury.

## 2.4     **Preservation of Law Enforcement Action**

Nothing herein precludes the Signatory Attorney General from enforcing the provisions of this Judgment, or from pursuing any law enforcement action with respect to the acts or practices of the Defendants not covered by this Judgment or any acts or practices of the Defendants conducted after the entry of this Judgment. The fact that such conduct is not expressly prohibited by the terms of this Judgment shall not be a defense to any such enforcement action.

2.5      **Compliance with State and Federal Law**

Nothing herein relieves Defendants of their duty to comply with applicable laws of the State and all federal or local laws, regulations, ordinances, and codes, nor constitutes authorization by the Signatory Attorney General for the Defendants to engage in acts or practices prohibited by such laws. If, subsequent to the Effective Date of this Judgment, any state, local, or federal law is enacted or regulation promulgated with respect to the Covered Conduct of this Judgment and Defendants intend to comply with the newly enacted legislation or regulation and that compliance may create a conflict with the terms of this Judgment, Defendants shall notify the Signatory Attorney General of this intent. If the Attorney General agrees, the State shall consent to a modification for the purpose of eliminating the conflict. The State agrees that consent to modify is appropriate if any conduct prohibited by this Judgment is required by State, local, or federal law or regulation, or if conduct required by this Judgment is prohibited by such State, local, or federal law or regulation. The State will give each request to modify based on a change in the applicable law reasonable consideration and will respond to the Defendant(s) within 90 days. Nothing herein is intended to preclude Defendants from seeking modification of this Judgment if the State does not consent to the request of the Defendant(s).

2.6      **Non-Approval of Conduct**

Nothing herein constitutes approval by the Signatory Attorney General of LPS' past or future practices. LPS shall not make any representation to the contrary.

2.7      **Release**

The State hereby releases and discharges LPS and each and all current and former officers, shareholders, and employees from civil or administrative claims that his or her State has or may have had against them under the DTPA including claims for damages, fines, injunctive

7

relief, remedies, sanctions, or penalties resulting from the Covered Conduct on or before the Effective Date (collectively, the "Released Claims").

Nothing herein shall be construed as a waiver or release of any private rights, causes of action, or remedies of any person against the Defendants with respect to the Covered Conduct.

### 2.8    Evidentiary Effect of this Judgment

This Judgment is not and shall not in any event be construed, deemed to be, and/or used as an admission or evidence of the validity of any claim that the State has or could assert against LPS, or an admission of any alleged wrongdoing or liability by LPS in any civil, criminal, or administrative court, administrative agency, or other tribunal anywhere in the country.  The agreement of LPS to comply with the provisions of this Judgment is not an admission that LPS ever engaged in any activity contrary to any law.  Moreover, by entering into this Judgment and agreeing to the terms and conditions provided herein, LPS does not intend to waive and does not waive any defenses, counterclaims, third party claims, privileges or immunities it may have in any other action or proceeding that has been or may be brought against it by any other State, Federal or local governmental agency, or any private litigant or class of litigants, arising from the practices described herein.

### 2.9    Titles or headings

The titles or headings to each section or provision of this Judgment are for convenience purposes only and are not intended by the parties to lend meaning to the actual provisions of this Judgment.

### 2.10    **Modification of Terms**

No waiver, modification, or amendment of the terms of this Judgment shall be valid or binding unless made in writing, agreed to by both parties, and approved by this Court and then only to the extent specifically set forth in such written waiver, modification, or amendment.

### 2.11    **Severability of Terms**

If any clause, provision, or section of this Judgment shall, for any reason, be held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other clause, provision, or section of this Judgment, and this Judgment shall be construed and enforced as if such illegal, invalid, or unenforceable clause, section, or other provision had not been contained herein.

### 2.12    **Time is of the Essence**

Time is of the essence with respect to each provision of this Judgment that requires action to be taken by LPS within a stated time period or upon a specified date or event.

### 2.13    **Execution in Counterparts**

This Judgment may be executed in any number of counterparts and by different signatories on separate counterparts, each of which shall constitute an original counterpart hereof and all of which together shall constitute one and the same document.  One or more counterparts of this Judgment may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart thereof.

### 2.14    **No Acts to Circumvent Terms**

LPS shall not participate directly or indirectly in any activity or form a separate entity or corporation for the purpose of engaging in acts or practices in whole or in part that are prohibited

by this Judgment or for any other purpose that would otherwise circumvent any part of this Judgment.

    2.15   **More Favorable Terms.**

    In the event that LPS voluntarily enters into an agreement with the Attorney General of any state that is not participating in this Judgment ("non-participating Attorney General") to resolve potential claims relating to the Covered Conduct in this Judgment on terms that are different than those contained in this Judgment, exclusive of LPS' payment to a non-participating Attorney General of reasonable costs and attorneys' fees incurred by the non-participating Attorney General in civil litigation or criminal investigation that is active and pending as of November 29, 2012, then LPS shall provide a copy of such agreement to each Signatory Attorney General for review. If, after review, the Signatory Attorney General determines those alternative terms are materially more favorable than those contained in this Judgment, then LPS will join the State in petitioning the Court to amend this Judgment to reflect any such terms in place of terms herein, without waiving its rights to a judicial determination as to materiality.

## III.   PERMANENT INJUNCTIVE RELIEF AND COMPLIANCE

    3.1   LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in acts and practices prohibited by federal, state, or local law. Further, LPS, and any person acting under the actual direction or control of LPS, are hereby permanently restrained and enjoined from engaging in the following acts and practices and shall comply with the following conduct requirements:

### Document Execution

    a.   LPS shall not engage in, or authorize its employees to engage in, Surrogate Signing, as described in Section 2.3 herein.

b.    LPS shall not execute any Attesting Document unless the affiant or signatory has personal knowledge of the accuracy and completeness of the assertions in the Attesting Document.

c.    LPS shall ensure that any Mortgage Loan Document that is executed by LPS on behalf of a Servicer is executed pursuant to proper and verifiable authority to sign on behalf of the Servicer and that assertions contained in the Mortgage Loan Document are supported by competent and reliable evidence.

d.    Any Mortgage Loan Document executed by LPS on behalf of a Servicer shall accurately identify the name of the signatory, the date on which the document is signed, and the authority upon which the signatory is executing the Mortgage Loan Document.  If applicable or permissible, each Mortgage Loan Document shall include the name and address of the entity for which the signatory works.

e.    LPS shall ensure that the affiant or signatory to any Attesting or Mortgage Loan Document shall sign by hand signature, except for permitted electronic filings.

f.    LPS shall not notarize or cause to be notarized any Attesting or Mortgage Loan Document that is signed or attested to outside the presence of the notary.

g.    If LPS provides any notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that the notary procedures comply with all applicable laws governing notarizations, including, but not limited to, ensuring that notaries verify the identity and signature of the putative signatory.  If LPS provides notary services or oversees the notarization of any Mortgage Loan Document, LPS shall ensure that notaries maintain notary logs that identify such Mortgage Loan Documents.

**Law Firms**

h.      LPS shall not improperly interfere with the attorney-client relationship between attorneys and Servicers.

i.      LPS shall not incentivize or promote attorney speed or volume to the detriment of accuracy.

j.      If LPS provides technology or other services that assist law firms or their agents in handling issues relating to processing a foreclosure, bankruptcy, or other legal action, LPS will ensure that its technology and services do not impede, compromise, or otherwise interfere with the activities of a law firm providing legal services to its client.

k.      LPS will ensure that foreclosure and bankruptcy counsel and foreclosure trustees to whom LPS provides services have an appropriate Servicer contact so they may communicate directly with the Servicer.

l.      LPS shall not inhibit or otherwise discourage attorneys and Servicers from direct communication with each other.

m.      LPS shall not negotiate any retainer agreements between the Servicer and its attorney(s) and LPS shall not be a party to such retainer agreements.

n.      For those attorneys who are using LPS' technology services to access information from Servicers, LPS shall take no action to prevent legal counsel from having appropriate access to information from the Servicer's books and records to perform their duties in compliance with applicable laws.

### Incentives

o.      LPS shall not pay volume-based or other incentives to employees or other agents for the purpose of encouraging undue haste or lack of due diligence to the detriment of accuracy.

### Third-Party Provider Oversight

p.      LPS shall adopt policies and processes to oversee and manage agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by LPS that provide foreclosure, bankruptcy or mortgage-servicing activities relating to default servicing (including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including the following:

(i).     LPS shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability.

(ii).    LPS shall ensure that all agreements, engagement letters, or oversight policies with Third-Party Providers comply with LPS' applicable policies and procedures (which will incorporate any applicable aspects of this Judgment) and applicable state and federal laws and rules.

(iii).   LPS shall ensure that agreements, contracts or policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures.

q.      LPS shall conduct periodic reviews of Third-Party Providers. These reviews shall include the following:

(i).     A review of the fees and costs assessed by the Third-Party Provider to ensure that such fees and costs are within the allowable fees authorized by the Servicers;

(ii).    A review of the Third-Party Provider's processes to provide for compliance with LPS' policies and procedures concerning Servicing Activities;

(iii).     A requirement in its agreements and contracts to require that the Third-Party Provider disclose to LPS any imposition of sanctions or professional disciplinary action taken against them for misconduct related to performance of Servicing Activities.

**Fees**

r.     LPS shall require that all fees charged by Third-Party Providers for default, foreclosure, and bankruptcy-related services performed shall be within the allowable fees authorized by Servicers.

s.     LPS shall be prohibited from collecting any unearned fee, or giving or accepting unlawful referral fees in relation to Third-Party Providers' default- or foreclosure-related services.

t.     Other than reasonable fees charged by LPS to the Servicers for its oversight of Third-Party Providers, LPS shall not impose additional mark-ups or other fees on Third-Party Providers' default- or foreclosure-related services.

u.     LPS' invoices to the Servicers shall label each fee or charge clearly and accurately to denote the specific product or service for which each fee or charge is attributed.

**Escalation of Consumer Complaints**

v.     LPS shall provide to consumers, and ensure that its Third-Party Providers provide to consumers, reasonable notice of dedicated toll-free telephone numbers established and maintained by LPS that consumers can call concerning any issues related to document execution and field services activities (property inspection, preservation, maintenance, and winterization) LPS performs for Servicers. LPS shall have adequate and competent staff to answer and respond to consumer inquiries promptly, and LPS shall establish a process for dispute escalation and

direct contact with a Servicer at a number designated by such Servicer, and methods for tracking the resolution or escalation of complaints.

### 3.2 Compliance with Attorneys General Agreements with Servicers and other Applicable Laws

a. LPS shall be familiar with the settlement terms between the State Attorneys General and any Servicers, including those agreements and judgments already in force, such as the consent judgments entered by United States District Judge Rosemary Collyer of the United States District Court for the District of Columbia in case number 1:12-cv-00361-RMC, *United States et al. v. Bank of America et al*, ("hereinafter referred to as the "National Servicing Settlement") and, upon notification by an Attorney General, any agreements reached or judgments entered subsequent to the entry of this Judgment that affect LPS' acts or practices relating to the Covered Conduct of this Judgment.

b. LPS shall ensure that any services provided by LPS are consistent with the terms, conditions, and standards imposed by those agreements and judgments as well as with any applicable state or federal law.

c. LPS will commit appropriate resources to develop technology solutions which will support the National Servicing Settlement standards and guidelines. LPS will make these technology solutions available to its clients, including, without limitation, the following:

- Protections for Military Personnel under the Service members Civil Relief Act (SCRA);

- Document Integrity Solution that enables Servicers to ensure the accuracy and personal knowledge requirement for the execution of certain Mortgage Related Documents;

- Development of a technology process to avoid dual-tracking by enabling a Servicer to define certain steps or critical events to halt a foreclosure process during a loan modification program;

- Processes to enable Servicers to provide a single point of contact; and

- Enhanced loss mitigation processes.

For a two-year period from the Effective Date of this Judgment, LPS will provide a process for the Signatory Attorney General to audit LPS with respect to the development, functionality and implementation timelines for such technology solutions relating to the National Servicing Settlement. This audit process is in addition to and does not limit LPS' obligations under Section 3.2(e) herein.

d.      LPS agrees to retain documents and other information reasonably sufficient to establish compliance with the provisions of this Judgment; however, nothing in this Judgment requires LPS to retain any specific document or other information for longer than five (5) years.

e.      For a period of five (5) years from the Effective Date, upon a request from the Signatory Attorney General, LPS agrees to provide to the Signatory Attorney General's Office reasonable access to all non-privileged LPS documents and other information without the need for a subpoena or other compulsory process. The term "non-privileged" means any LPS document or other information not protected by the attorney-client or attorney work product privileges as defined by applicable state law. The term "reasonable access" reflects an

16

understanding by LPS and the Signatory Attorney General's Office that LPS has a legal obligation to protect the privacy of personal identifying information of borrowers and to protect the trade secrets of LPS from public disclosure. LPS and the Signatory Attorneys General agree to work cooperatively to ensure compliance with these legal obligations. In the event that LPS concludes that specific information requested is not covered by this provision and cannot be disclosed without a subpoena or other compulsory process, it will notify the Signatory Attorney General within ten (10) days that a subpoena for the information will be required.

This provision is intended to supplement and does not supplant or in any way restrict the Signatory Attorney General's subpoena power and investigative authority under state law.

Subject to the provisions above regarding non-privileged documents and other information, and legal obligations to protect the privacy of personal identifying information and trade secrets from public disclosure, LPS agrees to cooperate with any Signatory Attorney General in its investigation of non-parties related to Covered Conduct.

f.     LPS shall ensure that if it is appointed to act as a trustee or successor trustee, LPS will meet all applicable state requirements to act as a trustee or successor trustee.

g.     LPS shall appoint its Chief Compliance Officer Sheryl L. Newman, or another designee, to act as liaison to the Signatory Attorneys General to receive and respond to inquiries relating to this Judgment.

## IV.     REMEDIATION TO HOMEOWNERS

4.1     LPS agrees to identify Mortgage Loan Documents executed by LPS between January 1, 2008, and December 31, 2010, that may require remediation and to remediate those documents when LPS has the legal authority to do so and when reasonably necessary to assist any person or borrower or when required by state or local laws. If Mortgage Loan Documents

executed by LPS prior to January 1, 2008, require remediation for compliance with applicable laws or when remediation of Mortgage Loan Documents executed by LPS prior to January 1, 2008, is reasonably necessary to assist any person or borrower, LPS shall remediate those documents when LPS has the legal authority to do so. Notwithstanding LPS' obligations pursuant to this paragraph, its obligations under Section 3.1(v) of this Judgment to address consumer inquiries with respect to document execution are not limited to documents executed between January 1, 2008 and December 31, 2010. For twelve quarters immediately following entry of this judgment, LPS shall provide each Signatory Attorney General with quarterly reports detailing its efforts to fulfill its obligations under this paragraph.

## V.    MONETARY RELIEF

5.1      LPS shall pay a total of Five Million, Seven Hundred Fifty-Five Thousand, Fifty dollars ($5,755,050) as a settlement payment to the State, and in accordance with the amounts of payments to each Signatory Attorney General set forth in the attached Exhibit A.

Said payment to the State of Texas in the amount of $5,755,050 shall be paid, no later than ten (10) days after the entry of this Judgment, to the State of Texas for deposit pursuant to Tex. Gov't Code Ann. § 404.094 (West 2005).

If any independent review or report by the Federal Banking Agencies determines that a greater number of documents might be affected than what was previously disclosed by Defendants, Defendants agree to notify the Signatory Attorney General within thirty (30) days and increase the payment to the State in accordance with the methodology used to calculate the State payment described in Exhibit A.

18

5.2     LPS shall pay, no later than ten (10) days after the entry of this Judgment, to the Investigating Attorneys General a total of $7 million in additional attorney's fees and costs to be divided and paid by LPS. LPS shall make a payment to the State of Texas, in the amount of Four Hundred, Eighty Three Thousand, Three Hundred and Thirty Three Dollars ($483,333) for attorney's fees and expenses pursuant to Tex. Gov't Code Ann. § 402.006(c) (West 2005).

5.3     Satisfaction of the monetary obligations in this Section V shall not relieve any other obligations under other provisions of this Judgment.

## VI.   RIGHT TO REOPEN

6.1     If, upon motion of the State and after hearing by the Court, the Court finds that LPS failed to pay any amount pursuant to the terms provided by Section V or, subject to the provisions of Section VII of this Judgment, that LPS failed to comply with the provisions in Section II, III, or IV, the Court may enter judgment against LPS in favor of the State, in an amount to be determined by the Court, subject to statutory maximum penalties, which shall become immediately due and payable as civil penalties or, upon motion of the Attorney General, as any element of relief available pursuant to the DTPA, less any amount previously paid. Should this Judgment be modified as to the monetary liability of Defendant, in all other respects, this Judgment shall remain in full force and effect, unless otherwise ordered by the Court.

6.2     Proceedings to reopen this case instituted under this Section are in addition to, and not in lieu of, any other civil or criminal remedies as may be available by law, including any other proceedings that the State may initiate to enforce this Judgment.

## VII.   COMPLIANCE ENFORCEMENT

7.1     The State may assert any claim that LPS has violated this Judgment in a separate civil action to enforce compliance with this Judgment or may seek any other relief afforded by

law, provided that the State gives LPS written notice of the alleged violation and affords LPS thirty (30) days from receipt of the notice to respond to and remedy the violation, or any other period as agreed to by the State and LPS. However, the Attorney General is not required to provide notice in advance of taking any enforcement action within his or her authority that the Attorney General believes is necessary to protect the health or safety of the public.

## VIII.   NOTICES

8.1    All notices under this Judgment shall be sent by overnight U.S. mail to the addresses below:

For the Plaintiff:

James A. Daross
Assistant Attorney General
Office of the Attorney General of Texas
401 E. Franklin, Suite 530
El Paso, Texas 79901

For the Defendants:

Todd C. Johnson, Executive Vice President and General Counsel
Lender Processing Services, Inc.
601 Riverside Avenue
Jacksonville, FL 32204

## IX.   RETENTION OF JURISDICTION

This Court shall retain jurisdiction over this matter for all purposes.

*ORDERED AND ADJUDGED at* _____, *this* 5 *day of* February 2013.

_____
*Judge Presiding*

JOINTLY APPROVED AND SUBMITTED FOR ENTRY:

For Plaintiff, State of Texas


By: _____
James A. Daross
State Bar No. 05391500
Assistant Attorney General
Office of the Attorney General of Texas
401 E. Franklin, Suite 530
El Paso, Texas 79901
(915) 834-5800
FAX (915) 542-1546

For Defendant LENDER PROCESSING SERVICES, INC.:

By: _____
Todd C. Johnson
Executive Vice President and General Counsel

Date: _1 - 28 - 13_____


For Defendant LPS DEFAULT SOLUTIONS, INC.:

By: _____
Todd C. Johnson
Executive Vice President and General Counsel

Date: _1 - 28 - 13_____


For Defendant DOCX, LLC:

By: _____
Todd C. Johnson
Executive Vice President and General Counsel

Date: _1 - 28 - 13_____

22

Counsel for Defendants:


_Andrew Weber_

C. Andrew Weber
State Bar No. 00797641
KELLY HART & HALLMAN LLP
301 Congress, Suite 2000
Austin, Texas 78701
Tel: 512.495.6400
Fax: 512.495.6401



With copies to:

Melanie Ann Hines
BERGER SINGERMAN LLP
125 South Gadsden Street
Suite 300
Tallahassee, FL 32301
Telephone: (850) 561-3010
Facsimile: (850) 561-3013

Counsel to Lender Processing Services, Inc.,
LPS Default Solutions, Inc., and DocX, LLC


Bernard Nash
Christopher J. Allen
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC 20006-5403
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

Counsel to Lender Processing Services, Inc.,
LPS Default Solutions, Inc., and DocX, LLC

Exhibit A:

| STATE | PAYMENT |
|---|---|
| Alabama | $1,039,780 |
| Alaska | $79,786 |
| Arizona | $3,288,621 |
| Arkansas | $692,496 |
| California | $35,592,284 |
| Connecticut | $1,404,186 |
| District of Columbia | $232,505 |
| Florida | $7,659,176 |
| Georgia | $4,137,490 |
| Hawaii | $401,030 |
| Idaho | $890,995 |
| Illinois | $3,364,326 |
| Indiana | $1,652,280 |
| Iowa | $603,400 |
| Kansas | $581,665 |
| Kentucky | $948,906 |
| Louisiana | $395,801 |
| Maine | $515,725 |
| Maryland | $2,993,130 |
| Massachusetts | $1,539,580 |
| Minnesota | $3,073,140 |
| Mississippi | $507,115 |
| Montana | $410,865 |
| Nebraska | $820,190 |
| New Hampshire | $457,961 |
| New Jersey | $2,904,356 |
| New Mexico | $671,531 |
| New York | $1,883,826 |
| North Carolina | $3,743,306 |
| North Dakota | $219,961 |
| Ohio | $2,544,990 |
| Oklahoma | $930,020 |
| Oregon | $2,513,875 |
| Pennsylvania | $2,890,741 |
| Rhode Island | $447,965 |
| South Carolina | $1,830,640 |
| South Dakota | $344,750 |
| Tennessee | $2,335,746 |
| Texas | $5,755,050 |
| Utah | $1,390,326 |
| Vermont | $371,000 |
| Virginia | $3,558,821 |
| Washington | $4,062,940 |
| West Virginia | $203,595 |
| Wisconsin | $1,505,315 |
| Wyoming | $232,491 |
| TOTAL | $113,623,678 |

IN THE COUNTY COURT AT LAW NUMBER ___6___
EL PASO COUNTY, TEXAS

N THE MATTER OF
STATE OF TEXAS

AND                                                    Cause No. 2010 - 3872

WELLS FARGO BANK, N.A.

FILED
GILBERT SANCHEZ
DISTRICT CLERK
2010 OCT   6   AM 8: 40
EL PASO COUNTY, TEXAS
DEPUTY

§
§
§
§
§
§
§
§

## ASSURANCE

This Assurance, by and between the State of Texas and Wells Fargo Bank, N.A. ("Wells

Fargo"), is entered into under the Texas Deceptive Trade Practices-Consumer Protection Act

("DTPA"), Tex. Bus. & Com. Code Ann, §§ 17.41 et. seq. (Vernon 1987 and 2007 Supp.) as of this

1st day of October, 2010 ("Effective Date"). The State of Texas, by and through Attorney General

Greg Abbott, and Wells Fargo hereby agree to the following:

**I.    PARTIES**

A.    State of Texas, by and through Attorney General Greg Abbott.

B.    Golden West Financial Corporation, a Delaware Corporation, and its subsidiaries

and affiliates, including but not limited to World Savings Bank, FSB, World Savings and Loan

Association, World Mortgage Company, World Savings Bank, FSB, World Savings Bank SSB,

World Loan Company and Home Loan Experts (hereinafter referred to as "World Savings Bank").

C.    Wachovia Corporation, and its subsidiaries and affiliates, including but not limited to

Golden West Financial Corporation, a North Carolina Corporation, AmNet Mortgage, LLC,

American Mortgage Network, LLC, Wachovia Mortgage, FSB, Wachovia Bank, FSB and

Wachovia Bank, N.A. (hereinafter referred to as "Wachovia"). Wachovia acquired Golden West

Financial Corporation, a Delaware Corporation, and its subsidiaries on October 1, 2006. Wells

Fargo & Company, a Delaware Corporation, acquired Wachovia Corporation on December 31,

2008, including Wachovia's subsidiaries, including but not limited to Wachovia Bank, N.A. and

Exhibit
7.d.

Wachovia Bank of Delaware, N.A. As a result of this acquisition, Wells Fargo is the party responsible for providing the relief set forth in this Assurance.

## II.  STIPULATION

A.  World Savings Bank and Wachovia originated payment option mortgages ("Pick-a-Payment mortgage loans"). The Pick-a-Payment mortgage loan permitted borrowers to elect to make a fully amortizing 30- or 15-year interest and principal payment; an "interest-only" payment; or a lesser, minimum payment. When the minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

B.  The Office of the Attorney General of Texas opened an investigation into whether violations of the DTPA were committed by Golden West or Wachovia in the marketing and advertising of Pick-a-Payment mortgage loans. Wells Fargo never originated or marketed and currently does not originate or market Pick-a-Payment mortgage loans, but acquired Wachovia's portfolio of Pick-a-Payment mortgage loans.

C.  Once it acquired Wachovia's portfolio of payment option mortgage loans, Wells Fargo began efforts to modify certain borrowers' loans.

D.  In light of the Pick-a-Payment mortgage loan features, the dramatic declines in home prices, and rising unemployment, some Pick-a-Payment mortgage loan borrowers are unable to meet their mortgage obligations.

E.  The Attorney General and Wells Fargo share concerns regarding the ability of troubled Pick-a-Payment mortgage loan borrowers to repay their loans. This Assurance sets forth a framework through which Wells Fargo will offer distressed Pick-a-Payment mortgage loan borrowers affordable loan modifications that include significant principal forgiveness. That framework includes a reporting requirement, described below, whereby Wells Fargo will provide

the State with detailed quarterly reports that provide state-specific and aggregate national data on Wells Fargo's efforts to assist Pick-a-Payment mortgage loan borrowers.

## III.    **DEFINITIONS**

    **A.**    *Usage.*  The following rules apply to the construction of this Assurance:

        1.    the singular includes the plural and the plural includes the singular;

        2.    "include" and "including" are not limiting;

        3.    the headings of the Sections and subsections are for convenience and shall not constitute a part of this Assurance, and shall not affect the meaning, construction, or effect of the applicable provisions of this Assurance;

        4.    words such as "hereunder," "hereto," "hereof," and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Assurance and not to any particular Section, subsection, or clause hereof.

    **B.**    *Defined Terms.*  The following bolded terms shall have the following meanings in this Assurance unless otherwise required by the context or definition:

*"Accrued Interest"* means scheduled periodic interest owed in accordance with the applicable mortgage note.

*"Borrower"* means the obligor(s) on a Pick-a-Payment mortgage loan note and the title holder(s) who signed the security investment subjecting certain real estate property as collateral for such note.

*"Commencement Date"* means December 18, 2010.

*"Corporate and Default-Related Advances"* means any default- or foreclosure-related fee or cost assessed to a Borrower's account for expenditures such as attorney fees, statutory expenses,

foreclosure fees and costs, fees for property valuations, property inspections, property preservation, and protective advances.

"*Deferred Interest*" means the interest charges added to the Borrower's principal balance as a result of the Borrower making the minimum payment where the minimum payment did not include all of the interest that had accrued on the Eligible Mortgage.

"*Delinquent Borrower*" means a Borrower whose mortgage payment is 60 days or more past due.

"**DTI**" or "**Debt-to-Income Ratio**" means the ratio of the Borrower's first-lien mortgage Monthly Payment (including monthly amounts for principal, interest, escrow, taxes, hazard insurance and homeowners' association or condominium fees if such homeowners' association or condominium fees are escrowed) to the Borrower's gross monthly income, all determined in accordance with HAMP, as defined in Treasury's Supplemental Directive 9-01: Introduction of the Home Affordable Modification Program, April 6, 2009.

"*Eligible Borrower*" means a Delinquent Borrower with an Eligible Mortgage or a Borrower facing Imminent Default with an Eligible Mortgage.

"*Eligible Mortgage*" means a Pick-a-Payment mortgage loan that is secured by a 1-4 unit residential property that is the Borrower's principal residence.

"*Escrow-related Advances*" refers to advances for items such as property taxes, hazard insurance, homeowner association or condominium fees advanced on behalf of the Borrower by Wells Fargo.

"*Fully Amortizing*" means a Pick-a-Payment mortgage loan in which the Borrower's Monthly Payment fully covers the interest accrued and due that month, as well as paying a portion

of the principal balance such that the balance of the loan should be paid in full at the expiration of the term of the loan if all Monthly Payments are made when due.

"*Good standing*" means a Borrower who is not currently and, since the effective date of the Borrower's MAP2R modification agreement, has never been delinquent by the equivalent of three (3) full Monthly Payments at the end of the month in which the last of the three (3) delinquent payments was due. Once lost, Good Standing cannot be restored even if the borrower subsequently cures the default.

"*HAMP*" refers to the Home Affordable Modification Program administered by the United States Department of the Treasury.

"*HAMP Principal Reduction Alternative*" refers to the principal reduction alternative described in Treasury's Supplemental Directive 10-05: Modification of Loans with Principal Reduction Alternative, dated June 3, 2010.

"*Imminent Default*" describes a Borrower who Wells Fargo has determined, in accordance with applicable HAMP guidance, as necessary, that default by the Borrower in making scheduled payments on his or her loan is reasonably foreseeable. In assessing whether a Borrower is facing Imminent Default, Wells Fargo will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA. Additionally, the fact that a Borrower is projected to Recast to a fully amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four contractual Monthly Payments using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI, shall be considered as a factor in the determination of Imminent Default.

"*LTV*" means the current ratio of the unpaid principal balance of the Eligible Mortgage less any amounts of principal forbearance, to the Market Value of the residential property that secures such Eligible Mortgage as of the time reviewed for eligibility for modification.

"*MAP 1*" shall mean Wells Fargo's proprietary modification program in effect from January 1, 2009 to June 4, 2010.

"*MAP2R*" means Wells Fargo's Mortgage Assistance Program 2 which is based on the terms described in this Assurance.

"*Market Rate*" is the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, as of the date that the modification or option is prepared, plus 100 basis points.

"*Market Value*" means the value of the residential property that secures a Pick-a-Payment mortgage loan as determined by Wells Fargo in reliance on an appraisal report prepared not more than 180 days before the date of determination, broker price opinion prepared not more than 120 days before the date of determination or automated valuation model prepared not more than 90 days before the date of determination. Notwithstanding the foregoing, for the purposes of Section "X" of this Assurance, Wells Fargo may rely on the most recent value available in its system of record for determining the value of the residential property.

"*Monthly Payment*" means the amount that is due from a Borrower on a monthly basis according to the note, and shall include any principal amounts, monthly accrued interest, monthly amounts to apply to escrow for taxes, hazard insurance, and homeowners' association or condominium fees.

"*Negative Amortization*" has the same meaning as Deferred Interest.

"*NPV Test*" means the calculation and comparison of the net present value ("NPV") of a

modification versus the NPV of conducting no modification as to the same mortgage loan. The calculation of NPV is arrived at using a proprietary formula developed by Wells Fargo. If the NPV of the modification would be greater than the NPV if there was no modification, the result is deemed "positive." If the NPV of the modification would be less than the NPV if there was no modification, the result is deemed "negative."

"*Office of the Attorney General*" means the Office of the Attorney General of Texas.

"*Payment Reset*" means an annual increase in the rate of interest such that the aggregate scheduled payments of principal (if applicable) and interest in any year increases by up to 7.5%.

"*Pick-a-Payment mortgage loan*" means a mortgage loan originated or acquired by World Savings Bank or Wachovia. The Pick-a-Payment mortgage loan permitted the Borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. In particular, for each payment, the borrower could choose from four options. Borrowers could (i) make a fully amortized interest and principal payment such that the loan would be satisfied in the traditional 30-year term; (ii) make a 15-year fully amortized payment; (iii) make an "interest-only" payment; or (iv) make a lesser, minimum payment. Borrowers could also choose any payment amount between these numbers. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased. Wells Fargo (which did not originate any Pick-a-Payment mortgage loans) acquired Wachovia and its Pick-a-Payment mortgage loan portfolio on December 31, 2008.

"*Reason for Rejection*" means the specific reason a Borrower was not offered a loan modification. Those specific reasons shall include, at a minimum, the following: negative NPV, Borrower already below 31% DTI, Borrower failed to make trial payments, Borrower rejected

modification proposal, Borrower failed to provide necessary documents or failed to respond to communications, or other.

"*Recast*" means a recalculation establishing a new fully amortizing periodic payment triggered by the unpaid principal balances cap, or date certain, such that the payment increase as a result of such Recast exceeds 7.5%.

"*Termination date*" means June 30, 2013, with the exception of certain reporting obligations outlined in Section "X. E." of this Assurance.

## IV. WELLS FARGO'S RESPONSIBILITY UNDER THIS ASSURANCE

A. *Responsibility of Wells Fargo*. Wells Fargo is responsible to the State of Texas for performance of all of the undertakings in this Assurance. Sale or other disposition of the ownership or servicing rights of all or any part of its Pick-a-Payment mortgage loan portfolio or of the entity or entities responsible for servicing or modifying these mortgages shall not relieve Wells Fargo of its duties under this Assurance or constitute a defense to its non-performance.

B. *Remedies for Failure of Wells Fargo to Cause Performance*. This Assurance shall be binding upon Wells Fargo. In the event that the State believes that there has been a material breach of the terms and conditions of this Assurance, the State, acting through its Attorney General, may seek enforcement of this Assurance, or, in the alternative, terminate this Assurance, provided that the State notifies Wells Fargo in writing in advance of termination or the filing any enforcement action and gives Wells Fargo at least sixty (60) days to cure the claimed breach. In the event that the State terminates this Assurance as a result of a breach by Wells Fargo that has not been cured in accordance with this Paragraph, it shall no longer be bound by the Releases in Section XI. However, (i) nothing in this Assurance shall be construed as authorizing any person or entity

other than a State acting through its Attorney General to enforce or seek remedies under this Assurance or as a result of this Assurance or a breach thereof; (ii) the State's remedies in any enforcement action shall not include any criminal sanctions; and (iii) this Assurance and all negotiations, statements, and proceedings in connection therewith shall not be construed as or deemed to be evidence of an admission or concession on the part of Wells Fargo of any violation of law, liability, or wrongdoing by it, and shall not be offered or received in evidence in any action or proceeding, or used in any way as an admission, concession or evidence of any violation of law, liability or wrongdoing of any nature on the part of Wells Fargo.

## V.   LOAN MODIFICATIONS FOR ELIGIBLE BORROWERS IN PICK-A-PAYMENT MORTGAGE LOANS

Starting with the Commencement Date, Wells Fargo, on an ongoing basis, shall offer Eligible Borrowers affordable loan modifications in accordance with the following provisions:

A.   *Loan Modifications to Be Considered.*   Consistent with federal requirements, each Eligible Borrower shall first be considered for a HAMP modification. Eligible Borrowers who do not qualify for or elect not to accept a HAMP modification shall be considered for a MAP2R modification on the terms as outlined in Section "V. B." of this Assurance.

B.   *MAP2R Modification.*   Eligible borrowers who do not qualify for or elect a HAMP modification shall be considered for a MAP2R modification on the terms in this Section "V.B." The following process shall commence upon receipt of the documents described in Section V.B.4. and subsequent verification that the Eligible Borrower's DTI is above 31%. The loan will be converted to a fully amortizing loan and the negative amortization feature will be eliminated.

1.   *Waterfall.*   Wells Fargo will apply the following waterfall, in the order listed below, until an Eligible Borrower's Monthly Payment reaches a DTI of 31%. The DTI may be

slightly higher than 31% if the next step or action within the waterfall will result in a DTI below 31%. Once a DTI as close as possible to 31% is reached, Wells Fargo will not apply any additional steps in the waterfall, nor actions within a step. If any step in the waterfall is already achieved, Wells Fargo will proceed to the subsequent step. If all steps of the waterfall have been exhausted and a DTI of 31% can not be achieved, Wells Fargo is not required to offer a MAP2R modification. Following application of the waterfall all loans must pass the NPV test (as outlined in Section V.B.3) before a MAP2R modification must be offered.

**a.** Waive all Accrued Interest, outstanding late charges, and outstanding fees.

**b.** Escrow-related Advances, and Corporate and Default-Related Advances will first be capitalized, then immediately and permanently forgiven. If this forgiveness combined with the waiver of all Accrued Interest, outstanding late charges, and outstanding fees in Section "V.B.1.a." does not equal a number that represents ten (10) percent of the unpaid principal balance (calculated by multiplying the pre-modification unpaid principal balance by 10%), then any Deferred Interest, if it exists will be waived until the total of the waived Accrued Interest, Escrow-related Advances, outstanding late charges, outstanding Corporate Advances, and Deferred Interest result in number that represents ten (10) percent of the unpaid principal balance. In the absence of Deferred Interest, only Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, and Corporate and Default-Related Advances will be forgiven. While Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, Corporate and Default-Related Advances will be waived for Eligible Borrowers, regardless of LTV, forgiveness of

Deferred Interest will be applied only to the extent that it does not reduce the Borrower's current LTV below 100%.

c.      Forgive principal until an LTV of 150% is achieved;

d.      Extend the loan term and re-amortize the loan in one month increments to a maximum term of 480 months;

e.      Forbear principal with the opportunity to be forgiven, as outlined in Section "V.B.2", until a LTV of 125% is achieved. The principal forbearance amount is non-interest bearing and non-amortizing. The amount of principal forbearance that is not forgiven will result in a balloon payment fully due and payable upon the earliest of the transfer of ownership of the property, payoff of the interest bearing unpaid principal balance, or maturity of the loan. Should Wells Fargo choose to participate in HAMP Principal Reduction Alternative ("PRA"), Supplemental Directive 10-05, the LTV level of this step shall be adjusted from 125% to 115% for modifications done on a prospective basis from the date Wells Fargo elects to participate in the PRA directive.

f.      Reduce the interest rate in .125% increments. In all cases, the interest rate shall not be reduced below a floor of 2%. If the interest rate after the modification is below the Market Rate, this reduced rate will be in effect for the first three years following the date of the loan modification. Thereafter it will be increased by a maximum of one percent per year at each 12-month anniversary date of the original modification until it reaches the Market Rate, at which time that rate shall be fixed for the remaining loan term. If the interest rate after the modification is above or equal to the Market Rate, then that resulting rate shall become the permanent rate for

the remaining loan term. In no event will a step rate increase result in a greater than 15% increase in the portion of the monthly payment for principal and interest. If it does, then the rate shall only be increased by the amount that results in an interest rate such that the increase in the monthly principal and interest portion of the payment is no greater than 15%; thereafter, the rate will continue to increase according to the terms above each year until the Market Rate is ultimately reached.

g.      Forbear principal without the opportunity for conditional forgiveness until a LTV of 100% is reached.

**2. Conditional Forgiveness.** Principal forborne under Section "V.B.1.e." will be forgiven if the Eligible Borrower who received a MAP2R modification is in Good Standing on the first, second, and third anniversaries of the loan modification. On each of the above anniversary dates that such Borrower is in Good Standing, equal portions of one-third of the principal forbearance amount will be permanently forgiven.

**3. NPV test.** All potential MAP2R modifications will be subjected to an NPV test prior to being offered to a Borrower. Wells Fargo shall not be required to offer the Borrower a MAP2R modification that yields an NPV negative result. However, Wells Fargo, in its sole discretion, may offer the NPV negative modification or, if possible, may offer an Eligible Borrower an alternate modification.

**4. Documentation Requirements.** In determining the documents required of Eligible Borrowers to apply for MAP2R modification, Wells Fargo, consistent with its need to obtain relevant financial information, will seek to minimize the burden on Eligible Borrowers and maximize participation in MAP2R. Wells Fargo will not

request signed affidavits from Borrowers to document their hardship, and will not require more than one year's income tax return, but will require documentary evidence of the Borrower's current income.

*5. Eligible Borrowers Who Do Not Qualify for MAP2R Modifications.* There is no obligation for Well Fargo to offer MAP2R loan modifications to Eligible Borrowers who cannot be qualified under the HAMP or MAP2R guidelines. Such Eligible Borrowers may receive consideration for payments in connection with Short Sales, Deeds-in-Lieu of Foreclosure, or relocation assistance as described in Section "VIII."

*6. Following Termination of this Assurance.* After the Termination Date, Wells Fargo will continue to evaluate Eligible Borrowers for potential loan workout solutions that are commercially reasonable and are designed to help avoid foreclosure. These solutions may or may not be MAP2R modifications and their terms will be in the sole discretion of Wells Fargo.

## VI. SERVICING COMMITMENTS FOR BORROWERS SEEKING MAP2R MODIFICATIONS OR FIXED RATE CONVERSIONS

*Outreach to Borrowers.* On or before the Commencement Date, Wells Fargo will send Delinquent Borrowers with Eligible Mortgages and HUD-certified housing counseling agencies in Texas two letters describing MAP2R's eligibility requirements, terms, and application process and its relationship with HAMP. These letters will be designed to maximize response rates and will include in-language communications to Spanish-speaking borrowers.

*Borrowers Within 120 Days of Recast.* Any Borrower whose loan is within 120 days of

Recast during the term of this Assurance will be offered by Wells Fargo the option, if qualified, of converting their Pick-a-Payment mortgage loan to a fixed rate loan at the Market Rate to be amortized over a thirty (30) year term ("Fixed Rate Conversion"). All such Borrowers eligible for this Fixed Rate Conversion must provide sufficient documentation to allow Wells Fargo to determine the Borrower's ability to repay the converted loan. There shall be no fee for exercising this Fixed Rate Conversion.

A.    ***Servicing Commitments.*** In order to ensure that Borrowers receive timely and appropriate consideration for modifications or Fixed Rate Conversion options, Wells Fargo will:

1.    Maintain a dedicated, adequately staffed help line to serve Eligible Borrowers, including Spanish-speaking borrowers;

2.    Make and communicate to Eligible Borrowers in writing, decisions on their MAP2R modifications within 30 calendar days of receiving all required documentation from the Eligible Borrower. This notice may be included within any notice required in connection with the consideration of the Eligible Borrower for a HAMP modification;

3.    Wells Fargo will assign a primary point of contact at Wells Fargo to each Eligible Borrower seeking a modification;

4.    Establish a formal second-look and escalation protocol for all Eligible Mortgages covered by the Assurance; and

5.    *Second Liens.* Where an Eligible Borrower who has a first lien loan that is modified under this Assurance, also has an equity line of credit second mortgage loan that was originated by Wachovia or World Savings Bank, and is currently serviced by Wells Fargo's Pick-a-Payment mortgage loan servicing group in San

Antonio, Texas, Wells Fargo will review this second lien for an appropriate modification based on the Eligible Borrower's circumstances.

B.    *Restrictions on the Foreclosure Process.* Wells Fargo will apply HAMP rules under Supplemental Directive 10-02, dated March 24, 2010, and any applicable state laws regarding initiating or advancing foreclosures to Eligible Borrowers being considered for MAP2R modifications. In addition, Wells Fargo will ensure that each Eligible Borrower:

1.    Has notes in his or her electronic records accessible to all loss mitigation, modification, and foreclosure departments that indicate whether he or she is being considered for a loan modification;

2.    Who is being considered for a loan modification receives in any foreclosure related communication notice that he or she is still being considered for a modification, with the exception of notices generated by outside counsel or foreclosure trustee companies retained by Wells Fargo to assist with or conduct the foreclosure process.    Wells Fargo will develop and implement policies and procedures to provide notification to their foreclosure attorney/trustee regarding a Borrower's modification status;

3.    Is notified in writing within ten (10) days of submitting a modification request of any documents believed to be missing and necessary for evaluation for a MAP2R loan modification; and

4.    Who is denied a MAP2R modification receives a timely denial letter that clearly explains the reasons that the modification was denied and describes the steps necessary to request that Wells Fargo re-review the decision.

## VII.    MISCELLANEOUS PROVISIONS RELATED TO LOAN MODIFICATIONS AND REFINANCING

A.    ***Modification Fees and Prepayment Penalties.*** Wells Fargo will waive all prepayment penalties and assess no fees in connection with a modification of an Eligible Mortgage. Wells Fargo shall not require a customer to make any payment of arrearages as part of the loan modification process.

B.    ***Releases.*** Wells Fargo will not solicit or require releases of claims in connection with loan modifications offered under this Assurance.

C.    ***Bankruptcy.*** MAP2R will be offered to Eligible Borrowers who are in bankruptcy to the extent and in the manner permitted by law.

D.    ***Borrowers With Prior Modifications.*** Eligible Borrowers who have earlier received a MAP 1 modification or other modification not pursuant to this Assurance will not be eligible to be considered for new loan modification offer under this Assurance.

E.    ***Compliance Monitor.*** Wells Fargo will designate an employee as the Compliance Officer responsible for this Assurance. The Compliance Officer will be responsible for providing agreed upon reporting and ensuring that Wells Fargo reviews and responds to complaints from the Office of the Attorney General or from individual borrowers concerning aspects of this Assurance. Within 30 days of receipt of a written consumer complaint sent through the Office of the Attorney General, the Compliance Officer will reply in writing to the Attorney General with a response that fairly addresses the substance of the consumer's complaint, including a discussion of any corrective measures that may have been taken to address issues raised by the complaint.

F.   **Borrower Consent.**  A Borrower's complaint to the Office of the Attorney General suffices as (or constitutes) the Borrower's authorization for Wells Fargo to discuss his or her complaint with the Office of the Attorney General.

## VIII.   NON-RETENTION ALTERNATIVES TO FORECLOSURE

A.   Wells Fargo will offer the Home Affordable Foreclosure Alternatives ("HAFA") or its internal short sale or deed-in-lieu of foreclosure alternatives to Eligible Borrowers who are unable to qualify for an affordable modification or who decide to leave their homes, and otherwise are qualified for a short-sale or deed-in-lieu of foreclosure under HAFA guidelines.

B.   Eligible Borrowers who qualify for HAFA will receive an incentive payment of at least $3,000 for a short-sale or deed-in-lieu of foreclosure; and

C.   Eligible Borrowers who do not qualify for HAFA, but otherwise qualify for a short-sale or deed-in-lieu of foreclosure will receive payments of at least $1,500 to assist with relocation expenses.

## IX.   FORECLOSURE RELIEF PROGRAM

Wells Fargo will provide $2,012,772 to the Office of the Attorney General in order to assist with the State's efforts to prevent or mitigate foreclosures and to prevent mortgage or loan modification fraud.

## X.   REPORTING REQUIREMENTS

Wells Fargo will provide the Office of the Attorney General with quarterly reports through the Termination Date, setting forth the information outlined in this Section "X", except for the

requirements set forth as described in Section "X.E." All such reports will be provided within forty-five (45) days after the end of each quarter and provide both state, as determined by the property address, and aggregate national data, as necessary per the specific reporting requirement for the activity during that quarter. The quarterly reports will provide the following information broken down by the type of relief for Eligible Mortgages: (1) HAMP modifications, (2) MAP2R modifications, and (3) combined information for both HAMP and MAP2R modifications; (4) Foreclosure Alternatives; and (5) Fixed Rate Conversions.

Additionally, in the event that States, in connection with their implementation of this Assurance, wish to locate and contact Borrowers of Eligible Mortgages who between January 2, 2005, and the Commencement Date have gone through a foreclosure sale, Wells Fargo will work with the State to contact or provide contact information for those borrowers. Specifically, Wells Fargo will 1) provide the name and most current mailing address of all Borrowers of foreclosed Eligible Mortgages within 60 days of a such a request from a state and 2) at its own expense, and upon request of a state, submit the names and all necessary identifying information of Eligible Borrowers that were not located using the information provided in section 1) to the United States Postal Services' National Change of Address (NCOA) service, and/or to a qualified vendor, and will provide the States with a best new address for said Eligible Borrowers within 90 days of such a request.

A.  **Modification Eligibility and Requests.**

1.  Number of Borrowers and Eligible Borrowers;

2.  Number of Borrowers contacting Wells Fargo on the borrower's initiative by delinquency status; and

3.  Number of modifications, foreclosure alternatives, and fixed rate conversions

that are: (i) offered (ii) completed and (iii) rejected. For modification, foreclosure alternative, and fixed rate conversion requests that were rejected, provide the number of Eligible Borrowers rejected by Reason For Rejection.

B.     *Loan Modifications.*    For loans modified under this Assurance provide the following:

1.     Average and total dollar amounts of Accrued Interest, Escrow-related Advances, Corporate Advances and outstanding late charges forgiven and average percentage of unpaid principal balance this represents;

2.     Average and total dollar amounts of Deferred Interest forgiven and average percent of unpaid principal balance this represents;

3.     Number of loans that received principal forgiveness, total principal forgiveness and average principal forgiveness per loan;

4.     Number of loans that received principal forbearance, total principal forbearance and average principal forbearance per loan;

5.     Number of loans that receive term extensions and the average new total term of such loans;

6.     Number of loans that receive interest rate reductions, average initial post-modification interest rate, and average interest rate reduction of such loans;

7.     Average percentage Monthly Payment reduction;

8.     Average and total dollar value of the modification by comparing the concessions of the modification to the original terms of the Note, assuming the borrower takes advantage of all opportunities presented by the modification;

9.  Average LTV pre- and post-modification;

10. Number of short-sales that are (i) offered (ii) completed and (iii) rejected; total and average incentive payment to Eligible Borrower pursuant to Section "VIII";

11. Number of deeds-in-lieu of foreclosure that are (i) offered (ii) completed and (iii) rejected; total and average incentive payment to Borrowers pursuant to Section "VIII";

12. Number of deeds-in-lieu of foreclosure and short sale requests that are (i) offered (ii) completed and (iii) rejected;

13. Number of foreclosure sales completed; and

14. Number of Borrowers who receive a Fixed Rate Conversion pursuant to Section "VI."; number of Borrowers who applied but were rejected for such conversions; delinquency rates of converted loans.

C.  *Portfolio and Modification Performance*

1.  Delinquency rates of unmodified Eligible Mortgages, by number and percentage, that are current, 30-59 days delinquent, 60 or more days delinquent, and in the foreclosure process;

2.  Delinquency rates (current, 30-59 days delinquent, 60 or more days delinquent, and in the foreclosure process) for Eligible Mortgages modified under MAP2R by the following post modification LTV categories: Less than 80%, 80% to 100%, 101% to 125%, 126% to 150%, and more than 150%. Break out this data for loans that received principal forgiveness and those that did not;

3.      Number of Eligible Mortgages that have not been modified and the percentage of the Pick-a-Payment mortgage loan portfolio they represent as determined by a total Pick-a-Payment portfolio on the last day of the month in which this Assurance is signed;

4.      Number and percentage of Borrowers electing the minimum payment option based upon the last payment received from the Borrower during the quarter for which the report is being prepared;

5.      Number and percentage of Borrowers accruing Deferred Interest based upon the last payment received from the Borrower during the quarter for which the report is being prepared;

6.      Number of Eligible Mortgages expected to Recast within the next four contractual Monthly Payments;

7.      Number of Eligible Borrowers (and unpaid principal balance) with unmodified loan and a current LTV of 100% or more; and

8.      Number of 60 or more days delinquent Eligible Borrowers (and unpaid principal balance) with unmodified loans and a current LTV of 150% or more.

D.      *Servicing Performance*

1.      Average time from when Eligible Borrower submits all documentation required in the Documentation Requirements of Section "V.B.4" until a modification decision is mailed; and

2.      Number of Eligible Borrowers who have submitted all documentation required in the Documentation Requirements of Section "V.B.4" for whom

the time to notification was more than 30 days and more than 60 days.

E.    **Additional Reporting.**  Beginning July 1, 2013 Wells Fargo will provide the Office of the Attorney General with quarterly reports through December 31, 2017 that include the information set forth below.  Such reports will be provided within forty-five (45) days after the end of each quarter.

1.    Delinquency rates of unmodified Eligible Mortgages by number and percentage that are 60 or more days delinquent;

2.    Delinquency rates (current, 30-59 days delinquent, 60 or more days delinquent, and in the foreclosure process) for Eligible Mortgages modified under MAP2R during the term of this Assurance;

3.    For any Eligible Mortgage Wells Fargo chooses to modify at its own discretion under its then existing Modification Program from January 1, 2013 through December 31, 2017, Wells Fargo will report the following information related to such modifications:

    a.    The number of modifications of Eligible Mortgages that are: (i) offered (ii) completed and (iii) rejected;

    b.    Number of Eligible Mortgages that received principal forgiveness, total principal forgiveness and average principal forgiveness per loan; and

    c.    The average percentage of monthly payment reduction per Eligible Mortgage.

4.    The amount of forbearance that has been converted to permanent forgiveness under Section "V.B.2" on Eligible Mortgages modified under MAP2R prior

to June 20, 2013.

## XI.    RELEASES; MORE FAVORABLE SETTLEMENT

A.    *Release.*  The State of Texas hereby fully releases and discharges Wells Fargo, its parents, affiliates, subsidiaries, employees, officers and directors from any and all civil and administrative actions, claims and causes of action based upon or with respect to the origination, marketing, servicing, prior modification or resolution practices of Eligible Mortgages prior to the date of this Assurance which the State could have brought against Wells Fargo prior to the Effective Date, except for (i) any regulatory or enforcement proceedings by or on behalf of an Agency other than a State Attorney General; (ii) any claims that the State of Texas might have as an investor in securities; and (iii) any criminal investigations or proceedings. This release does not apply to the current Texas investigation related to the insurance of property secured by or described in a mortgage loan.

B.    *More Favorable Terms.*  In the event that Wells Fargo voluntarily enters into an agreement to assist troubled Eligible Borrowers with the Attorney General of any state that is not a signatory to this same Assurance in a form or on terms that are different than those contained in this Assurance, then Wells Fargo will provide a copy of such agreement to the State for review. If, after review, the State determines those alternative terms or form of agreement are, taken as a whole, more favorable than those contained in this Assurance, then the parties will amend this Assurance to reflect any such terms or form of agreement in place of terms hereof.

## XII.    OTHER TERMS AND CONDITIONS

A.    *No Admission.*  The Assurance shall not constitute an admission of wrongdoing by

Wells Fargo or its predecessors, nor shall it be cited as such by the Office of the Attorney General. The Assurance shall not be admissible in any other proceeding.

    **B.**    ***Submission to Jurisdiction for Limited Purpose.***  Wells Fargo submits to the jurisdiction of the court in the State of Texas for the limited purpose of entering into and enforcing this Assurance only. Any acts, conduct or appearance by Wells Fargo does not constitute and shall not be construed as a submission to the general jurisdiction of any court in the State of Texas for any purpose whatsoever.

    **C.**    ***Voluntary Agreement.*** This Assurance is entered into voluntarily and no promises, other than what is contained in this Assurance, or threats have been made by the Office of the Attorney General of any member thereof to induce Wells Fargo to enter into this Assurance.

    **D.**    ***Jurisdiction; Choice of Law; Venue.***  The Assurance shall be construed and enforced in accordance with the laws of the State of Texas. In any action or dispute relating to this Assurance, the jurisdiction and venue shall be in the trial Court of appropriate jurisdiction of the State of Texas. Wells Fargo submits to the jurisdiction of the trial Court of appropriate jurisdiction of the State of Texas for the limited purposes state in this paragraph, which should not be construed as a submission to the general jurisdiction of that Court.

    **E.**    ***Confidentiality.***  The Office of the Attorney General agrees that all confidential information disclosed to it by Wells Fargo, its parent, subsidiaries or any of its affiliates, including but not limited to the periodic reports that will be provided pursuant to Section X shall be kept confidential; provided, however, that the following information reported to the Office of the Attorney General on a periodic basis shall not be deemed confidential to the extent aggregated for Eligible Borrowers in the State of Texas for a full reporting period:

        1.    the total number of Eligible Mortgages modified;

2.      the total amount of forgiven and forborne principal; and

3.      the total amount of interest and principal expected to be saved by Eligible Borrowers as a result of such MAP2R modifications over the life of the Eligible Mortgages.

The Office of the Attorney General shall not disclose or use any confidential information without the prior written consent of the disclosing party, except to the extent required by law, regulation or court order (and in any of these circumstances, only upon prior written notice to Wells Fargo).

     F.     **Enforcement.** This Court shall retain jurisdiction over this matter for the purpose of (a) enabling the Office of the Attorney General to apply, at any time, for enforcement of any provision of this Assurance; (b) enabling any party to this Assurance to apply, upon giving thirty (30) days written notice to all other parties, for such further orders and directions as might be necessary or appropriate either for the construction or carrying out of this Assurance; and (c) enabling any party to this Assurance to request information from a party or third party, with notice to counsel for the parties and subject to the parties' and any third parties' right to object and to move to quash.

     F.     *Conflict with Subsequent Law.* In the event that any applicable law conflicts with any provision hereof, making it impossible for Wells Fargo to comply both with the law and with the provisions of this Assurance, the provisions of the law shall govern.

     G.     *No Third Party Beneficiaries Intended.* This Assurance is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary. This Assurance is not intended to create a private right of action on the part of any person or entity other than the parties hereto.

     H.     *Service of Notices.* Service of notices required or permitted by this Assurance or its

enforcement shall be in writing and delivered on the following persons, or any person subsequently designated by the parties:

**For Wells Fargo:**

---

David L. Moskowitz
Deputy General Counsel
1 Home Campus, X2401-06T
Des Moines, Iowa 50328-0001

**For the Office of the Attorney General:**

---

James A. Daross
Assistant Attorney General
Consumer Protection and Public Health Division
401 E. Franklin Ave., Suite 530
El Paso, Texas 79901
Phone: (915) 834-5801
Fax: (915) 542-1546
State Bar No. 05391500

Any party may change the designated person and address for delivery with respect to itself by giving notice to the other parties as specified herein.

    **I.**    *Waiver.* The failure of any party to exercise any rights under this Assurance shall not be deemed a waiver of any right.

    **J.**    *Severability.* If any part hereof shall for any reason be found or held invalid or unenforceable by any court of competent jurisdiction, such invalidity or unenforceability shall not affect the remainder hereof, which shall survive and be construed as if such invalid or unenforceable part had not been contained herein.

    **K.**    *Counterparts.* This Assurance may be signed in one or more counterparts, each of which shall be deemed an original. Facsimile or electronic copies of this Assurance and the signatures hereto may be used with the same force and effect as an original.

**L.**  *Inurement.*  This Assurance is binding and inures to the benefit of the parties hereto and their respective predecessors, successors and assigns.

**M.**  *Integration.*  This Assurance constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter thereof.

**N.**  *Amendment.*  This Assurance may be amended solely by written agreement signed by the Office of the Attorney General and Wells Fargo.

**O.**  *Termination.*  The obligations of Wells Fargo under this Assurance shall terminate on the Termination Date.  Termination of the obligations under this Assurance shall not change or terminate the terms of any loan modification entered into pursuant to Section "V.B" of this Assurance.

**P.**  *Attorneys Fees and Costs.*  Wells Fargo has paid all attorneys' fees and costs related to this Assurance prior to execution of this Assurance.  No further fees or costs shall be sought by the Office of the Attorney General.

*[Signature pages on the following page]*

DATED this _5ᵗʰ_ day of _October_ , 2010

**WELLS FARGO BANK, N.A.**

Michael J. Heid
Executive Vice President

APPROVED AS TO FORM AND CONTENT:

GREG ABBOTT
Attorney General of Texas

By: _____

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**BILL COBB**
Deputy Attorney General for Civil Litigation

**PAUL D. CARMONA**
**Division Chief,**
Consumer Protection and
Public Health Division


JAMES A. DAROSS
Assistant Attorney General
State Bar No. 05391500

RICHARD L. BISCHOFF
Assistant Attorney General
State Bar No. 02343200
Office of the Attorney General
Consumer Protection and
Public Health Division
401 E. Franklin, Suite 530
El Paso, Texas 79901
(915) 834-5806; Fax (915) 542-1546
Attorneys for Plaintiff

29

IN THE COUNTY COURT AT LAW NUMBER ___6___
EL PASO COUNTY TEXAS

| | |
|---|---|
| IN THE MATTER OF: | § |
| STATE OF TEXAS | § |
| | § |
| AND | § |
| | § |
| WELLS FARGO BANK, N.A. | § |

Cause No. 2010 - ___3872___

2010 DEC 10   3 12
EL PA...
DEPUT...

## FINAL ORDER
## APPROVING ASSURANCE

On this date came on to be considered the Assurance between the State of Texas and Wells Fargo Bank, N.A., filed in the above-referenced cause, which is approved by all parties. Said Assurance is hereby **APPROVED** by this Court, pursuant to §17.58, Tex. Bus. & Com. Code.

SIGNED this __6__ day of __October__, 2010.

COUNTY COURT AT LAW #6
ORIGINAL SIGNED BY
JUDGE M. SUE KURITA

_____
JUDGE PRESIDING



IN THE DISTRICT COURT OF EL PASO COUNTY TEXAS

_____ 327TH _____ JUDICIAL DISTRICT

| | |
|---|---|
| THE STATE OF TEXAS, | § |
|         Plaintiff, | § |
| | § |
| | § |
| v. | §    Cause No. 2009 - _717_ |
| | § |
| COUNTRYWIDE FINANCIAL | § |
| CORPORATION, a Delaware corporation; | § |
| COUNTRYWIDE HOME LOANS, INC., a | § |
| New York corporation; and FULL | § |
| SPECTRUM LENDING, INC., a California | § |
| corporation. | § |
| | § |
|         Defendants. | § |
| | § |
| | § |

## AGREED FINAL JUDGMENT AND INJUNCTION

On this the _11th_ day of February, 2009, came before this Court the STATE OF TEXAS, Plaintiff, and Defendants COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING, INC., Defendants in the above entitled and numbered cause (collectively, the "Parties"). The STATE OF TEXAS, by and through Texas Attorney General Greg Abbott, and Defendants, by and through their attorney of record, announced to the Court that all matters of fact and things in controversy between them had been fully and finally compromised and settled and presented to the Court this Agreed Final Judgment and Injunction ("Final Judgment"). By their duly authorized signatures, the Parties stipulate to the Court the following: that they understand the terms of this Final Judgment; that they agree to the terms of this Final Judgment; that they have waived all rights to service of process of this suit; that they have waived all rights of appeal from this Final Judgment; that they actively participated in the negotiations leading up to this Final Judgment and are aware of the duties placed upon them by it and are desirous and capable of carrying out those duties in full; that they acknowledge receipt of copies of this Final Judgment and have full and actual notice of the terms of this Final Judgment; that the issuance and service of writ of injunction are waived; that the terms of this Final Judgment are sufficiently detailed and specific to be enforceable by the Court in conformance with TEX.R.CIV.P. 683; that the persons signing this Final Judgment are legally and fully authorized to do so; that this Final Judgment represents a compromise and settlement of all matters arising out of facts alleged by the STATE OF TEXAS in this cause.

Defendants deny the allegations of the Office of the Attorney General, and the parties agree and stipulate that neither this Final Judgment nor the payment of money by Defendant Countrywide Financial Corporation constitutes an admission by Defendants of any violation of the Texas Deceptive Trade Practices-Consumer Protection Act, TEX. BUS. & COM. CODE

§§17.41, *et seq.*, or any other law.

Pursuant to the agreement between them, the Parties submit to the jurisdiction of the Court for the purpose of entering and enforcing this final judgment and do not contest the entry of this Final Judgment.

It appearing to the Court that all parties agreed to the entry of this Final Judgment and that they have approved its entry by their duly authorized signatures and the signatures of their respective attorneys below, the Court, upon the stipulations of the Parties after being fully advised in this matter, finds as follows:

     (a)    That it has jurisdiction to enter and enforce this final judgment;

     (b)    That the settlement of this dispute is fair, reasonable, and just; and

     (c)    That it would be in the best interests of the Parties if the Court approved the settlement and rendered judgment accordingly.

The Parties shall bear their own costs of court.

Based on these findings, and having heard and considered the representations made by the Parties, the Court is of the opinion that an injunction should be issued as granted in this Final Judgment and that Plaintiff STATE OF TEXAS is entitled to recover as set forth below.

## RECITALS.

(1)    Countrywide Financial Corporation, a Delaware corporation ("*CFC*"), is a thrift holding company.

(2)    Countrywide Home Loans, Inc., a New York corporation and wholly-owned subsidiary of CFC, is or was a licensed mortgage banking organization.

(3)    Full Spectrum Lending, Inc., a California corporation and wholly-owned subsidiary of CFC, is or was a licensed mortgage banking organization.

(4)    Countrywide Home Loans Servicing, L.P., is a Texas limited partnership engaged in servicing loans, and as of the Judgment Date is a wholly-owned subsidiary of Bank of America, National Association.

(5)    On July 1, 2008, Bank of America Corporation, a Delaware corporation ("*BAC*"), announced that it had completed its purchase of CFC, including Countrywide Home Loans, Inc., Full Spectrum Lending, and Countrywide Home Loans Servicing, L.P. In connection with the acquisition, BAC announced that it would suspend offering subprime or high cost mortgages (as described in 15 U.S.C. 1602(aa)) and nontraditional forward mortgages (other than those that are Federal Eligible) that may result in, negative amortization -- such as Pay Option ARMs. BAC also stated that it would, for a time, place restrictions on offering "low documentation" and "no documentation" mortgage loans (other than those that are Federal Eligible) and set limits on mortgage broker compensation.

1.    **DEFINITIONS.**

    1.1    *Usage.*  The following rules apply to the construction of this Final Judgment:

        (a)    the singular includes the plural and the plural includes the singular;

        (b)    "include" and "including" are not limiting;

(c)      the headings of the Sections and subsections are for convenience and shall not constitute a part of this Final Judgment, and shall not affect the meaning, construction, or effect of the applicable provisions of this Final Judgment;

(d)      a reference in this Final Judgment or any Schedule to a Section, Exhibit, or Schedule without further reference is a reference to the relevant Section, Exhibit, or Schedule to this Final Judgment; and

(e)      words such as "hereunder," "hereto," "hereof," and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Final Judgment and not to any particular Section, subsection, or clause hereof.

1.2      *Defined Terms.*      The following capitalized terms shall have the following meanings in this Final Judgment unless otherwise required by the context or defined:

"*Affiliate*" means, with respect to any company, any company that controls, is under common control with, or is controlled by such company.

"*Affordability Equation*" has the meaning given to such term in Section 4.4.

"*Alt-A Residential Mortgage Loans*" means CFC Residential Mortgage Loans that are (a) not owned by a GSE; (b) not Subprime; (c) not a Pay Option ARM; (d) less than $400,000 in original principal amount; and (e) including documentation or other characteristics that make such loans not Federal Eligible.

"*Annual Increase*" means, with respect to any stated rate of interest, an annual increase in the stated rate of interest such that the aggregate scheduled payments of principal (if applicable) and interest in any year does not increase by more than 7.5% of the aggregate scheduled payments of principal and interest in the preceding year, subject to any stated interest rate cap.

"*ARMs*" means adjustable rate first-lien residential mortgage loans.

"*BAC*" means Bank of America Corporation.

"*Borrower*" means, with respect to any owner-occupied CFC Residential Mortgage Loan, the obligors(s) on such loan.  No covenant or commitment herein is intended to require a CFC Servicer to deal with more than one obligor on behalf of any Borrowers with respect thereto.

"*CFC*" means Countrywide Financial Corporation.

"*CFC-Originated*" means, with respect to any residential mortgage loan, that such residential mortgage loan is a first-lien residential mortgage that was originated on a retail basis directly or indirectly by CFC or its subsidiaries or through brokers in their wholesale lending channels.  "*CFC-Originated*" residential mortgage loans do not include CFC Purchased Loans.

"*CFC Purchased Loans*" means any first-lien residential mortgage loan originated by unaffiliated third parties and directly or indirectly purchased by CFC or its subsidiaries through their correspondent lending channels or otherwise, *provided* that such loan is serviced by a CFC Servicer.  "*CFC Purchased Loans*" do not include CFC-Originated residential mortgage loans.

"*CFC Residential Mortgage Loans*" means any (i) CFC-Originated first-lien residential mortgage loans, or (ii) CFC Purchased Loans, so long as, in each case, such loans are serviced by a CFC Servicer.

"*CFC Servicer*" means CFC or any Affiliate of CFC that services CFC Residential

Mortgage Loans.

"*CLTV*" means, with respect to a first-lien residential mortgage loan as of the time underwritten, the ratio of the sum of the unpaid principal balance of such mortgage loan *plus* the unpaid principal balance on any second-lien mortgage to the Market Value of the residential property that secures such mortgages.

"*Commencement Date*" means October 6, 2008.

"*Delinquent Borrower*" means, with respect to any Borrower, that the related CFC Residential Mortgage Loan (a) is Seriously Delinquent on or before the Termination Date, or (b) is subject to an imminent reset or Recast and, in the reasonable view of the CFC Servicer, as a result of such reset or Recast is reasonably likely to become Seriously Delinquent on or before the Termination Date.

"*Eligible Borrower*" has the meaning given to such term in Section 4.1.

"*Fannie Mae*" means Federal National Mortgage Association.

"*Fannie Rate*" means, as of any date, the Fannie Mae 30-year fixed rate 60-day delivery required net yield as of such date or if such rate is for any reason not available, a comparable rate published by another nationally recognized source.

"*Federal Eligible*" means, with respect to any first-lien residential mortgage loan that, at the time of origination, (a) such loan is or was eligible for sale to, or guaranty or insurance by, a federal agency, GSE or comparable federally-sponsored entity similar to a GSE, under then applicable guidelines of such agency, GSE or entity, or (b) such loan was made in connection with a program intended to qualify for credit under the Community Reinvestment Act of 1977.

"*Foreclosure Avoidance Budget*" has the meaning given to such term in Section 4.4(a).

"*Foreclosure Relief Program*" means the program under which certain Borrowers will be offered payments, as set forth in Section 6.

"*Foundation*" has the meaning given to such term in Section 7.

"*Freddie Mac*" means Federal Home Loan Mortgage Corporation.

"*GSE*" means a government-sponsored enterprise such as Fannie Mae or Freddie Mac.

"*Interest Rate Floor*" means, with respect to modification of a Qualifying Mortgage hereunder, (a) a rate of 3.5% per annum if the modification results in an interest-only payment; or (b) a rate of 2.5% per annum if the modification results in a fully amortizing payment.

"*LTV*" means, with respect to a first-lien residential mortgage loan as of the time reviewed for eligibility for modification, the ratio of the unpaid principal balance of such mortgage loan to the Market Value of the residential property that secures such mortgage.

"*Market Value*" means, with respect to any residential mortgage loan, the value of the residential property that secures such mortgage loan as determined by a lender or servicer in reliance on an appraisal (whether based on an appraisal report prepared not more than 180 days before the date of determination, broker price opinion prepared not more than 120 days before the date of determination, or automated valuation model prepared not more than 90 days before the date of determination).

"*Office of the Attorney General*" means the Office of the Attorney General of the State of Texas.

"*Pay Option ARMs*" means ARMs that, during an initial period (and subject to Recast), permit the borrower to choose among two or more payment options, including an interest-only payment and a minimum (or limited) payment.

"*Qualifying Mortgage*" has the meaning given to such term in Section 4.2.

"*Recast*" means, in the case of a Pay Option ARM, a contractual payment recast to a fully amortized payment based on a negative amortization trigger.

"*Relocation Assistance payment*" has the meaning given to such term in Section 5.1.

"*Seriously Delinquent*" means, with respect to any residential mortgage loan, that payments of interest or principal are 60 or more days delinquent.

"*Seriously Delinquent Borrower*" means, with respect to any Borrower that, on or before the Termination Date, the related CFC Residential Mortgage Loan is Seriously Delinquent.

"*Subprime 2, 3, 5, 7, and 10 Hybrid ARMs*" means Subprime Mortgage Loans that are 2, 3, 5, 7, and 10 Hybrid ARMs.

"*Subprime Mortgage Loans*" means first-lien residential mortgage loans that combine higher risk features (such as low or no documentation, low equity, adjustable interest rates, prepayment penalties, cash-out financing) with higher risk borrower profiles (lower FICO scores, recent bankruptcies/foreclosures, major derogatory credit), resulting in a loan that could not reasonably be underwritten and approved as a "prime" loan. An existing CFC Residential Mortgage Loan would be a "*Subprime Mortgage Loan*" if it is identified as such in connection with a securitization in which it is part of the pool of securitized assets or, in the case of a CFC Residential Mortgage Loan that is not included in a securitization, was classified as being "subprime" on the systems of CFC and its subsidiaries on June 30, 2008.

"*Termination Date*" means June 30, 2012.

## 2.    CFC SOLE OBLIGOR ON ALL OBLIGATIONS IN THIS FINAL JUDGMENT.

2.1    *Responsibility of CFC.*   Until the Termination Date (or such earlier date as is specified herein), CFC is responsible to the other parties hereto for performance of all of the undertakings in this Final Judgment, including the changes to the residential mortgage lending practices described in Section 3, the loan modification programs described in Section 4, the Relocation Assistance payments described in Section 5, the Foreclosure Relief Program described in Section 6, and the reporting obligations described in Section 8.

2.2    *Absence of Defenses.*   It is not an excuse to the performance of the obligations of CFC hereunder that it does not directly or indirectly engage in the business of originating residential mortgage loans or in the business of servicing residential mortgage loans. CFC is responsible for the conduct of CFC Affiliates and CFC Servicers as specified hereunder whether or not it controls such CFC Affiliates or CFC Servicers and the absence of such control shall not be a defense to or otherwise excuse CFC's failure to perform hereunder.

2.3    *Remedies for Failure of CFC to Cause Performance.*   If there is a material failure to perform the obligations under the loan modification programs described in Section 4, the Relocation Assistance payments described in Section 5, the Foreclosure Relief Program described in Section 6, or the reporting obligations described in Section 8, and such failure is not promptly cured after notice by the Office of the Attorney General, then the Office of the Attorney General may seek enforcement of this Final Judgment under Section 10.4, or, in the

alternative, terminate this Final Judgment. If the Office of the Attorney General elects to terminate this Final Judgment, it shall no longer be bound by the release set forth in Section 9.2.

## 3.   SERVICER PRACTICES.

Until the Termination Date, CFC shall be responsible for the implementation of the following by CFC Affiliates with respect to CFC Residential Mortgage Loans with respect to Borrowers in the State of Texas:

### 3.1   *Residential Mortgage Product Offerings*.

(a)   CFC Servicers will maintain robust processes for early identification and contact with Borrowers who are having, or are reasonably expected to have, trouble making their payments on CFC Residential Mortgage Loans. Under these processes, when contact is made with such Borrowers, an individualized evaluation of the Borrowers' economic circumstances will be made to determine if alternatives to foreclosure are available, and consistent with the directions of the investors, if applicable.

(b)   CFC Servicers will maintain the current practice of offering loan modifications or other workout solutions to Borrowers who are 30 days or more delinquent in their payments, who desire to remain in their homes, and who can afford to make reasonable mortgage payments, subject to applicable investor guidance and approvals.

(c)   CFC's reports to the Office of the Attorney General under this Final Judgment will include information on the numbers and types of workouts concluded on loans secured by Borrower-occupied properties in the State of Texas.

(d)   CFC Servicers will continue the current practice of regularly monitoring the delinquency characteristics of the entire portfolio of CFC Residential Mortgage Loans, including Alt-A Residential Mortgage Loans, loans with interest-only features, and other loans to prime borrowers, to identify high-delinquency segments that may be appropriate for streamlined or non-streamlined loan modification campaigns. CFC shall be responsible for providing reports to the Office of the Attorney General on the delinquency characteristics of such loans, as provided herein.

(e)   With respect to Alt-A Residential Mortgage Loans, CFC acknowledges that the Office of the Attorney General has expressed concerns about future delinquencies, and agrees to provide the Office of the Attorney General notification whenever the nationwide rate at which Borrowers on Alt-A Residential Mortgage Loans are 30 days or more delinquent in their payments exceeds 150% of the delinquency rate for comparably-aged FHA-insured loans serviced by CFC Servicers. If such notice is required, CFC agrees to confer with the Office of the Attorney General concerning Alt-A Residential Mortgage Loans delinquency trends, including whether delinquencies are isolated in certain segments of the Alt-A Residential Mortgage Loans portfolio (*e.g.*, loans with interest-only features, loans originated at high CLTV), and concerning the possible deployment of streamlined foreclosure avoidance solutions for such Borrowers.

(f)   Through July 1, 2009, a minimum of 3900 personnel shall be employed to assist Borrowers with loan modifications and other foreclosure avoidance measures.

(g)   CFC Servicers will ensure that the values in any AVM system used to generate electronic appraisals are regularly updated and periodically validated so as to provide reasonable assurance as to the accuracy of resulting valuations. Any validation

will, as appropriate, include back-testing of a representative sample of valuations against market data on actual sales (where sufficient information is available).

(h)    Although the scope of the loan modification program in this Final Judgment is limited to certain first lien Qualifying Mortgages, CFC acknowledges that (i) many Eligible Borrower-occupied 1-to-4 unit residential properties are subject to second lien mortgages and (ii) the existence of such junior liens may reduce the incentive of Borrowers to remain in their homes and may impair Eligible Borrowers' ability to refinance Qualifying Mortgages. CFC confirms that it is engaged in developing best servicing practices with respect to first lien Qualifying Mortgages secured by Eligible Borrower-occupied 1-to-4 unit residential properties that are subject to second lien mortgages.

3.2   *Compliance.*   Understanding the circumstances and behaviors of lenders and brokers that may have contributed, in part, to the current mortgage crisis, CFC recognizes its responsibility to ensure the very highest degree of ethical conduct on the part of CFC's agents and employees. CFC shall ensure that, (a) to the extent it resumes subprime lending, it will design and implement an effective compliance management program to provide reasonable assurance as to the identification and control of consumer protection hazards associated with such subprime lending activities, and (b) to the extent of its own lending activities (if any), it will create appropriate consumer safeguards to avoid unfair or deceptive activities or practices arising in connection with its interaction with brokers and other third parties.

## 4.   LOAN MODIFICATIONS FOR DELINQUENT BORROWERS IN CERTAIN MORTGAGE PRODUCTS.

Until the Termination Date, CFC shall be responsible for ensuring that CFC Servicers attempt, on an ongoing basis, to qualify eligible Borrowers in specified mortgage products for affordable loan modifications in accordance with the following provisions:

4.1   *Eligible Borrowers.*   An *"Eligible Borrower"* is a Borrower who has a Qualifying Mortgage with a first payment date on or before December 31, 2007, that (a) is secured by an owner-occupied 1-to-4 unit residential property, (b) is serviced by a CFC Servicer, and (c) in the event that it is determined that a condition described in Section 4.10 has occurred, the applicable CFC Servicer has determined that such Borrower is in financial distress. Eligible Borrowers are potentially eligible for loan modification relief under this Section 4. A Borrower who does not occupy the 1-to-4 unit residential property that secures the Qualifying Mortgage is not an *"Eligible Borrower."*

4.2   *Qualifying Mortgages.*   The following CFC Residential Mortgage Loans are *"Qualifying Mortgages"* if the Borrower is an Eligible Borrower and the Borrower meets one of the specified delinquency profiles:

(a)    *Subprime 2, 3, 5, 7, and 10 Hybrid ARMs.*   A Subprime 2, 3, 5, 7, and 10 Hybrid ARM shall be a Qualifying Mortgage if the Eligible Borrower meets any one of the following delinquency profiles at the time considered for loan modification:

(i)    The Eligible Borrower is a Seriously Delinquent Borrower and the LTV is 75% or more; or

(ii)   The Eligible Borrower is a Delinquent Borrower and the LTV is 75% or more.

(b)   *Pay Option ARMs.*  A Pay Option ARM shall be a Qualifying Mortgage if the Eligible Borrower meets any one of the following delinquency profiles at the time considered for loan modification:

(i)   The Eligible Borrower is Seriously Delinquent and the LTV is 75% or more; or

(ii)   The Eligible Borrower is a Delinquent Borrower and the LTV is 75% or more.

(c)   *Subprime First Mortgage Loans (Other than Subprime 2, 3, 5, 7, and 10 Hybrid ARMs).*  A Subprime CFC Residential Mortgage Loan shall be a Qualifying Mortgage if the Eligible Borrower is a Seriously Delinquent Borrower and the LTV is 75% or more.

4.3   *Loan Modifications to Be Considered.*  Each Eligible Borrower shall be considered for a range of affordable loan modification options with respect to his or her Qualifying Mortgage.  The loan modification options will include those described below and existing modification options, subject in each case to approval of the investor who owns the Qualifying Mortgage and the Affordability Equation as set forth in Section 4.4.   Loan modification options for each category of Qualifying Mortgages are as follows:

(a)   *Subprime 2, 3, 5, 7, and 10 Hybrid ARMs.*  Qualifying Mortgages that are Subprime 2, 3, 5, 7, and 10 Hybrid ARMs will be eligible for loan modifications as follows, in no particular order:

(i)   To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program.

(ii)   For Eligible Borrowers (A) who become Seriously Delinquent following a reset, or (B) who are subject to an imminent reset and, in the reasonable view of the CFC Servicer, as a result of such reset are reasonably likely to become Seriously Delinquent on or before the Termination Date (even though they are not Seriously Delinquent at the time of the modification), an unsolicited (subject to Section 4.10) restoration of the introductory rate for five years, without new loan documentation or an evaluation of the Eligible Borrower's current income.  Communications to Eligible Borrowers informing them of this modification will invite Eligible Borrowers to contact the applicable CFC Servicer if they do not believe they will be able to afford the introductory rate in order to be considered for more extensive relief under Sections 4.3(a)(iii) or 4.3(a)(iv).

(iii)   A streamlined, fully-amortizing loan modification subject to the Affordability Equation consisting of:

(A)   until the fifth anniversary of the loan modification, a reduction of the interest rate to the (1) introductory rate or (2) lower (but not less than 3.5%); and

(B)   on the fifth anniversary of the loan modification, an automatic conversion to a fixed rate mortgage for the remainder of the loan term at the higher of (1) the Fannie Rate and (2) the introductory rate. If the new payment would not be affordable to the Eligible Borrower

based on his or her income at the time of conversion, the Eligible Borrower will be considered for a single two year period of reduced-rate financing (in which case the conversion to a fixed rate mortgage will occur at the end of the seventh year).

(iv)   A streamlined loan modification subject to the Affordability Equation consisting of:

(A)   modification of the Qualifying Mortgage to include a ten-year interest-only period;

(B)   reduction of the interest rate to a rate no lower than the Interest Rate Floor, with an Annual Increase subject to an interest-rate cap as provided below in Section 4.3(a)(iv)(C); and

(C)   an interest-rate cap for the remaining, fully-amortizing term of the Qualifying Mortgage at an annual interest rate equal to the introductory rate.

(b)   **Pay Option ARMs.**  Qualifying Mortgages that are Pay Option ARMs are eligible for the following loan modifications, in no particular order:

(i)   To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program; or

(ii)   A streamlined, fully-amortizing (except as provided in Section 4.3(b)(ii)(B)) loan modification subject to the Affordability Equation consisting of:

(A)   elimination of the negative amortization feature;

(B)   optional introduction of a ten-year interest-only period on the loan;

(C)   reduction of the interest rate to a rate no lower than the Interest Rate Floor, with an Annual Increase subject to an interest rate cap of 7%; and

(D)   if the Eligible Borrower owns only one residential property and the LTV is 95% or higher, a write down of the principal balance of the Qualifying Mortgage (but any write down of principal would not be in an amount greater than necessary to achieve an LTV of 95%).

(c)   **Subprime Loans (Other than 2, 3, 5, 7, and 10 Hybrid ARMs).** Qualifying Mortgages that are Subprime Loans (Other than 2, 3, 5, 7, and 10 Hybrid ARMs) are eligible for the following loan modifications, in no particular order:

(i)   To the extent the HOPE for Homeowners Program is available, an FHA refinancing under the HOPE for Homeowners Program under the underwriting criteria applicable to that program; or

(ii)   A streamlined, fully-amortizing (except as provided in Section 4.3(c)(ii)(A)) loan modification within the limits of the Affordability Equation consisting of:

(A)   optional introduction of a ten-year interest-only period on the loan;

(B)   reduction of the interest rate on the mortgage to a rate no lower than the Interest Rate Floor, with an Annual Increase subject to an interest rate cap as provided below in Section 4.3(c)(ii)(C); and

(C)   an interest-rate cap for the remaining term of the Qualifying Mortgage at an annual interest rate equal to (i) the fixed interest rate *less* 200 basis points, in the case of fixed-rate loans, and (ii) the remainder of the sum of the contractual index amount *plus* spread immediately before the first loan modification, *minus* 200 basis points, in the case of an ARM.

4.4   *Affordability Equation.*   Qualifying Mortgages will be considered for loan modifications in accordance with the following Affordability Equation, which establishes a Foreclosure Avoidance Budget that is a cap on the cost of the loan modification.

(a)   *Foreclosure Avoidance Budget.*   Except for Eligible Borrowers who receive an unsolicited reduction of their interest rates pursuant to Section 4.3(a)(ii), a Foreclosure Avoidance Budget will be prepared with respect to the Eligible Borrower and the Qualifying Mortgage.   The "*Foreclosure Avoidance Budget*" at any time is the difference between (i) the likelihood and severity of the projected loss in a foreclosure sale and (ii) the likelihood and severity of the projected loss in the event that there was a loan modification with respect to the Qualifying Mortgage and a later foreclosure sale. For purposes of determining the Foreclosure Avoidance Budget for a Qualifying Mortgage, the LTV will be based on the Market Value.

(b)   *Affordability Criteria.*

(i)   Subject to the Foreclosure Avoidance Budget, if tax and insurance escrows are maintained with respect to the Qualifying Mortgage, the Eligible Borrower will be offered a loan modification that produces a first-year payment of principal (if applicable), interest, taxes, and insurance equating to 34% of the Eligible Borrower's income, or as close to 34% of the Eligible Borrower's income as the Foreclosure Avoidance Budget permits without exceeding 42% of the Eligible Borrower's income.

(ii)   Subject to the Foreclosure Avoidance Budget, if tax and insurance escrows are not maintained with respect to a Qualifying Mortgage, the Eligible Borrower will be offered a loan modification that produces a first-year payment of principal (if applicable) and interest equating to 25% of the Eligible Borrower's income, or as close to 25% of the Eligible Borrower's income as the Foreclosure Avoidance Budget permits without exceeding 34% of the Eligible Borrower's income.

(c)   *Borrowers Who Cannot Afford a Loan Modification.*   There is no obligation to offer loan modifications with respect to Qualifying Mortgages if the Eligible Borrower cannot be qualified under the Affordability Equation. Such Eligible Borrowers may be eligible for a Relocation Assistance payment and/or a payment under the Foreclosure Relief Program, all as provided in Sections 5 and 6.

4.5   *Outreach to Borrowers at Risk of Delinquency.*   Borrowers with Subprime Mortgage Loans or Pay Option ARMs with first-payment due dates between January 1, 2004 and

December 31, 2007, whose payments are scheduled to change as a result of an interest-rate reset, Recast, or expiration of an interest-only term, will be sent a communication approximately ninety (90) days before the payment change inviting them to contact their CFC Servicer if they believe they will not be able to afford their new payments. In the event that a borrower responds to this communication, the borrower will be considered for loan modifications under the eligibility criteria in this Final Judgment.

    4.6    *Restrictions on Initiation or Advancement of Foreclosure Process for Eligible Borrowers.*

    (a)    The foreclosure process for a Qualifying Mortgage of an Eligible Borrower will not be initiated or advanced for the period necessary to determine such Eligible Borrower's interest in retaining ownership and ability to afford the revised mortgage terms, as well as the investor's willingness to accept a loan modification.

    (b)    Any such foreclosure process will be initiated or advanced only if:

    (i)    it is determined, based on communication with the Borrower or based on the Borrower's abandonment of the residential property that secures the mortgage loan, that the Borrower does not wish to retain ownership of the residence that secured the mortgage loan;

    (ii)    it is or has been determined that the Borrower cannot be qualified for, or has refused, a loan modification under this Final Judgment within the limits of the Affordability Equation, as applicable; or

    (iii)    despite reasonable efforts, servicing agents have been unable to make contact with the borrower to determine his or her preferences with regard to home ownership, or to obtain information concerning his or her income and ability to afford a mortgage payment under a modification.

4.7    *Miscellaneous Provisions Related to Loan Modification Program.*

    (a)    ***Commitment to Waive Late/Delinquency Fees.*** Late/delinquency fees will be waived to the extent they arise with respect to past due loan payments that remain unpaid as of the date immediately before modification of the Qualifying Mortgage under this Final Judgment. Late/delinquency fees will not be waived to the extent they arise with respect to loan payments that were previously past due but were subsequently paid prior to the date immediately before modification.

    (b)    ***Commitment Not to Charge Loan Modification Fees.*** Except to the extent required in connection with the HOPE for Homeowners Program, Eligible Borrowers will not be charged loan modification fees in connection with loan modifications of Qualifying Mortgages hereunder.

    (c)    ***Prepayment Penalty Waivers.*** Prepayment penalties will be waived in connection with any payoff or refinancing (even if refinanced by a person not Affiliated with CFC) of a Qualifying Mortgage that is a Subprime Mortgage Loan or Pay Option ARM that (i) had a first payment due date between January 1, 2004 and December 31, 2007, (ii) was directly or indirectly held by CFC on June 30, 2008, and (iii) which at the time of the payoff or refinancing is held by CFC or any Affiliate. Investor owners or their representatives of Qualifying Mortgages that are Subprime Mortgage Loans or Pay Option ARMs serviced by a CFC Servicer will be encouraged to waive prepayment penalties in such circumstances.

(d)     *Commitment to Consider Additional Relief for Borrowers Receiving Modifications and Later Becoming Delinquent.*  Eligible Borrowers with respect to Qualifying Mortgages who have earlier received loan modifications or other workouts, whether or not pursuant to this Final Judgment, will be eligible to be considered for new loan modification offers under this Final Judgment if they otherwise satisfy the eligibility criteria.

(e)     *Representation Concerning Investor Delegation and Approval.*  CFC represents that CFC Servicers currently have, or reasonably expect to obtain, discretion to pursue the foreclosure avoidance measures outlined in this Final Judgment for a substantial majority of Qualifying Mortgages.  If CFC Servicers do not have discretion to pursue these foreclosure avoidance measures, best efforts will be used to obtain appropriate investor authorization.

4.8     *Commitment to Implement Relief Measures Authorized by Federal Government.*  To the extent the federal government acquires any Qualifying Mortgages and, as the owner of these mortgages, authorizes loan modifications that offer borrower benefits greater than those associated with the modifications outlined in this Final Judgment, such relief measures will be pursued in modifying such Qualifying Mortgages to the full extent of such authorization.

4.9     *Timeframe for Loan Modification Process.*  The loan modification process will be managed to ensure that offers of loan modifications under this Final Judgment (other than unsolicited interest rate reductions) are made to Eligible Borrowers, on average, no more than 60 days after such Eligible Borrowers make contact with the applicable CFC Servicer and provide any required information concerning a possible modification.

4.10    *Response to Intentional Nonperformance by Borrowers.*  If CFC detects material levels of intentional nonperformance by Eligible Borrowers that appears to be attributable to the introduction of the loan modification program, it reserves the right to require objective prequalification of Eligible Borrowers for loan modifications under the program by obtaining verification of all sources of income and the application of funds and to take other reasonable steps.  Such prequalification could result in the elimination of unsolicited interest rate reductions, inhibit streamlined solutions and could otherwise significantly slow implementation of the loan modification program.

4.11    *No Releases with Respect to Loan Modifications.*  In connection with loan modifications offered under this Final Judgment, no releases of claims will be solicited or required from Eligible Borrowers.

4.12    *Number of Loan Modification Offers before March 31, 2009.*  On or before March 31, 2009, loan modifications will be offered by CFC Servicers in accordance with this Final Judgment to not fewer than 50,000 Delinquent Borrowers on a nationwide basis.  The Office of the Attorney General may terminate the Final Judgment and no longer be bound by the release set forth in Section 9.2 if there is a material failure to satisfy this commitment.  If the Office of the Attorney General terminates this Final Judgment, any unspent portion of the Foreclosure Relief Program allocation that has been reserved by the Office of the Attorney General for purposes other than making payments to Borrowers as provided in Section 6 of this Final Judgment will be repaid to CFC.

4.13    *Second or Junior Liens.*  Loan modifications contemplated in Section 4 of this Final Judgment shall be made without consideration of second or junior liens on mortgaged

properties. CFC does not expect that the presence of second or junior liens will impede Eligible Borrowers from receiving a loan modification offer under Section 4 of this Final Judgment.

## 5. RELOCATION ASSISTANCE PROGRAM.

Through the Termination Date, payments will be provided to borrowers who are unable to retain their homes in accordance with this Section 5.

5.1  **Eligibility.**  Borrowers under CFC Residential Mortgage Loans who (a) were serviced by a CFC Servicer on June 30, 2008 (whether or not they are Qualifying Mortgages), (b) occupy a 1-to-4 unit residential property subject to servicing by a CFC Servicer on the date of determination of eligibility hereunder, and (c) are subject to a foreclosure sale date on or before the Termination Date, will be offered an agreement under which they can receive a cash payment to assist with the Borrower's transition to a new place of residence ("***Relocation Assistance payment***") in exchange for voluntarily and appropriately surrendering the residence that, at the time of the foreclosure sale, secured the Borrower's mortgage loan. Borrowers who are eligible for, or receive, payments under the Foreclosure Relief Program may also receive a Relocation Assistance payment.

5.2  **Amount.**  The amount of Relocation Assistance payments offered to any Borrower will be in the discretion of CFC or its delegee according to its or their assessment of the individual circumstances of the Borrower (*e.g.*, number of dependents or amount of moving expenses).

5.3  **Timing of Payments.**  Relocation Assistance payments shall be made to a Borrower no later than fourteen days following the Borrower's voluntary and appropriate surrender of the residence that secured the mortgage loan.

5.4  **Payment Projection.**  CFC projects that, from October 1, 2008, through December 31, 2010, Relocation Assistance payments will be made to 35,000 borrowers on a nationwide basis in a total amount of more than $70,000,000.

## 6. FORECLOSURE RELIEF PROGRAM.

Payments shall be made available to borrowers who experienced a foreclosure sale, or who were 120 days or more delinquent in making mortgage payments soon after their loans were originated or after an interest rate reset, in accordance with this Section 6.

6.1  **Payment.**  CFC shall make available $7,462,351 for payments to borrowers within the State of Texas, or otherwise for foreclosure relief/mitigation or related programs consistent with this Section 6.

6.2  **Individual Allocation.**  Unless otherwise directed by the Office of the Attorney General in accordance with Section 6.3 hereof, a Borrower will be eligible for payments under the Foreclosure Relief Program if the Borrower:

(a)  Has a CFC-Originated Residential Mortgage Loan secured by owner-occupied property;

(b)  The first payment on the CFC-Originated Residential Mortgage Loan was due between January 1, 2004 and December 31, 2007;

(c)  Six or fewer payments were made on the CFC-Originated Residential Mortgage Loan; and

(d)  The CFC-Originated Residential Mortgage Loan was foreclosed or is 120 days or more delinquent as of the Commencement Date.

6.3     *Expansion or Contraction of the Foreclosure Relief Program; Reservation of Funds for Other Purposes.*  The Office of the Attorney General may expand the Foreclosure Relief Program to cover additional Borrowers or limit the Foreclosure Relief Program to cover a narrower range of Borrowers, provided that at least those eligible Borrowers who made three or fewer payments over the life of the CFC-Originated Residential Mortgage Loan are covered.  If the Office of the Attorney General elects to expand or contract the program, the amount allocated to the State of Texas will remain the same.  The Office of the Attorney General may reserve as much as 50% of the sum allocated to the State of Texas for foreclosure relief/mitigation or related programs other than payments to defaulted Borrowers, including purchasing or rehabilitating foreclosed properties.

6.4     *Communications.*  CFC and the Office of the Attorney General shall consult as to the form and content of any communication sent to Borrowers who are to receive Foreclosure Relief Program payments.

6.5     *Unallocated Funds.*  Funds allocated to Borrowers in the State of Texas who choose not to participate in the Foreclosure Relief Program or who cannot be located after commercially reasonable efforts shall be available to the Office of the Attorney General for re-allocation to Borrowers under this program at the direction of the Office of the Attorney General.

6.6     *Release.*  In order to receive payments under the Foreclosure Relief Program, Borrowers will be required to execute a release in accordance with Section 9.1.  Borrowers offered payments under this Foreclosure Relief Program whose loans have not yet been foreclosed shall be afforded at least a three month period to decide whether to execute the release to permit them to determine whether they wish to raise claims covered by the release.

7.     **BANK OF AMERICA FOUNDATION COMMUNITY INVESTMENT ACTIVITIES**

The parties understand that, while the Bank of America Foundation (**"Foundation"**) is not a party to, or in any way bound by, this Final Judgment, the Foundation intends to work actively with non-profit organizations, community development corporations, and others in addressing the adverse effects of the current housing crisis, particularly by promoting community redevelopment and facilitating the application of Housing and Economic Recovery Act funds to beneficial usage of real estate owned properties.  CFC commits to collaborate in good faith with the Office of the Attorney General to identify ways in which CFC can support or complement the Foundation's efforts.

8.     **REPORTING REQUIREMENTS.**

8.1     *Eligible Borrowers in Qualifying Mortgages.*

(a)     On a quarterly basis through June 30, 2010, CFC shall report the following information to the Office of the Attorney General:

(i)     The names and addresses of Eligible Borrowers in the State of Texas in Qualifying Mortgages who received loan modification offers under this Final Judgment, and for whom loan modifications were concluded;

(ii)     For loan modifications offered or concluded under this Final Judgment, the total dollar amount of interest and principal expected to be saved by Borrowers as a result of such modifications over the life of the loans;

(iii)     For all loan modifications under this Final Judgment concluded within the reporting period in the State of Texas, the original and modified loan terms, and the amounts of late/delinquency fees waived, loan modification fees

waived, and prepayment penalties waived by CFC pursuant to this Final Judgment;

(iv)     For a sample of Eligible Borrowers in Qualifying Mortgages for whom CFC was unable to procure a loan modification offer under this Final Judgment during the reporting period (which sample shall be no less than 5% of all such Eligible Borrowers), the factors preventing a loan modification offer;

(v)     The number and total amount of Relocation Assistance payments or Foreclosure Relief payments made to Borrowers in the State of Texas during the reporting period;

(vi)     Delinquency data on active loans with first payment due dates between January 1, 2004 and December 31, 2007 that are secured by Borrower-occupied residential property in the State of Texas, broken down by type of loan; and

(vii)     Aggregated delinquency/default data on all loans modified under this Final Judgment for Eligible Borrowers in the State of Texas, separated by type of modification.

(b)     CFC shall provide annual reports to the Office of the Attorney General, that include the information specified in Section 8.1(a) for the periods July 1, 2010 through June 30, 2011, and July 1, 2011 through June 30, 2012.

8.2     *Other Loan Modifications.*  With the same frequency as specified in Section 8.1, CFC will provide to the Office of the Attorney General a report detailing the numbers and types of modifications concluded on first-lien residential mortgage loans secured by Borrower-occupied property in the State of Texas (other than Qualifying Mortgages) and the total unpaid principal balance of such modified loans.

8.3     *Best Servicing Practices for Modifying First Lien Qualifying Mortgages on Residential Property Subject to Second Lien Mortgages.*  CFC will periodically report to the Office of the Attorney General on its progress in developing best servicing practices as described in Section 3.1(h).

8.4     *Compliance Monitor.*  CFC will appoint an employee as the Compliance Monitor for this Final Judgment. The Compliance Monitor will be responsible for (a) making reports to the Office of the Attorney General under this Final Judgment and (b) receiving and responding to complaints from the Office of the Attorney General or from individual borrowers concerning the operation of the loan modification program.

9.     **RELEASES; MORE FAVORABLE SETTLEMENTS.**

9.1     *Releases from Borrowers.*  Borrowers to whom payments under the Foreclosure Relief Program are offered shall, as a condition of receiving such payments, be required to execute and return to CFC a release of claims that includes the following language:

In consideration for the payment we are to receive under the Foreclosure Relief Program, we release Countrywide Financial Corporation and its affiliates and their respective directors, officers, employees and agents (except brokers) from all civil claims, causes of action, any other right to obtain any type of monetary damages (including punitive damages), expenses, attorneys' and other fees, rescission, restitution or any other remedies of whatever kind at law or in equity, in contract, in tort (including, but not limited to, personal injury and emotional distress), arising under any source whatsoever,

including any statute, regulation, rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial proceeding, whether known or unknown, whether or not alleged, threatened or asserted by us or by any other person or entity on our behalf, including any currently pending or future purported or certified class action in which we are now or may hereafter become a class member, that arise from or are in any way related to CFC Loan No. [_____] and any loans originated directly or indirectly by Countrywide Financial Corporation or its affiliates in connection therewith that are secured by a second mortgage, including, without limitation, the origination of any such loan (and any representations or omissions made during that origination process), the terms and conditions of any such loan, and the servicing or administration of any such loan after its origination; provided, however, that nothing herein shall bar the assertion of any released claim solely as an affirmative defense to any claim against us for a deficiency in respect of any such loan, but in no event shall we be permitted to obtain an affirmative recovery in any such deficiency action.

9.2   *Release.*   As to CFC and its Affiliates, this Final Judgment effects a full resolution, complete settlement, and release by the Office of the Attorney General of all claims arising out of the residential mortgage origination or servicing activities of CFC and its subsidiaries occurring before entry of this Final Judgment that are within the authority of the Office of the Attorney General to release, except for (i) any claims that the State of Texas might have as an investor in CFC securities; (ii) any regulatory or enforcement proceedings by or on behalf of another State of Texas officer or agency; (iii) any claims or investigations identified to CFC by the Office of the Attorney General; and (iv) any criminal investigations or proceedings. This Final Judgment does not resolve or release, but instead specifically preserves, any claims the State of Texas may have against Angelo Mozilo or David Sambol.

9.3   *More Favorable Terms.*   The parties agree that should CFC resolve allegations concerning the conduct covered by this Final Judgment which occurred before the date of this Final Judgment in actions brought by Attorneys General of other states on terms that are different than those contained in this Final Judgment (other than terms offered by CFC but not accepted by the Office of the Attorney General), then CFC will provide a copy of those terms to the Office of the Attorney General for review. If, after review, the Office of the Attorney General determines the terms of such resolutions are, taken as a whole, more favorable than those contained in this Final Judgment, then CFC shall stipulate that this Final Judgment shall be amended to reflect all of such terms in place of the terms hereof.

## 10.   OTHER TERMS AND CONDITIONS

10.1   *No Admission.*   The Final Judgment shall not constitute an admission of wrongdoing by BAC, CFC, Countrywide Home Loans, Inc. or Full Spectrum Lending, Inc., nor shall it be cited as such by the Office of the Attorney General. The Final Judgment shall not be admissible in any other proceeding as evidence of wrongdoing or a concession of responsibility.

10.2   *Confidentiality.*   The Office of the Attorney General agrees that all confidential information disclosed to it by BAC or CFC or any of their Affiliates, including but not limited to the periodic reports that will be provided pursuant to Section 8, shall be kept confidential; provided, however, that the following information reported to the Office of the Attorney General on a periodic basis shall not be deemed confidential to the extent aggregated for Borrowers in the State of Texas for a full reporting period: (a) the total number of loans modified, (b) the total number of loans modified, by type of loan, (c) the total dollar amount of interest and principal expected to be saved by Borrowers as a result of such modifications over the life of the loans, and (d) the total dollar amount of payments under Sections 5 and 6 of this Final Judgment to

Borrowers. The Office of the Attorney General shall not disclose or use any confidential information without the prior written consent of the disclosing party, except to the extent required by law, regulation, or court order (and in such case, only upon prior written notice to the disclosing party).

      10.3    *Submission to Jurisdiction for Limited Purpose.* Defendants submit to the jurisdiction of the court in the State of Texas for the limited purpose of entering into and enforcing this Final Judgment only. Any acts, conduct, or appearance by Defendants does not constitute and shall not be construed as a submission to the general jurisdiction of any court in the State of Texas for any purpose whatsoever.

      10.4    *Enforcement.* This Court shall retain jurisdiction over this matter for the purposes of (a) enabling the Office of the Attorney General to apply, at any time, for enforcement of any provision of this Final Judgment and for sanctions or other remedies for any violation of this Final Judgment; and (b) enabling any party to this Final Judgment to apply, upon giving 45 days written notice to all other parties, for such further orders and directions as might be necessary or appropriate either for the construction or carrying out of this Final Judgment or for the modification or termination of one or more injunctive provisions of this Final Judgment.

      10.5    *Conflict with Subsequent Law.* In the event that any applicable law conflicts with any provision hereof, making it impossible for CFC to comply both with the law and with the provisions of this Final Judgment, the provisions of the law shall govern.

      10.6    *No Third Party Beneficiaries Intended.* This Final Judgment is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary. This Final Judgment is not intended to create a private right of action on the part of any person or entity other than the parties hereto.

      10.7    *Service of Notices and Process.* Service of notices and process required or permitted by this Final Judgment or its enforcement shall be in writing and delivered or served (as appropriate) on the following persons, or any person subsequently designated by the parties:

**For BAC and Defendants:**

John Beisner
Brian Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

**For the Office of the Attorney General:**

James A. Daross
Assistant Attorney General
Consumer Protection and Public Health Division
401 E. Franklin Ave., Suite 530
El Paso, Texas 79901

Any party may change the designated persons and address for delivery with respect to itself by giving notice to the other parties as specified herein.

      10.8    *Waiver.* The failure of any party to exercise any rights under this Final Judgment shall not be deemed a waiver of any right or any future rights.

      10.9    *Severability.* If any part hereof shall for any reason be found or held invalid or unenforceable by any court of competent jurisdiction, such invalidity or unenforceability shall

not affect the remainder hereof, which shall survive and be construed as if such invalid or unenforceable part had not been contained herein.

10.10   *Counterparts.* This Final Judgment may be signed in one or more counterparts, each of which shall be deemed an original. Facsimile copies of this Final Judgment and the signatures hereto may be used with the same force and effect as an original.

10.11   *Inurement.* This Final Judgment is binding and inures to the benefit of the parties hereto and their respective successors and assigns.

10.12   *Integration.* This Final Judgment constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.

10.13   *Amendment.* This Final Judgment may be amended solely by written agreement signed by the Office of the Attorney General and the Defendant(s) affected by such Amendment.

10.14   *Termination.* Except to the extent an early date is specified or the provisions of this Final Judgment are earlier terminated according to the terms hereof, the obligations of CFC under this Final Judgment shall terminate on the Termination Date. Provided, however, that no termination of the obligations under this Final Judgment shall change or terminate the terms of any loan modification entered into pursuant to Section 4 of this Final Judgment.

10.15   *Attorneys Fees and Costs.* CFC shall pay attorneys fees and costs in the amount of two hundred thousand dollars ($200,000) to the Office of the Attorney General within ten (10) days of the entry of this Final Judgment.

SIGNED on the _____11th_____ day of February, 2009.

JUDGE PRESIDING

SIGNATURES ARE ON THE FOLLOWING PAGE

APPROVED AS TO FORM AND SUBSTANCE AND ENTRY REQUESTED:

**Countrywide Financial Corporation**

By: _____

Name:  Paul Lane

Title:  Senior Vice President, Assistant General Counsel

**DEFENDANTS**
**Countrywide Financial Corporation,**
**Countrywide Home Loans, Inc., and**
**Full Spectrum Lending, Inc.**

By: _____

James E. Davis

Locke Lord Bissell & Liddell LLP

Counsel for Defendants

Countrywide Financial Corporation,

Countrywide Home Loans, Inc., and

Full Spectrum Lending, Inc.

APPROVED AS TO FORM AND SUBSTANCE AND ENTRY REQUESTED:


**Countrywide Financial Corporation**


By:_____
Name:  Paul Lane
Title:  Senior Vice President, Assistant General Counsel



**DEFENDANTS**
**Countrywide Financial Corporation,**
**Countrywide Home Loans, Inc., and**
**Full Spectrum Lending, Inc.**

By:_____
James E. Davis
Locke Lord Bissell & Liddell LLP
Counsel for Defendants
Countrywide Financial Corporation,
Countrywide Home Loans, Inc., and
Full Spectrum Lending, Inc.

FOR THE STATE OF TEXAS:

GREG ABBOTT
ATTORNEY GENERAL OF TEXAS

C. ANDREW WEBER
First Assistant Attorney General

JEFF L. ROSE
Deputy First Assistant Attorney General

PAUL D. CARMONA
Chief, Consumer Protection and Public Health Division


James A. Daross
Assistant Attorney General
Consumer Protection and Public Health Division
401 E. Franklin Ave., Suite 530
El Paso, Texas 79901
(915) 834-5800
Fax (915) 542-1546
james.daross@oag.state.tx.us
State Bar No. 0539150

Rosemarie Donnelly
Special Assistant Attorney General
Consumer Protection & Public Health Division
808 Travis, Suite 300
Houston, Texas 77002
(713) 223-5886 Ext. 106
Fax (713) 223-5821
rosemarie.donnelly@oag.state.tx.us
State Bar No. 05983020

# REGISTER OF ACTIONS
## CASE NO. 2010-3307

| | | |
|---|---|---|
| STATE OF TEXAS vs. AMERICAN HOME MORTGAGE SERVICING, INC. | §<br>§<br>§<br>§<br>§ | Case Type: **Injunction Relief**<br>Date Filed: **08/30/2010**<br>Location: **448th District Court** |

---

### RELATED CASE INFORMATION

**Related Cases**
  2014DCV0180 (Related Case)

---

### PARTY INFORMATION

| | | |
|---|---|---|
| **Defendant** | **AMERICAN HOME MORTGAGE SERVICING, INC** | **Lead Attorneys**<br>**ROBERT T MOWREY**<br>*Retained*<br>214-740-8000(W) |
| **Plaintiff** | **STATE OF TEXAS** | **JAMES A DAROSS**<br>*Retained*<br>915-834-5806(W) |

---

### EVENTS & ORDERS OF THE COURT

| | |
|---|---|
| | **DISPOSITIONS** |
| 03/24/2014 | **Agreed Judgment** (Judicial Officer: Enriquez, Sergio H.)<br>    Comment (Final / signed 03.24.14 / jf) |
| | |
| | **OTHER EVENTS AND HEARINGS** |
| 08/30/2010 | **Plaintiff's Original Petition** |
| 09/02/2010 | **Interrogatories and Request for Production** |
| 09/07/2010 | **Citation** |
| 09/07/2010 | **Citation** |
| |   AMERICAN HOME MORTGAGE SERVICING, INC    Served          09/09/2010<br>                                        Response Received  11/22/2010 |
| 09/27/2010 | **Letter** |
| 10/27/2010 | **Letter** |
| 11/22/2010 | **Answer** |
| 11/22/2010 | **Motion to Transfer Venue** |
| 11/22/2010 | **Civil Service Answer Default (Response Case Event)** |
| 11/23/2010 | **Electronic Filing** |
| 11/23/2010 | **Electronic Filing** |
| 01/10/2012 | **Order Setting Hearing    Doc ID# 1** |
| 02/02/2012 | **Status Hearing** (10:00 AM) (Judicial Officer ARDITTI, REGINA) |
| 02/03/2012 | **Order for Referral to Mediation** |
| 02/03/2012 | **Order Setting Hearing    Doc ID# 2** |
| 06/07/2012 | **Order Setting Hearing    Doc ID# 3** |
| 07/03/2012 | **Motion for Abatement    Doc ID# 4** |
| 07/03/2012 | **Proposed Order** |
| 07/11/2012 | **Order** |
| 09/14/2012 | *CANCELED*  **Transfer of Venue Hearing** (2:00 PM) (Judicial Officer ARDITTI, REGINA)<br>    *Abated* |
| 11/01/2012 | *CANCELED*  **Pre-Trial Hearing** (2:00 PM) (Judicial Officer ARDITTI, REGINA)<br>    *Abated* |
| 11/05/2012 | *CANCELED*  **Jury Trial** (9:00 AM) (Judicial Officer ARDITTI, REGINA)<br>    *Abated* |
| 12/20/2012 | **Motion for Abatement    Doc ID# 5** |
| 01/04/2013 | **Order Granting    Doc ID# 6** |
| 05/14/2013 | **Motion    Doc ID# 7** |
| 05/17/2013 | **Order Granting    Doc ID# 8** |
| 08/14/2013 | **Motion for Continuance    Doc ID# 10** |
| 08/15/2013 | **Order Granting    Doc ID# 9** |
| 08/29/2013 | **Notice of Intent to Dismiss for Want of Prosecution    Doc ID# 11** |
| 08/29/2013 | **Notice of Dismissal Hearing    Doc ID# 12** |
| 08/29/2013 | **Notice of Dismissal Hearing    Doc ID# 13** |
| 09/19/2013 | *CANCELED*  **DWOP Hearing** (3:30 PM) (Judicial Officer Enriquez, Sergio H.)<br>    *Cancelled Pending Reset* |
| 09/24/2013 | **Entry of Appearance    Doc ID# 14** |
| 10/18/2013 | **Motion to Strike    Doc ID# 15** |
| 10/25/2013 | **Order Setting Hearing    Doc ID# 16** |
| 10/31/2013 | **Motion for Continuance    Doc ID# 17** |
| 11/01/2013 | **Order** |
| 11/01/2013 | **Notice of Filing    Doc ID# 18** |

Exhibit

8.

| | |
|---|---|
| 11/05/2013 | *CANCELED* **Motion Hearing** (11:00 AM) (Judicial Officer Enriquez, Sergio H.) |
| | *Cancelled Pending Reset* |
| 11/07/2013 | **Order Setting Hearing**     **Doc ID# 19** |
| 11/20/2013 | **Notice**     **Doc ID# 20** |
| 11/26/2013 | **Motion for Appointment**     **Doc ID# 21** |
| 12/02/2013 | **Motion Hearing** (11:00 AM) (Judicial Officer Larsen, Susan) |
| 12/06/2013 | **Order Granting**     **Doc ID# 22** |
| 12/19/2013 | **Motion**     **Doc ID# 23** |
| 12/30/2013 | **Motion for Hearing**     **Doc ID# 24** |
| 01/31/2014 | **Order Setting Hearing**     **Doc ID# 25** |
| 03/07/2014 | **Order Setting Hearing**     **Doc ID# 26** |
| 03/18/2014 | **Response**     **Doc ID# 27** |
| 03/19/2014 | **Motion to Dismiss**     **Doc ID# 28** |
| 03/19/2014 | **Response**     **Doc ID# 29** |
| 03/19/2014 | **Response in Opposition** |
| 03/24/2014 | **Status Hearing** (2:00 PM) (Judicial Officer Enriquez, Sergio H.) |
| 03/24/2014 | **Entry of Judgment Hearing** (2:00 PM) (Judicial Officer Enriquez, Sergio H.) |
| 03/24/2014 | **Order Denying**     **Doc ID# 30** |
| 03/25/2014 | **Notice of Judgment Sent** |
| 03/25/2014 | **Notice of Judgment Sent** |

# REGISTER OF ACTIONS
## CASE NO. 2010-3872

| | | |
|---|---|---|
| **STATE OF TEXAS vs. WELLS FARGO BANK, N.A.** | §<br>§<br>§<br>§<br>§ | Case Type: **Breach of Contract**<br>Date Filed: **10/06/2010**<br>Location: **County Court at Law 6** |

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| **Defendant** | **WELLS FARGO BANK, N.A.** | |
| | | |
| **Plaintiff** | **STATE OF TEXAS** | **JAMES A DAROSS**<br>*Retained*<br>915-834-5806(W) |

---

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 10/06/2010 | **Plaintiff's Original Petition** |
| 12/16/2010 | **Order to Appear** |
| 03/11/2011 | **Suggestion of Bankruptcy** |
| 02/14/2012 | **Motion          Doc ID# 1** |
| 02/15/2012 | **Order Setting Hearing          Doc ID# 2** |
| 02/22/2012 | **Motion Hearing  (10:45 AM) (Judicial Officer Kurita, M. Sue)** |
| 02/22/2012 | **Order Granting          Doc ID# 3** |
| 09/18/2013 | **Motion to Approve          Doc ID# 4** |
| 09/26/2013 | **Order Granting          Doc ID# 5** |

Skip to Main Content Logout My Account Search Menu New Civil Search Refine Search Back          Location : All Courts   Help

# REGISTER OF ACTIONS
## CASE NO. 2013DCV0413

| | |
|---|---|
| STATE OF TEXAS vs LENDER PROCESSING SERVICES, INC., a Delaware Corporation; LPS DEFAULT SOLUTIONS, INC., a Delaware Corporation and DOCX, LLC, a Georgia Limited Liability Company | § §  § § § |

Case Type: **Deceptive Trade Practices**
Date Filed: **02/01/2013**
Location: **384th District Court**

---

### PARTY INFORMATION

**Lead Attorneys**

| | | |
|---|---|---|
| **Defendant** | **DOCX, LLC** | |
| **Defendant** | **LENDER PROCESSING SERVICES, INC.** | |
| **Defendant** | **LPS DEFAULT SOLUTIONS, INC.** | |
| **Plaintiff** | **STATE OF TEXAS** | **JAMES A DAROSS**<br>*Retained*<br>915-834-5806(W) |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**
02/06/2013 | **Final Judgment** (Judicial Officer: Garcia, Patrick M.)
 Judgment
  Awarded To: STATE OF TEXAS
  Awarded Against: LENDER PROCESSING SERVICES, INC., et al

**OTHER EVENTS AND HEARINGS**
02/01/2013 | **Original Petition (OCA)**      Doc ID# 1
02/01/2013 | **Case Information Sheet**      Doc ID# 2
02/11/2013 | **Notice of Judgment Sent**
02/11/2013 | **Notice of Judgment Sent**
02/11/2013 | **Notice of Judgment Sent**
02/11/2013 | **Notice of Judgment Sent**

Amend **CSHB 1** in Article VII of the bill pattern for the Department of Housing and Community Affairs, by adding the following appropriately numbered rider and renumbering subsequent riders accordingly:

_____: Transfer from general revenue $125.2 million deposited in general revenue from the State-Federal National *Mortgage Settlement* to the Department of Housing and Community Affairs to assist certain organizations or governmental entities to make residential mortgage loans to residents of certain neighborhoods.

Exhibit

9.

Amend **CSHB 1** in Article XI of the bill, by adding the following appropriately numbered rider and renumbering subsequent riders accordingly:

_____: Contingent on the enactment of **HB 2473**, or similar legislation to establish grant program in the Department of Housing and Community Affairs to assist certain organizations or governmental entities to make residential mortgage loans to residents of certain neighborhoods funded from the $125.2 million deposited in general revenue from the State-Federal National �она *Mortgage Settlement*☉ .



Public information request

**Greg Gilliland**                                                    Jan 29, 2014
To  rromanattorney@yahoo.com
CC  Ruth Soucy

Dear Mr. Roman:

The Texas Comptroller of Public Accounts received your below request for information.  Your request has be

You asked for "information on 3rd party requests, appropriation applications or grant requests etc.. made th
Fund for 2011, 2012 and 2013."  We understand you to ask for information relating to the Judicial Fund, Fu
Treasury and only the Legislature via the General Appropriations Act (GAA) or other supplementary approp
fund only to state agencies.  State agencies may issue payments from the Judicial Fund – 0573, and the tota
Cash Reports that are published at http://www.texastransparency.org/State_Finance/Budget_Finance/Repor

Due to the statutory restriction that "the fund shall be used only for court-related purposes for the support
found in Article IV of the GAA are able to receive funding from this fund per the Legislature's discretion.  Ag
Appropriations Request (LAR).  Copies of the LARs can be found at http://docs.lbb.state.tx.us/display.aspx?D
respective judicial branch agency.

In years 2011–13, the following agencies expended funds from the Judicial Fund – 0573:
201 – Supreme Court
211 – Court of Criminal Appeals
221 – Court of Appeals – First District (Houston)
222 – Court of Appeals – Second District (Fort Worth)
223 – Court of Appeals – Third District (Austin)
224 – Court of Appeals – Fourth District (San Antonio)
225 – Court of Appeals – Fifth District (Dallas)
226 – Court of Appeals – Sixth District (Texarkana)
227 – Court of Appeals – Seventh District (Amarillo)
228 – Court of Appeals – Eighth District (El Paso)
229 – Court of Appeals – Ninth District (Beaumont)
230 – Court of Appeals – Tenth District (Waco)
231 – Court of Appeals – Eleventh District (Eastland)
232 – Court of Appeals – Twelfth District (Tyler)
233 – Court of Appeals – Thirteenth District (Corpus Christi)
234 – Court of Appeals – Fourteenth District (Houston)
241 – District Courts – Comptroller's Judiciary Section

The GAA's for various years can be found at http://www.lbb.state.tx.us/StateBudgetsGAA.aspx.  All the abov

Thank you for your request.  Please feel free to contact us at open.records@cpa.state.tx.us should you need

Sincerely,
Greg Gilliland
_____
Greg Gilliland, Legal Projects Coordinator
Open Records
Comptroller of Public Accounts
Phone: (512) 463-4108
Fax: (512) 463-4288

**From:** Richard Roman [mailto:rromanattorney@yahoo.com]
**Sent:** Friday, January 10, 2014 9:51 AM
**To:** Ruth Soucy
**Subject:** Re: request for information - follow-up

Ms. Soucy:

        In connection with my previous Texas PIA request, how may I obtain inform
appropriation applications or grant requests etc., made that are seeking funds fro
2011, 2012 and 2013?

Richard A. Roman, Esq.
Former Judge of the 346th District Court

Date Mature Women

Check out the
online community
dedicated to
mature singles

Click to
View Singles In
Your Area

SELECT YOUR AGE:

50 - 59

Browse Pics Now

OurTime.com

by Max Ma on flickr

Exhibit

10.

# SCHEME

1. **Marking of the inception of the timeline:**

   In 2012 a task force comprised of 49 state attorneys general announced it successfully negotiated a settlement to benefit aggrieved homeowners. The nation's five largest banks agreed to a 2.5 billion dollar settlement on charges of "fraudulent foreclosure practices, etc" .

2. **A list of potential witnesses:**

   See witness list.

3. **Recitation of how homeowners may have been harmed, the legal authority for claims that defendants actions are illegal, false and applicable regulations:**

   The State of Texas' portion of the $2.5 billion (in direct state payments) was 134 million. Texas reportedly received the third largest of all state payments. The reason provided was because of the "extent of the damage Texans homeowners suffered". Texas homeowners were given the false impression by the Texas Attorney General's Office that relief was forthcoming. It was diverted. This is a violation of the federal false claims act.

4. **Falsity of the defendants actions and how the Relator discovered this:**

   True homeowner relief was never provided. The scheme used by Texas to divert settlement funds (124 million into the Texas General Fund and 10 million into the Texas Judicial Fund) was discovered through open records requests.

5. **Actions Relator has taken to expose the illegal diversion:**

   Texas Assistant Attorney General Daross explains how and when Texas' funds were diverted. Relator learned about this first hand through her own litigation and files the instant complaint.

Exhibit

11.

# SCHEME

1.  **M**arking of the inception of the timeline:

    In 2012 a task force comprised of 49 state attorneys general announced it successfully negotiated a settlement to benefit aggrieved homeowners. The nation's five largest banks agreed to a 2.5 billion dollar settlement on charges of "fraudulent foreclosure practices, etc" .

2.  **A** list of potential witnesses:

    See witness list.

3.  **R**ecitation of how homeowners may have been harmed, the legal authority for claims that defendants actions are illegal, false and applicable regulations:

    The State of Texas' portion of the $2.5 billion (in direct state payments) was 134 million. Texas reportedly received the third largest of all state payments. The reason provided was because of the "extent of the damage Texans homeowners suffered". Texas homeowners were given the false impression by the Texas Attorney General's Office that relief was forthcoming. It was diverted. This is a violation of the federal false claims act.

4.  **F**alsity of the defendants actions and how the Relator discovered this:

    True homeowner relief was never provided. The scheme used by Texas to divert settlement funds (124 million into the Texas General Fund and 10 million into the Texas Judicial Fund) was discovered through open records requests.

5.  **A**ctions Relator has taken to expose the illegal diversion:

    Texas Assistant Attorney General Daross explains how and when Texas' funds were diverted. Relator learned about this first hand through her own litigation and files the instant complaint.